Case No. 24-3149

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

**Matthew Byrnes**
*Plaintiff/Appellant*

vs.

**St. Catherine Hospital and Centura Health Corporation**
*Defendants/Appellees*

---

Appeal from the United States District Court for the District of Kansas
The Honorable Daniel D. Crabtree, United States District Court Judge
District Court Case No. 2:21-cv-02086

---

## APPELLANT'S OPENING BRIEF

FOULSTON SIEFKIN LLP
Boyd A. Byers, Kan. #16253
Eric Turner, Kan. #25065
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206
Telephone: (316) 267-6371
Email :   bbyers@foulston.com
             eturner@foulston.com
*Attorneys for Plaintiff/Appellant*
*Matthew Byrnes*

## ORAL ARGUMENT IS REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF RELATED CASES ................................................................ vi

JURISDICTIONAL STATEMENT .................................................................... vii

STATEMENT OF ISSUES ...................................................................................1

NATURE OF THE CASE ......................................................................................2

STATEMENT OF FACTS .....................................................................................3

    Byrnes is an accomplished and successful medical doctor who enjoyed a
    successful career and provided quality patient care. ...........................................3

    Byrnes files a sexual harassment complaint against Kessler on behalf of several
    nurses. ..................................................................................................................5

    Defendants protect Kessler and retaliate against Byrnes....................................7

    Byrnes questions the thoroughness of Defendants' investigation and states that
    Defendants are retaliating against him for filing the complaint.........................9

    Kessler files a retaliatory complaint against Byrnes with the KBHA...............10

    Defendants conduct an unfair, one-sided investigation into the KBHA
    complaint............................................................................................................12

    Defendants terminate Byrnes in retaliation for his protected complaints and then
    provide false, inconsistent, and shifting reasons for termination, one of which
    they abandoned after discovery revealed it was false........................................16

    April 2019 Meeting............................................................................................24

    Defendants' Post-termination Review of Byrnes' Cases ..................................25

    Lost Documents .................................................................................................30

SUMMARY OF THE ARGUMENT ...................................................................31

ARGUMENT AND AUTHORITIES..................................................................34

    I.  Standard of Review........................................................................................34

    II. When the record is viewed in the light most favorable to Byrnes, with all
       facts and permissible inferences in his favor, there are genuine disputes of

material facts that must be resolved by a jury, making summary judgment of his Title VII retaliation claims inappropriate. ................................................34

A. The evidence is sufficient to infer that Defendants' stated reasons for firing him are pretextual. ..........................................................................36

    1. Defendants' shifting, abandoned, stale, and false reasons for firing Byrnes are sufficient to show pretext....................................................38

    2. Defendants' unfair, one-sided investigation is sufficient to show pretext...............................................................................................44

    3. Temporal proximity provides additional evidence of pretext............48

    4. Viewed in its totality, the record supports a finding of pretext. .........50

B. The evidence is sufficient to infer a causal connection between Byrnes' protected activity and Defendants' biased medical-case review process, which resulted in four of his cases being improperly reported to the KBHA. .................................................................................................51

C. The district court did not analyze the remaining *McDonnell-Douglas* burdens as to Defendants' post-termination retaliatory conduct, but such analysis would not justify summary judgment, either. ...........................55

III. Because Byrnes' federal Title VII claims should be remanded for trial, the district court's refusal to exercise supplemental jurisdiction over Byrnes' state law claims should be vacated and remanded for reconsideration.........55

CONCLUSION AND RELIEF SOUGHT ..............................................................57

STATEMENT REGARDING ORAL ARGUMENT .............................................58

CERTIFICATE OF COMPLIANCE......................................................................59

CERTIFICATE OF SERVICE ..............................................................................60

ADDITIONAL DOCUMENTS..............................................................................61

A. Memorandum and Order.............................................................................61

B. Judgment in a Civil Case............................................................................117

# TABLE OF AUTHORITIES

## Cases

*Avila v. Jostens, Inc.*, 316 F. App'x 826 (10th Cir. 2009) ........................................48

*Baca v. Sklar*, 398 F.3d 1210 (10th Cir. 2005) .........................................................56

*Benjamin v. Bd. of Trs. Cmty. Coll.*, 810 F. App'x 691 (10th Cir. 2020) ...............50

*Bogden-Cozmuta v. Granby Urgent Care, LLC*, 2022 WL 4585442 (D. Conn. Sept. 29, 2022) .........................................................................................35

*Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114 (10th Cir. 2005) ..............................38

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015) ...............39

*Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299 (10th Cir. 2017) ...................................47

*Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021) ..............................................48

*EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476 (10th Cir. 2006) ............41, 44

*English v. Colo. Dep't of Corr.*, 248 F.3d 1002 (10th Cir. 2001) ...........................47

*Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875 (10th Cir. 2018) ....................................................................................37, 39, 40, 41

*Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178 (10th Cir. 2016) ................................40

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020) .............................................................................................................37

*Hansen v. SkyWest Airlines*, 844 F.3d 914 (10th Cir. 2016) ...................................49

*Henderson v. Stormont-Vail Healthcare, Inc.*, No. 21-2194, 2022 WL 3585627 (D. Kan. Aug. 22, 2022) ........................................................................43

*Hinsdale v. City of Liberal*, 19 F. App'x 749 (10th Cir. 2001) ...............................48

*Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193 (10th Cir. 2021) .............................................................................................34, 44, 45, 46

*Johnson v. Cherokee Cty. Bd. of Cty. Comm'rs*, No. 02:17-2644, 2020 U.S. Dist. LEXIS 48349 (D. Kan. Mar. 20, 2020) ......................................38

*Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280 (10th Cir. 2022) ............43

*Macias v. Sw. Cheese Co., LLC*, 624 F. App'x 628 (10th Cir. 2015) ....................56

*Orr v. City of Albuquerque*, 531 F.3d 1210 (10th Cir. 2008) ...........................37, 50

*Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005) ........................................34, 35, 41

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ......................................................35

*Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530 (10th Cir. 2014) ......................44

*Thomas v. Berry Plastics Corp.*, 803 F.3d 510 (10th Cir. 2015) .............................47

*Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008) ...................................42, 48

*Waggoner v. Frito-Lay, Inc.*, No. 22-3111, 2023 WL 2967693, at *2 (10th Cir. Apr. 17, 2023 .................................................................37, 38, 50

*Whittington v. Nordam Grp. Inc.*, 429 F.3d 986 (10th Cir. 2005) ..........................40

*Young v. Dillon Cos.*, 468 F.3d 1243 (10th Cir. 2006) ............................................47

*Zuniga v. Boeing Co.*, 133 F. App'x 570 (10th Cir. 2005) ...............................43, 51

## Statutes

28 U.S.C. § 1291 ..................................................................................................... vii

28 U.S.C. § 1331 ..................................................................................................... vii

42 U.S.C. § 12101 *et seq.*......................................................................................... 2

42 U.S.C. § 2000e *et seq.*......................................................................................... 2

## Rules

Federal Rule of Appellate Procedure 4 .................................................................. vii

Federal Rule of Appellate Procedure 32 ................................................................. 58

Federal Rule of Appellate Procedure 34 ................................................................. 57

Federal Rule of Appellate Procedure 56................................................................. 33

Tenth Circuit Rule 28.2........................................................................................... vi

Tenth Circuit Rule 32............................................................................................. 58

## STATEMENT OF RELATED CASES

Pursuant to Tenth Circuit Rule 28.2(C)(1), counsel for Byrnes notifies the Court that there have been no prior appeals to this or any other court in this civil action. Appellant Byrnes filed an appeal from the order and final judgment entered below, which was docketed as Appellate Case No. 24-3149. No other cases are known to counsel to be pending in this or any other court that will directly affect this Court's decision in the instant appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and over his state law claims pursuant to 28 U.S.C. § 1367(a). This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered an order granting Defendants' motion for summary judgment on the federal law claims and dismissing Byrnes' state law claims without prejudice on September 5, 2024, and entered final judgment on September 6, 2024. On October 1, 2024, Plaintiff timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF ISSUES

The issues for this Court to decide on appeal are:

1.      Did the district court err by failing to construe the record evidence in the light most favorable to Byrnes and to draw all permissible inferences in his favor in ruling that Byrnes failed to present evidence from which a jury could infer that defendants' stated reasons for terminating his employment were unworthy of belief and thus pretext for retaliation?

2.      Did the district court err by failing to construe the record evidence in the light most favorable to Byrnes and to draw all permissible inferences in his favor in ruling that Byrnes failed to present evidence from which a jury could infer a causal connection between his protected activity and the biased and improper manner in which his cases were reviewed and reported to the KBHA?

3.      Because Byrnes' Title VII retaliation claims should be reversed and remanded for trial, should this Court vacate, and direct the district court to reconsider, its order declining to exercise supplemental jurisdiction over Byrnes' state law claims and dismissing those claims without prejudice?

## NATURE OF THE CASE

This is an employment law case brought by Plaintiff Dr. Matthew Byrnes against Defendants St. Catherine Hospital and Centura Health Corporation, who jointly employed him. In 2020, Defendants fired Byrnes after he filed a legally protected complaint against another doctor and then continued to complain about the retaliation he experienced after filing the original complaint.

After exhausting his administrative remedies with the Equal Employment Opportunity Commission, Byrnes sued in the United States District Court for the District of Kansas. In addition to the retaliation claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), Byrnes also brought claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), Kansas statute, and Kansas common law.

After discovery closed, Defendants moved for summary judgment on all claims. The district court granted Defendants' motion on the Title VII and ADA claims and then declined to exercise supplemental jurisdiction over the state law claims and dismissed them without prejudice.

Byrnes appealed and now asks this Court to reverse the district court's order granting Defendants' motion for summary judgment on Byrnes' Title VII retaliation claims and to vacate and direct the district court to reconsider its order declining to

exercise supplemental jurisdiction over and thus dismissing without prejudice his state law claims.[1]

## STATEMENT OF FACTS

**Byrnes is an accomplished and successful medical doctor who enjoyed a successful career and provided quality patient care.**

Matthew Byrnes is a licensed medical doctor who is board-certified in general surgery and critical care. He graduated from the KU School of Medicine in 2001, completed a fellowship at Washington University in St. Louis in 2007, and was on faculty at the University of Minnesota from 2007 to 2012, where he completed another fellowship and obtained two master's degrees. Byrnes' medical license has never been sanctioned by any state board, and he has never had a lawsuit settlement or judgment against him based on his medical care. App. Vol. 6 at 1557, 1562-77.

In 2012, Byrnes returned to Kansas for family reasons and took a position as an intensivist and general surgeon at St. Catherine Hospital ("SCH") in Garden City. *Id.* at 1557. During times relevant to this case, SCH was managed by Centura Health Corporation ("Centura"), and SCH and Centura (collectively "Defendants") jointly employed Byrnes and other employees at SCH. App. Vol. 1 at 194.

---

[1] Byrnes has elected to focus on his Title VII and state law claims and not to pursue an appeal of his alternative ADA claims.

Byrnes was employed as a physician at SCH from 2012 until February 12, 2020. He worked as an intensivist and general surgeon and, from 2013 to June 2019, served as SCH's Chief Medical Officer ("CMO").[2] *Id.*; App. Vol. 3 at 641-676; App. Vol. 2 at 354.

Byrnes was a good doctor who met or exceeded all of SCH's expectations and standards throughout his employment. Defendants' quality reviews and metrics, which were regularly reviewed with the Medical Executive Committee ("MEC"), showed Byrnes had good scores on par with other doctors in his specialty. App. Vol. 6 at 1444, 1457, 1487-88. Defendants' provider scorecards and data show he met or exceeded SCH's targets, including a risk-adjusted mortality rate lower than both the predicted and target rates. *Id.* at 1557; 1676-79. SCH's Quality Department never received any report about Byrnes abandoning patients or having excessive complications, and the quality data did not reflect excessive complications. App. Vol. 5 at 1358-59; App. Vol. 6 at 1557, 1578-1605. *See also* App. Vol. 6 at 1606-16.

---

[2] Byrnes resigned his role as CMO for the sole reason that Defendants were concerned his total compensation might exceed regulatory limits if he continued to perform and be paid for all three roles (intensivist, general surgeon, and CMO). App. Vol. 1 at 221, 194; App. Vol. 2 at 357, 373; App. Vol. 3 at 705-06; App. Vol. 6 at 1455-56.

Byrnes was employed pursuant to a written employment contract. App. Vol. 1 at 194; App. Vol. 3 at 641-76; App. Vol. 2 at 354. On September 5, 2019, Defendants entered into a new contract with Byrnes. Defendants would not have done so if they had concerns about the quality of his medical care. App. Vol. 3 at 667-76; App. Vol. 6 at 1445.

In November 2020, SCH reappointed Byrnes to the Medical Staff and continued his clinical privileges. In so doing, the Surgery Department Chair (Dr. Gretchen Dunford), Medical Executive Committee ("MEC") (which included Dr. William Freund, Dr. Bryan Stucky, and Dunford), and SCH Board (which included Dr. Zeferino Arroyo) found he met specified criteria, including: current competence; ability to safely and competently perform clinical privileges; support of and commitment to quality care; meeting professional practice evaluations and other peer review activities, satisfactory practitioner-specific data; and absence of verified complaints by patients or medical staff. App. Vol. 6 at 1558, 1642, 1646, 1671 (MEC serving as Credentialing Committee); App. Vol. 5 at 1191, 1353-55; App. Vol. 3 at 576-77, 602-03; App. Vol. 8 at 1941.

**Byrnes files a sexual harassment complaint against Kessler on behalf of several nurses.**

On August 31, 2019, Byrnes filed a formal written complaint about Dr. Kurt Kessler, another doctor who practiced at SCH, reporting numerous incidents of sexual harassment and departures from the standard of care. With respect to sexual

harassment, the complaint alleged, among other things, that Kessler "has made sexually explicit comments to numerous nurses" which "made many of them highly uncomfortable" and "touched [a nurse] just inches from her breasts without her consent" which made her feel "extremely uncomfortable." The complaint was directed to Freund, the Medical Staff President, and to Nancy Killion, the Director of Quality. App. Vol. 1 at 194; App. Vol. 3 at 795-98; App. Vol. 4 at 998; App. Vol. 6 at 1557-58. Byrnes also submitted a complaint about these same things via SCH's Integrity Hotline, which went directly to the Compliance Department. App. Vol. 3 at 794; App. Vol. 4 at 996-97; App. Vol. 5 at 1286; App. Vol. 6 at 1557-58.

Byrnes made the complaints in good faith, based on sources he reasonably believed to be credible, including the first-hand accounts of several nurses who had been subjected to or witnessed Kessler's inappropriate comments and/or touching.[3] App. Vol. 6 at 1557-58; 1648-56; App. Vol. 4 at 1000-12, 1022-28, 1032-41. Defendants admit Byrnes did what he should have done, he followed the right processes, he made his complaints in an appropriate manner, and his complaints were legally protected. App. Vol. 5 at 1155, 1282-83, 1299-1300.

-----

[3] Shortly before Byrnes filed the complaint, a group of employed nurses came to him and reported that Kessler had sexually harassed nurses and engaged in acts of substandard clinical care. The nurses did not want to file complaints themselves because they feared retaliation. App. Vol. 3 at 795-98; App. Vol. 4 at 1013-20; App. Vol. 6 at 1468-70, 1557, 1610-12.

**Defendants protect Kessler and retaliate against Byrnes.**

Freund and Kessler were workplace friends. App. Vol. 6 at 1471; App. Vol. 5 at 1302-03. Freund showed Kessler the complaint and told him Byrnes was the one who filed it, which Defendants admit was a confidentiality breach that violated their anti-harassment policy. App. Vol. 5 at 1225, 1306-07; App. Vol. 6 at 1710-12.

After learning about Byrnes' complaint, Kessler "rant[ed]"to Killion about it. App. Vol. 6 at 1657. He also approached the HR Director, "agitated" and "upset," to discuss the sexual harassment complaint, in a manner that was "completely inappropriate." App. Vol. 5 at 1289-90.

Defendants failed to conduct a reasonable investigation of Byrnes' complaint and tried to sweep the issues with Kessler under the table by telling everyone that Byrnes had filed a false complaint. With regard to sexual harassment, the only "investigation" was that Freund and HR talked to the nurse Kessler touched inappropriately. App. Vol. 5 at 1167-68. The nurse told Freund Kessler touched her in a way that was "weird and inappropriate," which was consistent with what Byrnes reported. App. Vol. 6 at 1617. Neither Freund nor anyone else interviewed any of the other nurses or inquired about the inappropriate comments. App. Vol. 1 at 194; App. Vol. 3 at 799-803; App. Vol. 4 at 1042-47; App. Vol. 5 at 1177-79, 1221-24, 1236-37, 1287-89, 1293-94, 1296-98; App. Vol. 6 at 1616, 1648-56, 1681-82. Had

they done so, the nurses would have verified what Byrnes reported in his complaint. App. Vol. 6 at 1557, 1610-12.[4]

Even though his intentionally limited "investigation"[5] confirmed much of Byrnes' complaint, Freund told the medical staff that Byrnes had filed a false complaint. On September 17, he told the MEC about Byrnes' complaint and said he had investigated it and found the allegations to be false. App. Vol. 3 at 808; App. Vol. 5 at 1181; App. Vol. 6 at 1473-74. Freund also told Kessler he found the complaint to be "totally false." App. Vol. 5 at 1311-14.

---

[4] With respect to Byrnes' complaints about patient care issues. Freund's investigation substantiated Byrnes' complaint about Kessler's lack of hand hygiene, which Defendants admit was a "very significant health issue." App. Vol. 4, 1148-50; App. Vol. 5 at 1156-58. Freund also admits he discovered the nurses kept documentation about Kessler, which chronicled at least three patient care incidents, App. Vol. 5 at 1180, thus verifying that part of Byrnes' complaint as well. Freund did not do anything to investigate Byrnes' complaint that Kessler had a high rate of converting laparoscopic cholecystectomy (gallbladder removal) procedures to open procedures, other than ask Kessler if this was true, which he of course denied. App. Vol. 5 at 1213, 1308-11. But when Defendants finally investigated this issue later, after Byrnes was terminated, they discovered that Kessler's conversion rate was "over 2.5 times the national benchmark," thus substantiating Byrnes' concern. App. Vol. 8 at 1881; App. Vol. 6 at 1512.

[5] Freund did not follow up with Byrnes for more specifics or details because Freund "was trying to make our medical staff to where we didn't have disagreements, didn't have any issues between the medical staff." App. Vol. 5 at 1172-73. Freund did not take notes or document his "investigation," even though his usual practice is to "take notes all day" and "write stuff down because [he is] very detailed." App. Vol. 1169-71, 1173.

On September 19, Dunford sent an email to Dr. Toni Green-Cheatwood, Group VP and Physician Executive for Centura's Greater Colorado Kansas Group, expressing her concern that "[a]ll of the allegations [in Byrnes' complaint about Kessler] were found to be false." App. Vol. 3 at 809; App. Vol. 4 at 1069-71. On September 21, Freund forwarded Byrnes' complaint to Green-Cheatwood. App. Vol. 5 at 1159-61.

**Byrnes questions the thoroughness of Defendants' investigation and states that Defendants are retaliating against him for filing the complaint.**

On October 16, 2019, Green-Cheatwood, along with Freund and Stucky (then Vice President of the Medical Staff), met with Byrnes to discuss their concerns about his complaint, telling him "there was no merit found to any of the components" and it "was dismissed in its entirety." Byrnes questioned the adequacy of their investigation, said he stood by his complaints, and expressed concern they were trying to sweep issues under the rug. App. Vol. 4 at 1042-47; App. Vol. 5 at 1236-37; App. Vol. 6 at 1681-82. Shortly after the meeting, Byrnes told Green-Cheatwood in a text message that multiple nurses, who could substantiate his complaint, wanted to talk to her. But she said it would be "inappropriate" for her to interview them because their supervisor was out. Byrnes wrote back:

> I presented very cogent and clear concerns. And the response was to ask if I am having stress issues. This dissuades any 'whistleblowing' activities significantly. … [T]he way all of this has unfolded is so unfortunate as to be nearly a farce. Our physician review system is broken if this is the best we can do. … I am frustrated. Both for myself

and the nurses that have been continually sexually harassed. And for
the patients that [Kessler] sees. I truly pray for a better system. … [T]his
is the kind of case that just makes you question entire systems."

App. Vol. 5 at 1221-24; App. Vol. 6 at 1682.

On December 9, Freund told Peter Sabey, Centura's in-house counsel, that
Byrnes had made "false allegations against a member of the [SCH] medical staff."
App. Vol. 5 at 1185-88; App. Vol. 6 at 1668-70. On January 2, 2020, Freund gave
Byrnes a letter requesting he undergo a psychological evaluation because of his
complaint against Kessler. App. Vol. 2 at 513; App. Vol. 3 at 811. On January 19,
2020, Byrnes sent a response to Stucky, the new President of the Medical Staff,
stating that he stood by his prior complaints and also asserting that he was being
retaliated against for his prior "whistleblower complaint" and that "there are several
state and federal laws that protect whistleblowers." This letter was passed on to
Sabey. App. Vol. 2 at 362-63; App. Vol. 3 at 812-17; App. Vol. 5 at 1436-37; App.
Vol. 6 at 1635. The request that Byrnes undergo an evaluation was withdrawn. App.
Vol. 3 at 818-19.

**Kessler files a retaliatory complaint against Byrnes with the KBHA.**

On January 22, the Kansas Board of Healing Arts ("KBHA") notified Byrnes
that an anonymous complaint had been filed against him. The complaint alleged,
among other things, that "Dr. Byrnes has had multiple alarming adverse outcomes,
including multiple patient deaths, that have not been properly reported due to

intimidation and Dr. Byrnes pressuring hospital CEO Scott Taylor to disband the hospital peer review committee"; "he has had an unusually high number of nicked bowels during surgeries that he has failed to address consistent with the standard of care"; "he abandoned 8 I.C.U. cases, failing to sign them out and simply left town"; "[he] was witnessed out of town and purchasing alcohol while on call for the ICU"; and he "[made] false accusations against fellow physicians." App. Vol. 3 at 826-31. These and the other allegations in the complaint were false. App. Vol. 6 at 1558; App. Vol. 3 at 824, 827.

Not surprisingly, this complaint was precipitated by Kessler, who directly provided the allegations to the KBHA. App. Vol. 5 at 1315-18. "Everyone" at SCH understood that Kessler made the KBHA report against Byrnes in retaliation for Byrnes' complaints about him. App. Vol. 6 at 1477-78.

On January 27, Defendants received a document subpoena from KBHA pursuant to its investigation of Kessler's complaint against Byrnes. App. Vol. 1 at 195; App. Vol. 2 at 312; App. Vol. 3 at 820-21. Taylor forwarded it to Sabey and Killion, saying, "My understanding is this was precipitated by Dr Kessler (retaliation about Byrnes' letter)." App. Vol. 6 at 1477-78; App. Vol. 3 at 820-21.

On January 30, Byrnes called Green-Cheatwood to let her know a complaint had been filed against him with the KBHA. In this perfunctory eight-minute-long call, Byrnes simply advised her about the KBHA complaint; told her it had been

11

made in retaliation for the complaint he filed against Kessler in August; said the allegations against him were false and could easily be disproved; let her know there were many knowledgeable witnesses who could speak to and refute the allegations; and let her know that SCH's provider data would contradict the allegations that his mortality rate was higher than expected. App. Vol. 6 at 1559; App. Vol. 2 at 381-82; App. Vol. 3 at 824.

Green-Cheatwood informed Sabey about the KBHA complaint. She told him that Byrnes "said the complaint was in retaliation for a complaint he filed against Kessler in August," and that Byrnes had a lawyer and was set to disprove the allegations. App. Vol. 3 at 824.

On February 3, 2020, Byrnes' lawyer provided Sabey with a copy of the complaint, stating that "Dr. Byrnes is confident that each of these allegations is totally false and baseless and that these claims were not made in good faith." App. Vol. 2 at 312; App. Vol. 3 at 826-31.

**Defendants conduct an unfair, one-sided investigation into the KBHA complaint.**

Defendants then conducted an intentionally one-sided and unfair investigation that was contrary to their policies and usual procedures. On February 6, Green-Cheatwood and Sabey interviewed a small group of witnesses: Taylor, Killion, Stucky, Dunford, Arroyo, Dr. Julie Freeman, Dr. James Zauche, Dr. Michael Babigumira, and Kessler. App. Vol. 2 at 315-16, 318, 320-23, 386. Taylor and

Freund were not asked any substantive questions related to the allegations in the KBHA complaint. App. Vol. 5 at 1197-1201; App. Vol. 6 at 1480-83. Green-Cheatwood and Sabey took what Kessler said with a "grain of salt." App. Vol. 5 at 1396-97. This is not surprising, as it was "well-known" among the medical staff that Kessler exhibited signs of paranoia and was prone to exaggeration. Medical staff had previously expressed concerns related to Kessler's anger, criticism, and suspiciousness regarding the competence and intentions of others. App. Vol. 6 at 1464-66, 1475-76, 1720; App. Vol. 5 at 1319-21.

Defendants did not notify Byrnes about their investigation or ask him to provide his version of events. Defendants stipulated that "Sabey and Dr. Green-Cheatwood did not interview Dr. Byrnes on February 6 or any other time as part of their investigation. In addition, Sabey and Dr. Green-Cheatwood did not interview any nurses who worked with Dr. Byrnes." App. Vol. 1 at 195. Defendants also failed to ask Byrnes to identify, so they could talk to, any of the many witnesses he said were best-positioned to address the allegations, or review any of SCH's provider data, which he had told Green-Cheatwood would refute the allegations in the KBHA complaint. App. Vol. 6 at 1559.

Defendants admit that interviewing the subject of an investigation to get that person's response and perspective is the best practice and their normal procedure. App. Vol. 4 at 1090-93. *See also* App. Vol. 6 at 1488-90. But they failed to follow

their regular practice and never talked to Byrnes. App. Vol. 4 at 1048; App. Vol. 5 at 1257-58, 1268-70. Green-Cheatwood says they did not interview Byrnes because (1) he was out of town and (2) he was represented by counsel. App. Vol. 5 at 1255-57. But, as to the first reason, she made no effort to communicate with him or seek his input at any time, even though she called other witnesses in advance to discuss their availability, she had Byrnes' cell phone number, and he obviously would have made himself available at any time for something this important. App. Vol. 6 at 1559; App. Vol. 5 at 1244-45; App. Vol. 4 at 1140-41. As for the second reason, Green-Cheatwood and Sabey had no issues interviewing Kessler with his lawyer present. App. Vol. 5 at 1257.

Defendants admit Green-Cheatwood and Sabey should have interviewed the nurses who worked with Byrnes to validate any "patient abandonment" concerns, but they did not do so. Notably, Green-Cheatwood admits that she assumed the nurses who worked with Byrnes held him in high regard. App. Vol. 4 at 1088-89, 1097-98; App. Vol. 5 at 1253-54. *See also* App. Vol. 6 at 1644. Indeed, had Defendants talked to the doctors and nurses who worked closely with Byrnes and were best-positioned to answer questions about the allegations—such as surgeons who regularly operated with him in joint procedures, ICU nurses, SCH's Medical Director for Emergency Services, and the prior Chief of Staff and Chief of Surgery— these witnesses would have discredited the false allegations in the KBHA complaint,

14

just as Byrnes had told Green-Cheatwood they would. App. Vol. 1 at 250-51, 262; App. Vol. 3 at 833; App. Vol. 4 at 911, 915-22, 929-30, 932, 967-71, 979-83, 1048, 1074-80, 1088-93, 1095-98, 1128-47; App. Vol. 5 at 1189-92, 1197-1201, 1226-29, 1244-47, 1252-66, 1268-70, 1315-18, 1326-33, 1336-39, 1350, 1356-62, 1391-97; App. Vol. 6 at 1452-56, 1458-62, 1491-92, 1529-34, 1545, 1548-50, 1559-61, 1578-1605-06, 1608, 1610-12, 1614-15, 1644, 1659, 1663, 1665-67, 1671-73, 1679; App. Vol. 8 at 1855-56, 1902. Similarly, Defendants' own quality data and metrics showed Byrnes met all goals and targets and did not have excessive complications or mortalities. App. Vol. 5 at 1359-62; App. Vol. 6 at 1679. *See also* App. Vol. 4 at 929; App. Vol. 5 at 1358-59; App. Vol. 6 at 1444, 1452-54, 1457, 1487, 1557, 1559, 1578-1606, 1608, 1610, 1612, 1614, 1616, 1665-67, 1679.

None of the witnesses whom Green-Cheatwood and Sabey interviewed provided any first-hand, specific information to substantiate any of the allegations in the KHRC complaint. Green-Cheatwood and Sabey did not follow up on any of the general, speculative, and unsubstantiated comments made by a few of the witnesses and were dismissive of the information that supported Byrnes.[6] (This is addressed further in the discussion about pretext in the next section.)

---

[6] No substantiated allegations about disbanding peer review. App. Vol. 3 at 833; App. Vol. 5 at 1189-92, 1226-29, 1326-33, 1336-39, 1356-57; App. Vol. 6 at 1458-62, 1671-73.

**Defendants terminate Byrnes in retaliation for his protected complaints and then provide false, inconsistent, and shifting reasons for termination, one of which they abandoned after discovery revealed it was false.**

Defendants terminated Byrnes on February 12, 2020. App. Vol. 3 at 864-65; App. Vol. 1 at 195. This was only three-and-one-half weeks after he complained he was still being retaliated against for his complaint about Kessler, and less than two weeks after he reported that Kessler had filed a retaliatory KBHA complaint against him.

Prior to his termination, Defendants never disciplined or counseled Byrnes about the quality of his clinical care, patient abandonment or patient care coverage, or any other performance issue. His performance reviews were all very good. App. Vol. 6 at 1557; App. Vol. 4 at 1020-21, 1031, 1056-57, 1105-06. Nobody ever told him he was under investigation. App. Vol. 6 at 1557.

In their motion for summary judgment, Defendants stated they terminated Byrnes for two reasons, (1) "abandonment of patients" and (2) "clinical quality issues," "based on information provided to" Dr. Scott Lichtenberger and Thomas

---

No substantiated allegations about so-called "patient abandonment." App. Vol. 4 at 1078-80; App. Vol. 5 at 1260-65. *See also* App. Vol. 4 at 979-83, 1088-89, 1097-98, 1129-37, 1140-44; App. Vol. 5 at 1253-54, 1265-66, 1268-70, 1358-59, 1391-92; App. Vol. 6 at 1561, 1578-1606, 1608, 1612, 1614.

No substantiated allegations about clinical competency and patient care. App. Vol. 4 at 967-68, 970-71 (reporting "talk" with no factual information), 982-83, 1078-79, 1132; App. Vol. 5 at 1197-1201, 1393-96; App. Vol. 6 at 1548-49, 1605.

Gessel by Green-Cheatwood and Sabey. App. Vol. 1 at 233. The decision was made during a phone call attended by Green-Cheatwood, Sabey, Lichtenberger, and Gessel. App. Vol. 4 at 1102-03. Green-Cheatwood did not have authority to make the termination decision herself, so she had to present it to and get the approval of a Group President. App. Vol. 1 at 290. Thus, based on Green-Cheatwood's recommendation, and in reliance on the information she and Sabey provided, Lichtenberger and Gessel jointly approved the decision to fire Byrnes. App. Vol. 5 at 1267, 1370-71, 1374-75, 1381. There is no report, summary, notes, or other documentation about what was said or decided during this meeting. App. Vol. 4 at 1103; App. Vol. 5 at 1377-78, 1398.

Defendants' stated reasons for termination are inconsistent with what they previously told Byrnes, the EEOC, and the district court. At the termination meeting, attended by Green-Cheatwood and Zauche, they gave Byrnes a letter, signed by Lichtenberger, that said he was being terminated "without cause." Byrnes specifically asked what the reason was, and Green-Cheatwood said only that "it was for no cause." App. Vol. 3 at 865-65; App. Vol. 1 at 195; App. Vol. 4 at 1051; App. Vol. 5 at 1277-79. *See also* App. Vol. 6 at 1639-41, 1560-61. Not long after the meeting, Zauche told Byrnes he was "a good doctor" and that he (Zauche) did not know or understand why Byrnes had been fired. App. Vol. 4 at 1051-52; App. Vol. 6 at 1548-50. Taylor, the CEO, believed the termination was "unwarranted." App.

Vol. 6 at 1486. He was in a position to know, and he had no concerns about the quality of Byrnes' patient care—Byrnes was a good doctor and meeting and exceeding all expectations, including care quality metrics. *Id.* at 1457, 1486.

In September 2020, in response to Byrnes' complaint with the Equal Employment Opportunity Commission ("EEOC"), Defendants filed a position statement with the EEOC stating that they fired Byrnes for two reasons: "[1] his patient care and [2] his halting of the peer review processes." They emphasized "halting peer review," asserting that "[i]n his role as CMO, he inappropriately shut down the normal and required processes of professional peer review within the Hospital that would have identified the deficiencies in his medical care and should have resulted in his loss of clinical privileges at the Hospital." They exclaimed that "*this case is all about professional peer review*" and that "[i]t turns on the inappropriateness of Dr. Byrnes' patient care and his self-protecting shut down of the peer review processes." This reason was provided by Cynda Eklund, who later testified as Defendants' corporate representative, and Sabey. App. Vol. 6 at 1618-20, 1709; App. Vol. 5 at 1399-1400; App. Vol. 4 at 1083-85.

In June 2022, Defendants similarly told the court in a legal brief that they fired Byrnes "because, among other reasons, [he], in his former role as CMO, shut down peer review within the Hospital and thus prevented his own cases and others' from being appropriately reviewed." App. Vol. 1 at 27-28.

But in the first round of depositions, CEO Taylor and Quality Director Killion testified that Byrnes did not do anything to halt, shut down, or interfere with SCH's peer review processes, or even have the authority or ability to do so, and that he was at all times subject to SCH's quality and peer review processes. App. Vol. 6 at 1440, 1461-62; App. Vol. 5 at 1322, 1334-35, 1356-57, 1361-62; App. Vol. 3 at 833. So Defendants changed their story, abandoned the "shut down peer review" reason for termination, and manufactured a new reason.

Lichtenberger initially testified that Defendants fired Byrnes for three reasons: (1) based on the witness interviews it sounded like there were times the ICU nurses unsuccessfully tried to contact him, which he characterized as "patient abandonment"; (2) "poor documentation" and "potentially poor clinical judgment" in *one case* (based on an informal chart review by a Dr. Bordelon, as reported to him by Green-Cheatwood); and (3) Byrnes had stopped peer review components in his role as CMO. App. Vol. 5 at 1372-73. But, later in the deposition, Lichtenberger did an about-face and said it was really just the first two reasons, (1) "abandonment" and (2) "questions around clinical quality." App. Vol. 5 at 1379-80.[7]

---

[7] Gessel, Lichtenberger's ostensible co-decisionmaker, does not recall why Byrnes was terminated, who made the decision, or whether he was involved in any discussions about it. He surmised it must have been supported by Green-Cheatwood and Sabey. App. Vol. 5 at 1204-07.

Later, Eklund testified, as Defendants' corporate designee, that Defendants' reasons for termination were (1) patient abandonment and (2) concern about clinical competency. App. Vol. 4 at 1103-04.

Beyond Defendants' abandoned and shifting reasons for termination, and their failure to conduct a fair and evenhanded investigation, the evidence shows Defendants' stated reasons were not true and that Green-Cheatwood and Sabey withheld material facts from, and provided inaccurate, misleading, one-sided information to, Lichtenberger and Gessel to get them to sign off on Green-Cheatwood's desire to terminate Byrnes.

For example, they did not tell Lichtenberger and Gessel that:

- they did not interview Byrnes so he could respond—as Lichtenberger assumed they had done;

- they failed to interview witnesses with first-hand knowledge or review the objective quality data, which Byrnes said would disprove the false allegations, as he informed Green-Cheatwood when he notified her of Kessler's retaliatory KBHA complaint;

- some witnesses discredited the false allegations;

- they failed to follow up with other doctors and nurses on the speculative hearsay information provided by some witnesses;

- no patient care concerns had ever been reported to or validated by Defendants' Quality Department or peer review processes; or

- they were aware the KBHA complaint had been filed by Kessler and, through both Taylor and Byrnes, that Kessler had a motive to retaliate

against Byrnes for his earlier complaint about Kessler's poor standard of care and sexual harassment of nurses.

App. Vol. 1 at 195, 250-51, 262; App. Vol. 2 at 381-82; App. Vol. 3 at 576-77, 602-03, 820-24, 833; App. Vol. 4 at 911, 914-22, 929-30, 932, 936-37, 940, 967-71, 979-83, 1048, 1074-80, 1088-93, 1095-98, 1128-47; App. Vol. 5 at 1189-94, 1197-1201, 1226-29, 1235-47, 1252-66, 1268-70, 1293-95, 1297, 1315-18, 1326-33, 1336-39, 1350, 1353-62, 1376, 1391-97; App. Vol. 6 at 1444, 1452-62, 1477-80, 1487, 1491-92, 1529-34, 1545, 1548-50, 1557-61, 1578-1606, 1608, 1610-12, 1614-16, 1642, 1644, 1646, 1659, 1663, 1665-67, 1671-73, 1679, 1681-86; App. Vol. 8 at 1855-56, 1902, 1939-44.

Green-Cheatwood admits Byrnes never "abandoned" a patient in the commonly understood sense of discontinuing medical services before the need for medical services was at an end. App. Vol. 5 at 1263-64. But, with respect to Byrnes, she used the term "patient abandonment" to mean "not signing out so we knew what was going on with the patients coming on the service for whoever is taking over," and that "signing out" is mostly a verbal communication. App. Vol. 5 at 1260-63.

Defendants say a witness reported that Byrnes was seen drinking alcohol while he was on call, and this was the "one case" that supported the allegation of patient abandonment. App. Vol. 4 at 1084-87, 1096-97. But this was not true—no witness ever told Sabey or Green-Cheatwood that Byrnes was *drinking* alcohol (as opposed to purchasing growlers "to go"). App. Vol. 4 at 1133; App. Vol. 5 at 1392.

Green-Cheatwood identified Dunford as the source of the "patient abandonment" concerns. App. Vol. 5 at 1265. But Dunford denies this—she says she told them, with respect to Byrnes, that patients in the ER and ICU were always covered, there were never any patient care issues, and she was not aware of any issues with Byrnes coordinating the transition between physicians coming off and on shift. App. Vol. 4 at 1078-80. *See also* App. Vol. 5 at 1265-66.

Freeman said she reported to Green-Cheatwood and Sabey that in 2017—nearly three years earlier—she saw Byrnes purchase to-go growlers of beer from a brew pub, but not drinking, when she thought he was scheduled to be on call. But she acknowledged she did not know whether he had arranged for coverage. App. Vol. 4 at 1129-37, 1140-44; App. Vol. 5 at 1391-92; App. Vol. 6 at 1561. Green-Cheatwood and Sabey did not follow up or verify this. App. Vol. 4 at 1098. Had they done so, they would have learned that Byrnes had arranged for another provider to cover while he was out that day. App. Vol. 6 at 1561.

Numerous witnesses who were in a position to know but were never asked—including two who were actually interviewed on February 6 but not asked—could have verified that Byrnes never "abandoned" any patients in any sense and always

ensured appropriate call coverage.[8] App. Vol. 4 at 982-83; App. Vol. 5 at 1358-59;

App. Vol. 6 at 1561, 1578-1605, 1606, 1608, 1612, 1614.

As to clinical competency, Defendants could not identify any specific patient

care issues, but said it was just a "general sense" based on Green-Cheatwood's

review of five files. App. Vol. 4 at 1088-89. This was contradicted by Lichtenberger,

who said this concern was based on "***potentially*** poor clinical judgment" in ***one*** case

based on a chart review by Dr. Bordelon. App. Vol. 5 at 1372-73. Moreover, Green-

Cheatwood cannot even say whether she reviewed any patient files before the

termination decision. Ex. App. Vol. 5 at 1246-47, 1252, 1259.[9]

None of the witnesses verified any clinical competency or patient care

concerns. Babigumira and Zauche spoke highly of Byrnes' clinical competency.

App. Vol. 4 at 982-83; App. Vol. 5 at 1393, 1395-96; App. Vol. 6 at 1548-49, 1605.

Dunford reported no patient care issues as it related to Byrnes. App. Vol. 4 at 1078-

79. Freeman and Stucky had no opinion or insight. App. Vol. 4 at 1132; App. Vol.

---

[8] Babigumira, one of the witnesses interviewed, told Green-Cheatwood and Sabey he was not aware of anything negative against Byrnes, which "was not what they were looking for," so it was a "very brief" meeting, and he never had the opportunity to tell them he and his partner regularly provided coverage for Byrnes, and he was not aware of Byrnes ever being gone without lining up coverage. App. Vol. 4 at 979-83.

[9] Defendants did not follow their normal practices or procedures for investigating concerns about a case, including discussing it with the doctor. App. Vol. 4 at 1090-93; App. Vol. 6 at 1526-27, 1531-32, 1637, 1691.

5 at 1394. Freund was not asked about patient care issues. App. Vol. 5 at 1197-1201.

The only person (other than Kessler, whose input Sabey and Green-Cheatwood took

with a "grain of salt," App. Vol. 5 at 1396-97) who had anything negative to say

about Byrnes' clinical competency was Arroyo, who merely reported "talk" he had

overheard about supposed patient care issues, about which he had no personal

knowledge or information. App. Vol. 4 at 967-68, 970-71.

Joanne Rink, SCH's Chief of Surgery from 2007-2010 and Chief of the

Medical Staff from 2010-2016, who continued as an employed surgeon at SCH

through September 2018 (which covered the timeframe of many of the stale and

fabricated issues Kessler had reported to the KBHA), testified that nobody who

conducted a reasonable inquiry by talking with Byrnes and the providers and nurses

who worked closely with him and reviewing the quality data could have reasonably

believed his clinical care was unacceptable or he had ever abandoned patients in the

ICU or failed to arrange coverage for patients when he was absent. App. Vol. 6 at

1614.

**April 2019 Meeting**

Defendants rely heavily on an April 2019 meeting between Taylor and doctors

Kessler, Arroyo, Freeman,[10] Freund, and Dunford to try to rebut the mountain of

---

[10] Julie Freeman was known as Julie King at the time of her deposition. App.
Vol. 7 at 1736 n.5.

pretext evidence supporting a retaliatory inference. But during that meeting, the doctors shared concerns that were primarily based on "their personal interactions with Dr. Byrnes and …  his interactions with the community." While there were some references in the meeting "to patient care, none … were substantiated by any evidence …." App. Vol. 6 at 1491-92. None of these individuals ever reported any concerns about Byrnes' clinical care to the Quality Department or sought to initiate any peer review action on Byrnes (which was the responsibility of the MEC, of which two of them—Freund and Dunford—were members at the time). App. Vol. 4 at 968-69, 1145-47; App. Vol. 5 at 1350, 1358-59. Taylor believed these concerns, which, again, were predominantly personal, were resolved by the already-existing plan for Byrnes to discontinue the CMO role to avoid any potential regulatory concerns regarding his compensation, and Freund agreed with this resolution. App. Vol. 6 at 1455-56, 1492. Apparently the other doctors did, too, because in October and November 2019, Dunford, Freund, and Arroyo determined that Byrnes' clinical care and quality met standards and approved him for reappointment. App. Vol. 3 at 576-77, 602-03; App. Vol. 5 at 1191, 1353-55; App. Vol. 6 at 1558, 1642, 1646, 1671 (MEC serving as Credentialing Committee); App. Vol. 8 at 1939-44.

**Defendants' Post-termination Review of Byrnes' Cases**

Per SCH policy, the MEC, not administrative staff or a separate peer review committee, was responsible for ensuring appropriate peer review at SCH. App. Vol.

5 at 1331-32. Indeed, "the MEC act[ing] as your peer review body is the Centura standard and… is the national best practice." App. Vol. 6 at 1503-05.

But, shortly after Byrnes was fired, Green-Cheatwood proposed and implemented an alternative short-term plan for quality and peer review at SCH. App. Vol. 2 at 439-41; App. Vol. 4 at 887-90. This process targeted Byrnes and treated him differently than other SCH doctors.

Under Green-Cheatwood's peer review plan (which she proposed on January 29, 2020), all charts from the past two years that met certain triggers (such as complications, returns to surgery, and mortality) would be preliminarily flagged for further evaluation by outsider reviewers. App. Vol. 2 at 442, 462, 469, 471; App. Vol. 4 at 891-92. In addition, after Byrnes reported Kessler's retaliatory complaint and because of Kessler's retaliatory allegations about Byrnes, Green-Cheatwood later decided ***all*** of Byrnes' cases from the past five years would be reviewed by outside reviewers. App. Vol. 2 at 379, 381; App. Vol. 4 at 887-892.

Cases flagged for review were presented to Green-Cheatwood and Stucky. App. Vol. 2 at 442, 462, 470, 473. The two of them then reviewed the cases, knowing the doctors at issue (not "blind"), and decided which ones to submit to the outside peer review committee at a Centura hospital in Denver. Both Green-Cheatwood and Stucky knew about Byrnes' original complaint against Kessler, as well as Kessler's ongoing retaliation against Byrnes for making that complaint. App. Vol. 4 at 986-

93; App. Vol. 5 at 1407-08; App. Vol. 6 at 1680; App. Vol. 4 at 986-93; App. Vol. 8 at 1951 (physicians were identified); App. Vol. 3 at 824. Stucky even admits he still had concerns about Byrnes because of Byrnes' complaint about Kessler. App. Vol. 5 at 1438-39.

Defendants' policies and procedures require, without exception, that physicians be given an opportunity to respond to cases under review. App. Vol. 6 at 1526-27, 1531-32, 1637 (SCH policy), 1691 (Centura policy). Defendants admit that chart review alone is insufficient for appropriate peer review, and physician feedback is important to effective peer review. App. Vol. 4 at 972, 1081; App. Vol. 5 at 1409-12, 1415-19; App. Vol. 6 at 1691, 1707-08. However, contrary to these policies, and unlike the way he treated other doctors, Stucky did not give Byrnes any notice or afford him the opportunity to respond or provide information on any of his cases. App. Vol. 5 at 1246-51, 1273-76, 1420-21; App. Vol. 6 at 1560, 1713-17. But Stucky gave other doctors notice and the opportunity to respond to peer review concerns.[11]

---

[11] The importance of doctor feedback is demonstrated by Stucky's request to another surgeon, Lionel Gottschalk, to provide feedback on cases that were flagged by the peer review process. Three of Gottschalk's cases were initially scored by the outside reviewers as "significant improvement opportunities," triggering mandatory reporting. App. Vol. 8 at 1956-58. After Stucky solicited and received a substantive response on these cases from Gottschalk, the ratings were lowered to "moderate improvement opportunities," and two of those cases were never reported to KBHA.

In addition, doctors were supposed to be de-identified during peer review. App. Vol. 8 at 1947-48. But, on May 18, 2020, Green-Cheatwood tainted the process and identified Byrnes when she asked Rebecca Vogel, chair of the outside review committee, to conduct a "personal" review outside of the prescribed process of several Byrnes cases, thereby calling special attention and scrutiny to Byrnes and his cases, whereas other doctors remained anonymous. App. Vol. 6 at 1525, 1528, 1542-44.

As further evidence of this targeted and biased pre-review process, one case Green-Cheatwood and Stucky selected for peer review was a 2015 thyroidectomy in which Byrnes and another doctor were co-surgeons. But Green-Cheatwood and Stucky only asked the committee to review Byrnes, and not the co-surgeon who performed the procedure with him. App. Vol. 6 at 1529-34, 1614-15; App. Vol. 8 at 1949-50, 1954-55.

Once the cases were reviewed by the outside reviewers, they came back to SCH, which then determined which cases to report to the KBHA. App. Vol. 5 at 1409-10. As a result of this tainted process, Defendants ultimately submitted Reports of Adverse Findings to the KBHA on four of Byrnes' cases. App. Vol. 4 at 1109-14.

---

App. Vol. 4 at 1109-12; App. Vol. 6 at 1729; App. Vol. 8 at 1962-65. *See also* App. Vol. 6 at 1538-41, 1718.

Defendants say that, under their process, the only cases they submitted to KBHA were those rated as Standard of Care ("SOC") 3 or 4. App. Vol. 1 at 250-51, 262. However, they also submitted a Report of Adverse Findings to the KBHA on one of Byrnes' cases (the five year-old thyroidectomy), even though the peer review committee found only "minor opportunities for improvement," which was an SOC 2 on the Kansas scale and did not need to be reported. App. Vol. 6 at 1529-34; App. Vol. 8 at 1902, 1953-55.

On October 8, 2020, KBHA notified Byrnes that Defendants had reported that case and identified him as the sole "Licensee Involved" (backdating the Report to 3/9/2015, the date of the procedure). App. Vol. 4 at 1113; App. Vol. 6 at 1560; App. Vol. 8 at 1949-50. Even though KBHA requires facilities to submit a separate Report for each licensee involved in a reported incident, Defendants did not report the co-surgeon involved in that case. App. Vol. 6 at 1615; App. Vol. 8 at 1950.

On May 3, 2021, KBHA notified Byrnes that Defendants had submitted Reports of Adverse Findings on three more of his cases (which they backdated to 12/19/2017, 2/3/2018, and 3/3/2018, the dates of the procedures). App. Vol. 4 at 1113-14; App. Vol. 6 at 1560; App. Vol. 8 at 1949-50.

KBHA gave Byrnes the opportunity to review the Reports and records submitted and respond to the allegations. During that process, Byrnes discovered that Defendants had submitted incomplete medical records on all four cases. App.

29

Vol. 6 at 1560. On May 25, 2022, following Byrnes' input, KBHA sent notice that it had completed its investigation of the first Report and determined there was no basis to take any action and closed the case. App. Vol. 6 at 1663. On August 3, 2022, KBHA sent notice that it had completed its investigations on the other cases and found that Byrnes' treatment adhered to the applicable standard of care. App. Vol. 4 at 1055; App. Vol. 6 at 1660-62.

**Lost Documents**

Defendants lost or destroyed numerous documents related to this case, including: the nurses' file of incident reports about Kessler (App. Vol. 4 at 933; App. Vol. 5 at 1179-80, 1195-96, 1299, 1348, 1431; App. Vol. 6 at 1622); Killion's notes about Byrnes' complaint (App. Vol. 5 at 1342-44); Green-Cheatwood's notebooks (App. Vol. 5 at 1230-31); Morgan Thomas' notes and supporting documents related to the post-termination quality review (App. Vol. 5 at 1232-34, App. Vol. 6 at 1497-98, 1506-08); and the outside reviewers notes from the peer review component of the quality review (App. Vol. 6 at 1534-37).

## SUMMARY OF THE ARGUMENT

The standards for granting summary judgment are well-known. The moving party bears the burden of showing there is no genuine dispute of any material facts and that it is entitled to judgment as a matter of law. And, when determining whether material facts are disputed, the Court must construe the evidence in the light most favorable to the non-moving party and draw all permissible inferences from that evidence in its favor.

In this case, the district court erred by misapplying those standards and, thus, granting Defendants' motion for summary judgment on Byrnes' Title VII claims, even though the record is replete with genuine disputes of material facts. In doing so, the district court overlooked key evidence, construed certain disputed facts in **Defendants'** favor, and misapplied this Court's well-established case law for showing pretext and causation.

First, the district court erred by ruling that Byrnes failed to present evidence sufficient for a jury to infer that Defendants' reasons for terminating his employment were pretextual, or unworthy of belief. Byrnes presented evidence showing, among other things, that:

(1) (a) Defendants shifted their stated reasons for firing him several times, including abandoning the primary reason they gave to the EEOC after that reason was exposed as false in discovery; (b) Defendants' witnesses gave inconsistent

31

factual reasons underlying the termination decision; (c) Defendants' investigators, who wanted to fire Byrnes, provided false and incomplete information to senior leaders to get them to approve termination; and (d) numerous disputed facts about what Defendants say witnesses said versus what the witnesses say they said.

(2) Defendants conducted an unfair, one-sided investigation, including: (a) intentionally failing to interview him and get his side of the story, (b) refusing to interview many witnesses and other evidence they were told would refute the retaliatory false complaint filed against Byrnes with the KBHA, and (c) failing to interview nurses and other obvious key witnesses.

This Court has decided cases with facts like these many times, and that robust body of case law is clear that any of the evidence described above, by itself, is enough to infer pretext. And, when this evidence is viewed in its totality, as this Court says it must be, the sufficiency of Byrnes' evidence is even more evident. In addition, temporal proximity and other evidence of pretext adds to the overall picture. In sum, the evidence, viewed most favorably to Byrnes, is sufficient to infer that Defendants' stated reasons for firing him were pretextual.

Second, the district court erred by ruling that Byrnes failed to present evidence sufficient for a jury to infer a causal connection between his protected complaints and the retaliatory process by which Defendants treated him and his cases differently, including tipping off the head of the committee and denying the

committee the information need to conduct a sufficient peer review, resulting in four of his cases being improperly submitted to the KBHA—reports the KBHA quickly found had no merit.

When the record is viewed with all fact disputes and inferences in Byrnes' favor, as it must be, there are genuine disputes about many facts material to Byrnes' Title VII retaliation claims, which must be resolved by a jury. Because those claims should be reversed and remanded for trial, this Court also should vacate, and direct the district court to reconsider, its order declining to exercise supplemental jurisdiction over Byrnes' state law claims, which the court dismissed without prejudice. Accordingly, this Court should reverse the district court, set aside its order and judgment, and remand with instruction to let Byrnes proceed with his Title VII claims, to reconsider the exercise of supplemental jurisdiction over his related state law claims, and to let a jury decide this case.

## ARGUMENT AND AUTHORITIES

### I.  Standard of Review

This Court conducts *de novo* review and will not uphold summary judgment when there are genuine disputes of material fact. *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1199-1200 (10th Cir. 2021).

### II.  When the record is viewed in the light most favorable to Byrnes, with all facts and permissible inferences in his favor, there are genuine disputes of material facts that must be resolved by a jury, making summary judgment of his Title VII retaliation claims inappropriate.

Byrnes alleges Defendants fired him, and then targeted him and treated him differently than other doctors in a quality review process, in retaliation for his protected complaints, in violation of Title VII. In their motion for summary judgment, Defendants failed to meet their burden to show no genuine dispute as to any material fact and that they were entitled to judgment as a matter of law on these claims. *See* Fed. R. Civ. P. 56(a). Indeed, when the evidence is viewed in the light most favorable to Byrnes, with "all inferences arising from the record" in his favor— as it must be on summary judgment—there are genuine disputes about facts material to Defendants' motion, making summary judgment inappropriate. *See Plotke v. White*, 405 F.3d 1092, 1093-94 (10th Cir. 2005) (quotation omitted). To the extent Defendants assert a different version of events than Byrnes, their narrative is irrelevant because all "[c]redibility determinations and the weighing of evidence are jury functions, not those of a judge." *Id.* at 1094 (quotation and alterations omitted).

Viewed under this standard, Byrnes has presented evidence sufficient to satisfy his burdens under the familiar three-step *McDonnell-Douglas* burden-shifting approach: (1) the "light" burden to show a *prima facie* case ((a) he engaged in protected activities, (b) Defendants took adverse actions against him, and (c) a causal connection between the protected activities and adverse actions); and (2) the burden to show there is a genuine dispute of material fact whether Defendants' proffered reasons for their challenged actions are pretextual, or unworthy of belief. *See Plotke*, 405 F.3d at 1101.

With respect to the first two elements of his *prima facie* case, there is no dispute—nor could there reasonably be—that Byrnes engaged in protected activities and Defendants actions against him were adverse.[12] App. Vol. 7 at 1799-1800, 1823. But Defendants disputed the third element (causation), arguing that neither the executives who signed off on Green-Cheatwood's proposal to fire him (based on and limited to the information she and Sabey provided), nor the peer review committee that reviewed his cases (based on the information provided to them pursuant to a gatekeeping process Green-Cheatwood created and she and Stucky controlled), knew about his protected activities.

---

[12] Title VII protects former employees from post-termination retaliation. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Reporting an employee or former employee to a state licensing board in an adverse action. *Bogden-Cozmuta v. Granby Urgent Care, LLC*, 2022 WL 4585442, at *7 (D. Conn. Sept. 29, 2022).

With respect to his termination, the district court properly found the evidence established a causal connection based on the "cat's paw" theory, *i.e.*, that (1) a subordinate (Green-Cheatwood, along with the in-house lawyer supporting her) took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action; and (3) the subordinate's actions proximately caused the intended adverse action. *Id*. at 1800-05. However, with regard to Defendants' retaliatory actions toward him in the quality review process, the district court erroneously held that Byrnes' evidence did not show a causal connection, finding that neither Green-Cheatwood nor Stucky were the decisionmakers and that their influence over the outside reviewers was insufficient to support a cat's paw theory. *Id*. at 1787, 1824-27.

Even though the district court found Byrnes' evidence of pretext sufficient to show causation with respect to his prima facie case, *id*. at 1803, it incorrectly held that he had not presented sufficient evidence to infer that Defendants' stated reasons for firing him were unworthy of belief. *Id*. at 1787. As described below, the court erred by ruling that Byrnes did not proffer adequate evidence to have his Title VII claims decided by a jury.

### A.    The evidence is sufficient to infer that Defendants' stated reasons for firing him are pretextual.

The district court erred in granting summary judgment on Byrnes' Title VII retaliatory discharge claim because it misstated Defendants' stated reason for firing

him, overlooked supporting evidence, and did not view all disputed facts and permissible inferences in his favor. To paraphrase this Court's holding in *Fassbender*, once this Court draws all reasonable inferences in Byrnes' favor, a coherent narrative emerges in which Defendants used a sham investigation as an excuse to fire him. It makes no difference whether Defendants could offer a plausible counter-narrative, because it is not the Court's role at summary judgment to choose between competing explanations. Such is the jury's province. And this case could benefit greatly from a jury's discerning attention. *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018).

Pretext is shown by evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action," which permits a jury to find the employer's reasons "unworthy of credence" and to infer the employer acted for an unlawful reason. *Waggoner v. Frito-Lay, Inc*., No. 22-3111, 2023 WL 2967693 (10th Cir. Apr. 17, 2023) (quoting *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020). Such evidence "may take a variety of forms," *id.* (quoting *Frappied*, 966 F.3d at 1059), and courts "do not 'look at each piece of evidence in isolation; rather, … [they are] obliged to consider [plaintiffs'] evidence in its totality.'" *Id.* at *3 (quoting *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008)). At summary judgment, "the inference of discrimination permitted by

evidence of pretext must be resolved in favor of the plaintiff." *Id.* (reversing district court for improperly accepting defendants' interpretation of the evidence) (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)).

Byrnes' evidence supports a finding of pretext and requires reversal.

### 1. Defendants' shifting, abandoned, stale, and false reasons for firing Byrnes are sufficient to show pretext.

The district court's pretext analysis is based on the erroneous premise that Defendants rely on "four reasons" for firing Byrnes: "abandoning patients in the ICU; poorly documenting patients' status; potentially exercising poor clinical judgment; and stopping some of the peer review components in his role as CMO." App. Vol. 7 at 1809 (citing Lichtenberger's deposition). Thus, according to the court, "defendants never abandoned or affirmatively disclaimed any of their reasons." *Id*. at 1810. But this ignores numerous facts and misstates the termination reasons Defendants articulated to meet their burden under the *McDonnell-Douglas* analysis.

At the termination meeting, Byrnes directly asked what the reason was, and Green-Cheatwood said Defendants had "no cause" to fire him. *See Johnson v. Cherokee Cty. Bd. of Cty. Comm'rs*, No. 02:17-2644, 2020 U.S. Dist. LEXIS 48349, at *26-27 (D. Kan. Mar. 20, 2020) (employer "did not give [employee] a reason for his termination" but later claimed it terminated him for poor performance, which supported finding of pretext).

Months later, in response to Byrnes' EEOC complaint alleging Title VII retaliation, Defendants asserted two reasons for firing him: patient care and halting of peer review, emphasizing that "this case is all about professional peer review." [13]

But then something happened in discovery to upset Defendants' applecart. Two of Defendants' managers, who were well-positioned to know and who Green-Cheatwood and Sabey had talked to as part of their investigation, testified that Byrnes was not, and could not possibly have been, responsible for any perceived peer review problems. Because this testimony contradicted the primary reason Defendants previously gave the EEOC, Defendants abandoned it.

When Lichtenberger was deposed, he initially identified the same three reasons the district court cited (although the court had counted four reasons, treating poor documentation and potentially poor clinical judgment, which both referred to one case, as separate reasons). But, later in his deposition, he backpedaled to correct

---

[13] The district court discounted Defendants' EEOC position statement because it was "framed" by outside counsel. App. Vol. at 1810. But courts regularly compare the termination reasons formally reported to the EEOC with statements later given during litigation. *See Fassbender*, 890 F.3d at 887-88 (comparing reasons given to the EEOC); *Burton v. Freescale Semiconductor*, *Inc.*, 798 F.3d 222, 237-39 (5th Cir. 2015) ("employer's rationale [was] 'suspect' where it had not remained the same between the time of the EEOC's investigation and the ultimate litigation" (quotation omitted)). And, in any event, the evidence shows the information provided in the EEOC statement came from Eklund, who later abandoned peer review as a reason for Byrnes' termination when she testified on that topic as Defendants' corporate representative.

his prior testimony, explaining there were really just two reasons for termination: patient abandonment and patient care, with the new reason, patient abandonment, being the "dominant" one. When it was Eklund's turn to testify as Defendants' corporate representative, she stuck with the new script and gave those same two— and only two—reasons. This eliminated any doubt that Defendants abandoned the primary reason they originally gave the EEOC, but knew they could no longer stand behind in light of earlier depositions, and manufactured a new reason, patient abandonment, as a substitute.

As this Court has routinely held, abandoning previously stated reasons for termination and/or manufacturing new ones, as Defendants did here, establishes pretext. *See Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005) (defendant "disclaimed … or abandoned in the face of contrary testimony from its own management" all but one of its original reasons, and "jury was not bound to believe" its remaining reason); *Fassbender*, 890 F.3d at 887-88 (plaintiff was fired for "severity" of her violation, which employer did not identify; then employer told her and the EEOC it was because she had not reported sooner a note she received from an inmate; but at summary judgment, employer argued taking the note home (not failing to report it) was its sole reason); *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016) ("inconsistency" in manager's deposition testimony about the reason for plaintiff's termination supported a finding of pretext).

This is particularly true where, as here, a juror could find that Defendants "abandoned [their] original explanations in favor of one that's harder to assail because [they] knew that [their original] explanations were [not] true." *Fassbender*, 890 F.3d at 888 (shifting from original reason because the cited conduct might not have actually violated company policy); *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 491 (10th Cir. 2006) (shifting from original reason after it was debunked); *Plotke*, 405 F.3d at 1103 (reversing district court for accepting new reasons the employer proffered, claiming the initially cited reason "was only one of several incidents" the decisionmakers considered; a juror could conclude the newly proffered reasons had not been stated earlier because the decisionmakers had not really relied on them).

Besides the shifting and abandoned reasons for termination, there are also troubling inconsistencies with regard to the alleged facts Defendants say were the bases for their stated reasons, and none of the reasons they gave were actually supported by the investigation. With regard to "patient abandonment" (which everyone conceded was not really patient abandonment in the customary medical definition), Green-Cheatwood said this meant "not signing out" when going off shift. Inconsistently, Lichtenberger said this reason was based on the investigators' report that it sounded like there had been times nurses could not reach Byrnes. Further changing course, Defendants, through their corporate representative, said patient

abandonment referred to "one case" where Byrnes was seen drinking alcohol off premises when he was on call. But none of the witnesses ever said he was drinking alcohol. And only one shared a concern about him not being available (more than two years earlier), but she admitted she did not know whether he had arranged for coverage.[14]

As for clinical care, Defendants argued at summary judgment that their concerns were based on the witness interviews. App. Vol. 1 at 249. Inconsistently, Lichtenberger said he understood this concern to be based on "potentially" poor clinical judgment in *one* case, based on an informal chart review by Dr. Bordelon (who was not interviewed), as reported by Green-Cheatwood (even though Defendants understood that a medical-chart-only review is not a reliable way to assess patient care). *See Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159 (10th Cir. 2008) (employer fired employees for time theft after comparing gate-entry and time-entry records, even though it knew this was not a reliable methodology). And Defendants, through their designated representative, could not identify a single specific patient-care issue, but said it was just a subjective "general sense" based on Green-Cheatwood's informal review of five files. *See Zuniga v. Boeing Co.*, 133 F. App'x 570, 574 (10th Cir. 2005) ("We have stressed that subjective judgments are viewed

_____

[14] All of this nonsense could easily have been put to bed if anyone had asked Byrnes of the nurses about, but Defendants' deliberately failed to do so.

42

with skepticism in the pretext inquiry" because "obviously subjective decision making provides an opportunity for unlawful discrimination." (quotation and citations omitted)). But Green-Cheatwood could not say she had even reviewed any patient files before termination.

These persistent inconsistencies between what Green-Cheatwood and Sabey say was "corroborated" by the witnesses, versus what the witnesses testified they actually said, is sufficient to infer that Green-Cheatwood and Sabey did not have a good faith basis for what they reported to Lichtenberger and Gessel to convince them to sign off on Byrnes' termination. *Henderson v. Stormont-Vail Healthcare, Inc.*, No. 21-2194, 2022 WL 3585627, *4 (D. Kan. Aug. 22, 2022) (investigators cannot "honestly believe" findings based on supposed statements that witnesses deny making).

Thus, this case is nothing like *Litzsinger* (on the district court relied), where this Court found that an employer consistently offered the same, non-pretextual reason for terminating an employee (personal use of computer while on probation for that same conduct) and held that "merely elaborat[ing] on the initial justification" did not show pretext. *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1292 (10th Cir. 2022). By contrast here, Defendants did not merely elaborate on their earlier reasons by, for example, giving more specific examples of how Byrnes halted peer review; they instead abandoned that primary reason, and replaced it with a new

43

dominant reason. Moreover, Defendants' witnesses materially disagreed about the underlying facts that purportedly support their broad general reasons for termination, and, based on the record, none of their reasons were actually corroborated by any of the supposed sources.

### 2. Defendants' unfair, one-sided investigation is sufficient to show pretext.

Evidence that an employer's investigation was unfair shows pretext. *Ibrahim*, 994 F.3d at 1199-1200; *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542-43 (10th Cir. 2014); *BCI*, 450 F.3d at 476. Such unfairness can manifest in multiple ways. One obvious example of unfairness is when decisionmakers do not interview the plaintiff to get his side of the story and, instead, take action based on a "one-sided" version of events. *Smothers*, 740 F.3d at 543; *BCI*, 450 F.3d at 491-93 (manager had an issue with employee and reported it to the decisionmaker, who "conducted no independent inquiry into the events that took place …, … failed to take even the basic step … of asking [plaintiff] for his side of the story," and terminated the employee based on the manager's account).[15]

---

[15] The district court misread *Smothers* to mean that an unfair investigation is not pretextual unless the employer "deliberately prevented" the plaintiff from addressing the allegations against him. App. Vol. 7 at 1814. But *Smothers* was concerned with the one-sidedness of the employer's investigation, 740 F.3d at 542-43 & n.13 ("The decision makers ultimately relied on one-sided information" and "reached their conclusions about what transpired based on one-sided information," and the district court "improperly … ignored fatal problems with [employer's]

An unfair, one-sided investigation is exactly what occurred here. The investigators, Green-Cheatwood and Sabey, never even interviewed Byrnes—the person most likely to have insight into the allegations against him—or afforded him the opportunity tell his side of the story. In fact, Byrnes never even knew Defendants were investigating him.

The district court found that "a single phone call" was "the most important event for the court to evaluate prextext here." App. Vol. 7 at 1815-16. However, the referenced call was a perfunctory eight-minute phone call initiated by Byrnes to give Green-Cheatwood a heads up that a report had been filed against him with the KBHA, which he reported Kessler had filed in retaliation for Byrnes' prior protected complaint against him.

Defendants turn Byrnes' brief notice of the KBHA action and his complaint of ongoing retaliation on its head, claiming it constitutes a sufficient interview to provide his version of events. However, Defendants' revisionist reliance on this phone call contradicts their **stipulation** that they "did not interview Dr. Byrnes on February 6 or any other time." App. Vol. 1 at 195. Defendants thus are barred from

---

inadequate, one-sided investigation."); it never suggests a deliberate refusal to hear the plaintiff's side of the story is required to show pretext. Further, this Court has since held that even where the decisionmaker actually spoke with the plaintiff, a "factfinder can reasonably infer pretext from an employer's failure to inquire into the reasons for an employee's behavior." *Ibrahim*, 994 F.3d at 1200.

arguing otherwise now, and, in any event, their stipulation, which must be viewed in Byrnes' favor, is a sufficient basis to infer Byrnes was never afforded the opportunity to tell his side of the story. Moreover, at the time of the call, Byrnes did not attempt to provide Green-Cheatwood with any substantive explanation or particulars in response to the allegations (or have any reason to think he needed to at that time), and Green-Cheatwood did not ask him any questions. Green-Cheatwood even admitted she never interviewed Byrnes—not because she believed he had already given her his version of events, but because he was out of town and had a lawyer—hardly barriers to an interview. Later, when Defendants did investigate, they never told Byrnes they were investigating him and never interviewed him or asked him about of the allegations or gave him an opportunity to respond, explain, provide more information, or give his side of the story. *See Ibrahim*, 994 F.3d at 1200.

Even if receiving a complaint of retaliation could satisfy a decisionmaker's obligation to hear an employee's version of events before making a decision, that did not happen here.[16] Defendants cannot take credit for the January 30 phone call when they intentionally failed to act or follow up on the limited information Byrnes provided during the heads up call, such as by interviewing the witnesses he said

---

[16] Nor could Byrnes' call to report Kessler's retaliatory KBHA complaint cure all the other investigative defects supported by the record.

could refute the allegations in the KBHA report (or even asking Byrnes who these witnesses were) or reviewing the quality data he identified. And, significantly, they never shared anything about that short call with the decisionmakers. Thus, from the decisionmakers' perspective, it was as if this phone call never happened.

By contrast, this Court has accepted an employer's investigation when the decisionmakers knew (or tried to obtain) the employee's side of the story. *Young v. Dillon Cos.*, 468 F.3d 1243, 1253 (10th Cir. 2006) (investigator interviewed plaintiff "and transmitted [plaintiff's] version of events to his superiors" who "independently reviewed" the underlying records); *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314-15 (10th Cir. 2017) (decisionmaker held a formal "Day in Court" hearing and "asked [plaintiff] for her version of events"); *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (decisionmaker balanced investigative findings with invitations for employee and his attorney to rebut or mitigate them); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 515 (10th Cir. 2015) (no pretext where investigator omitted no relevant information from its report). Unlike those cases, Green-Cheatwood and Sabey did not afford Byrnes any opportunity to tell his story, did not tell Lichtenberger and Gessel about the call with Byrnes, and did not disclose any other evidence they solicited that did not align with their "fire Byrnes" narrative.

Even aside from the failure to talk to Byrnes so he could respond and provide insight into the specific allegations against him, Defendants' failures to interview

witnesses Byrnes said could disprove the allegations made in the KBHA report, to review the objective quality data they were told existed, and to do any follow up or talk to any witnesses with first-hand knowledge of the bogus allegations,[17] by themselves are grounds to infer an unfair, pretextual investigation. *See Avila v. Jostens, Inc.*, 316 F. App'x 826, 834 (10th Cir. 2009) (employer never questioned the witness plaintiff identified to corroborate his version of events); *Trujillo*, 524 F.3d at 1160 (company investigation "seemingly relied only on evidence to the detriment of [plaintiffs] and failed to interview key witnesses"). *See also Doe v. Univ. of Denver*, 1 F.4th 822, 832-34 (10th Cir. 2021) (investigator interviewed accuser's (but not accused's) witnesses, refused to collect exculpatory evidence, and failed to disclose inconsistencies in accuser's evidence in its report).

### 3. Temporal proximity provides additional evidence of pretext.

Close temporal proximity, when combined with other pretext evidence, strengthens the inference that an employer's stated reasons are a pretext to hide a retaliatory motive. *See Hinsdale v. City of Liberal*, 19 F. App'x 749, 757 (10th Cir. 2001). Temporal proximity measures the time from (1) the date of protected activity "most favorable" to the plaintiff to (2) the date of the adverse action. *Id.* at 757 n.7;

---

[17] For example, Defendants never interviewed any nurses, even though Lichtenberger said the investigators told him Byrnes engaged in "patient abandonment" because there were times the nurses could not reach him.

*Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (reversing judgment for employer where court overlooked proximity between termination and "several, more recent instances" of protected activity).

Here, Byrnes continued to engage in protected activity on January 19 and 30, 2020, reporting ongoing retaliation for his original protected complaint, and Defendants terminated him on February 10, less than a month later. This easily satisfies the close-temporal-proximity standard.

But the district court erroneously viewed the record in Defendants' favor, concluding the timing in this case was a "problem" for Byrnes because the concerns that supposedly triggered his termination in February 2020 predated his protected activity because they had been raised by five doctors in April 2019. But the record shows the issues they raised—concerns about "patient care, none of which were substantiated by any evidence," but mostly about "their personal interactions with Dr. Byrnes and … his interactions with the community," App. Vol. 6 at 1491-92—were not the same predominant (but shifting) reasons Defendants gave for firing Byrnes—peer review and patient abandonment.

If anything, viewing the record in Byrnes' favor, this timing supports (not negates) a pretext finding because a juror could find that the doctors' April 2019 concerns already had been resolved—by June, Freund agreed the April concerns were sufficiently addressed; by September, Defendants signed a new contract with

Byrnes; and by November, the three doctors involved in recredentialing all agreed to reappoint Byrnes (meaning they were satisfied with his patient care)—but were resurrected in February 2020, after Byrnes persisted in his protected activities, by Green-Cheatwood and Sabey to convince the decisionmakers to terminate him. *Benjamin v. Bd. of Trs. Cmty. Coll.*, 810 F. App'x 691, 696 (10th Cir. 2020); ("[A] jury certainly can consider that an employer was aware of an issue, did nothing about that issue, then later terminated that employee for that earlier issue *after* the employee reported misconduct.").

### 4.  Viewed in its totality, the record supports a finding of pretext.

Ultimately, courts do not look at pretext evidence in isolation, but in its totality. *Waggoner*, 2023 WL 2967693, at *3 (quoting *Orr*, 531 F.3d at 1215). While Defendants' contradicting reasons for firing Byrnes and their one-sided investigation are both, alone, sufficient to support a finding of pretext and defeat summary judgment, that evidence is even stronger when considered together, and stronger yet considering the close temporal proximity.

In addition, other evidence adds to the overall picture of pretext. For example, a reasonable juror could find that any or all of the following evidence further supports a finding of pretext and corresponding inference of retaliation:

- Defendants admit their investigation was "solely because of" the KBHA complaint, which the investigators had been told was submitted by Kessler

in retaliation for Bynes' prior protected complaint against him. App. Vol. 1 at 249. Defendants also admit they did not find Kessler credible, taking what he said with a "grain of salt." Yet, despite this, they failed to talk to either Byrnes or the many witnesses he told Green-Cheatwood could properly address the allegations.

- The stated reasons for termination were inconsistent with Byrnes' performance evaluations, Defendants' own objective patient care data, and Defendants' recent contract renewal and recredentialing. *See Zuniga*, 133 F. App'x at 574 ("This court has recognized on numerous occasions that a plaintiff can defeat summary judgment by demonstrating that an evaluation offered to justify his termination conflicts with other assessments of his work performance.")

Together, all of the evidence, viewed most favorably to Byrnes, is sufficient to infer that Defendants' stated reasons for termination were pretextual. Thus, summary judgment is inappropriate, and the Court should reverse judgment for Defendants and remand this claim for trial.

**B.  The evidence is sufficient to infer a causal connection between Byrnes' protected activity and Defendants' biased medical-case review process, which resulted in four of his cases being improperly reported to the KBHA.**

Green-Cheatwood and Stucky—both fully aware of Byrnes' protected activities, with Stucky admitting he still was concerned about Byrnes because of his

complaint against Kessler—designed a peer review process that contravened Defendants' written policies, controlled and manipulated the information on which the outside reviewers relied, and ultimately determined which cases would be reported to the KBHA. Thus, the district court erred when it found that Green-Cheatwood and Stucky lacked sufficient control over the process to have caused Byrnes' cases to be reported to the KBHA. *See* App. Vol. 7 at 1825.

On January 29, 2020, Green-Cheatwood proposed a two-year (2018 and 2019) retrospective review process to fill a perceived gap in peer review at SCH. All SCH cases would be screened for certain criteria that would trigger further assessment by outside reviewers. But after Byrnes called Green-Cheatwood the next day to report further retaliation by Kessler, she revised the process to target Byrnes by requiring every one of his cases over a five-year period be submitted for review.

A juror also could infer that Green-Cheatwood and Stucky manipulated the outside reviewers in two ways. First, while no one can say definitively what records the reviewers considered—because Defendants destroyed them—the evidence shows Defendants sent the KBHA incomplete records (presumably the same records the reviewers considered). A juror could find Stucky and Green-Cheatwood, as gatekeepers of the files, sent the reviewers incomplete information (which Defendants later destroyed to conceal their content) so they would flag Byrnes' cases, even though (as the KBHA's findings show) a complete record would not

have resulted in any reportable findings. Second, Green-Cheatwood defeated the entire purpose of setting up an anonymous review process by an outside entity when she approached Vogel (who chaired the outside review committee) outside of the prescribed process to specifically call her attention to Byrnes' cases. A jury could infer that Green-Cheatwood was signaling to Vogel that she expected Vogel to give extra scrutiny to Byrnes' cases.

Green-Cheatwood and Stucky also intentionally disadvantaged Byrnes by not affording him any chance to explain or defend his cases. Not interviewing Byrnes violated Defendants' written policies. Green-Cheatwood and Defendants knew that making standard-of-care assessments based solely on a review of medical records is unreliable and that doctor interviews are critical to a proper evaluation. And it was contrary to how Green-Cheatwood and Stucky applied the outside-review process to other doctors. Stucky admitted that, once the reviewers flagged a case as a potential SOC 3 or 4 violation based on their paper review, he provided the doctors (except for Byrnes) "opportunity for a remediation or a further collegial intervention" by communicating with them before reporting anything to the KBHA. App. Vol. 5 at 1410. For example, Stucky invited Gottschalk to address cases the outside reviewers initially had flagged as reportable incidents. Based on the information he provided, two of his cases were downgraded and not reported to the KBHA. This underscores that the doctors' interviews were not mere formalities, but rather could determine

whether or not Stucky reported a case. Given that the KBHA—whose investigation including talking to Byrnes and affording him the opportunity to provide information—concluded that there were no concerns about Byrnes' patient care, a juror could infer that, had Green-Cheatwood and Stucky not violated company policy and their own process for outside review by denying Byrnes any opportunity to provide information, which Defendants admit is an unreliable way to review medical records, his cases would not have been reported to the KBHA.

Stucky's testimony that he (not the outside reviewers) decided which cases to report to the KBHA establishes (contrary to the district court's holding) that Stucky and Green-Cheatwood were the ultimate decisionmakers. This is also reflected by the fact that Stucky (who claimed only to report cases the outside reviewers rated at SOC 3 or 4) reported Byrnes' 2015 thyroidectomy case to the KBHA, even though the outside reviewers found only non-reportable, "minor opportunities for improvement" (SOC 2). That Stucky only reported Byrnes, and not all "Licensees Involved" in that procedure, underscores he used the process to target Byrnes.

This evidence satisfies Byrnes' light *prima facie* burden to show Green-Cheatwood and Stucky caused his cases to be reported to the KBHA.

**C.  The district court did not analyze the remaining *McDonnell-Douglas* burdens as to Defendants' post-termination retaliatory conduct, but such analysis would not justify summary judgment, either.**

Defendants' stated reason for reporting Byrnes is that they had to report any case with an SOC 3 or 4 finding. But this does not explain the fact they reported one of Byrnes' cases even though it was rated SOC 2 or their failure to report all Licensees Involved in that case. Nor does this address Green-Cheatwood's and Stucky's actions in deciding what information to provide to the peer review committee (which treated Byrnes differently than everyone else) and tainting the review process by having sidebar communications about Byrnes' cases with the committee chair. Even assuming Defendants could meet their burden, the evidence of disturbing procedural irregularities discussed above with respect to causation are sufficient to infer pretext. In its totality, this evidence, viewed in Byrnes' favor, supports a finding of pretext, precluding summary judgment and requiring trial.

**III.  Because Byrnes' federal Title VII claims should be remanded for trial, the district court's refusal to exercise supplemental jurisdiction over Byrnes' state law claims should be vacated and remanded for reconsideration.**

After the district court granted summary judgment on Byrnes' federal claims, it declined to exercise supplemental jurisdiction on Byrnes' remaining state law claims, which arise out of the same events leading to, and pretextual reasons for, Byrnes' termination. App. Vol. 7 at 1835-36. Because judgment on Byrnes' Title VII claims was granted in error and those claims should be reversed and remanded

for trial, "the legal predicate for [that] decision no longer exists." *Macias v. Sw. Cheese Co., LLC*, 624 F. App'x 628, 640 (10th Cir. 2015). The Court therefore should vacate that portion of the Order and direct the district court to reconsider whether to exercise supplemental jurisdiction over the state law claims, which are so related to the Title VII claims that they form part of the same case or controversy. *Id. See also Baca v. Sklar*, 398 F.3d 1210, 1222 n.4 (10th Cir. 2005) ("Because we remand [plaintiff's federal] retaliation claim, the district court should reconsider its decision to decline supplemental jurisdiction over [plaintiff's] state law claims.").

## CONCLUSION AND RELIEF SOUGHT

For the reasons presented above, the memorandum and order of the district court granting summary judgment on Byrnes' Title VII claims should be reversed, the corresponding declination to exercise supplemental jurisdiction and dismissal without prejudice of the state law claims should be vacated, and the Title VII and state law claims should be remanded to the district court for further proceedings, including a jury trial.

Respectfully submitted,

By: /s/ *Boyd A. Byers*
    Boyd A. Byers, Kan. #16253
    Eric Turner, Kan. #25065
    FOULSTON SIEFKIN LLP
    1551 N. Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    Telephone: (316) 267-6371
    Email : bbyers@foulston.com
          eturner@foulston.com
    *Attorneys for Plaintiff/Appellant*
    *Matthew Byrnes*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), Byrnes respectfully requests oral argument. This case involves a voluminous factual record and important legal issues. Byrnes believes oral argument will assist the Court in ruling upon the issues in this appeal.

*/s/ Boyd A. Byers*
Boyd A. Byers

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Tenth Circuit Rule 32(B), this document contains 12,351 words, as counted by Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Tenth Circuit Rule 32(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in proportionally spaced typeface using the Microsoft Word application of Microsoft 365 Apps for Enterprise in a 14-point Times New Roman serif font.

*/s/ Boyd A. Byers*
Boyd A. Byers

## CERTIFICATE OF SERVICE

I certify that on December 20, 2024, the foregoing Brief was filed electronically with the Clerk of Court using the Court's ECF system. I further certify that all parties required to be served have been served through the Court's ECF system.

Seven copies of the foregoing Appellant's Opening Brief will be sent via FedEx for overnight delivery within the prescribed time, addressed to:

Clerk of the Court
Tenth Circuit Court of Appeals
Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257

*/s/ Boyd A. Byers*
Boyd A. Byers

**ADDITIONAL DOCUMENTS**

# A. Memorandum and Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MATTHEW BYRNES,

          **Plaintiff**,

v.

ST. CATHERINE HOSPITAL, et al.,

          **Defendants**.

Case No. 21-2086-DDC

## <u>MEMORANDUM AND ORDER</u>

People get fired from their jobs for many reasons, or, sometimes, for no reason at all. And if the person's an at-will employee, that's just fine, the law says. Just fine, that is, as long as his employer didn't fire him for discriminatory or retaliatory reasons. Plaintiff Dr. Matthew Byrnes got fired in February 2020. He had worked as a surgeon and intensivist for St. Catherine Hospital (SCH) in Garden City, Kansas, since 2012. And he was their Chief Medical Officer (CMO) from 2013 to 2019. Then, SCH and Centura—who managed SCH—fired him without cause. Plaintiff was an at-will employee under his employment agreement. So, SCH and Centura didn't need a reason to fire him. And the court isn't here to decide if firing him was a good call—justified or unjustified, fair or not. They didn't need a reason at all, much less a good or fair one. Instead, the outcome of defendants' summary judgment motion (Doc. 172) turns solely on whether Centura fired plaintiff for discriminatory or retaliatory reasons.

Plaintiff claims they did. He contends that defendants St. Catherine Hospital and Centura Health Corporation wanted him out because of his complaints about a fellow doctor. Plaintiff had accused Dr. Kurt Kessler of sexual harassment and other standard-of-care shortcomings. He

also claims that—because of these complaints against Dr. Kessler—defendants viewed him as mentally unstable. So, he asserts, this perceived impairment drove their desire to let him go. What's more, even after they got rid of him, plaintiff claims that defendants continued to retaliate against him by unfairly reporting four of his medical cases to the Kansas Board of Healing Arts (KBHA).

Defendants, for their part, say they didn't fire plaintiff for retaliatory or discriminatory reasons. Instead, they rely on patient care concerns and issues with peer review in his role as CMO. And they say they never perceived plaintiff as impaired, nor was their KBHA reporting process retaliatory.

And so, defendants have filed a Motion for Summary Judgment (Doc. 172). The court grants the motion, concluding that plaintiff has failed to present a triable issue on his federal claims of Title VII retaliation, ADA retaliation, or ADA discrimination. In a nutshell, plaintiff has failed to adduce evidence that defendants' reasons for terminating his employment were pretext for retaliation. Nor has he shown facts sufficient to support an inference that defendants perceived him as impaired. And he fails to demonstrate—such that a reasonable juror could infer—a causal connection between defendants' KBHA reporting processes and his protected activity. With the federal claims resolved, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims and thus dismisses those state law claims without prejudice. The court explains its decisions, below.

## I.    Background

The following facts are stipulated, uncontroverted or, where controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### *Plaintiff's Job*

Plaintiff worked at Saint Catherine Hospital in Garden City, Kansas, as a general surgeon and intensivist from 2012 until February 12, 2020.  Doc. 165 at 2–3 (Pretrial Order ¶ 2.a.ii., vi., xii.).  Plaintiff also served as SCH's Chief Medical Officer from roughly 2013 to June 2019.  *Id.* at 3 (Pretrial Order ¶ 2.a.xi.).  The agreements that governed plaintiff's employment during his tenure at SCH specified that SCH was "operated and managed by Centura . . . , which may assign management duties to its Centura Health Physician Group division."  *Id.* (Pretrial Order ¶ 2.a.ix.); Doc. 174-7 at 1 (Def. Ex. 24).  And so, SCH and Centura "concede that they jointly employed" plaintiff.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.x.).

### *April 2019 Meeting*

The issues with plaintiff's employment started—at least for purposes of this case—in April 2019.  It was then that five SCH doctors, who worked with plaintiff, requested that SCH's Chief Executive Officer (CEO) Scott Taylor fire plaintiff.  Doc. 173-2 at 5 (Taylor Dep. 133:23–135:21); Doc. 173-13 at 4 (Arroyo Dep. 31:24–32:5).  The doctors attending that meeting included Dr. William Freund, Dr. Kessler, Dr. Julie Freeman (King),[1] Dr. Gretchen Dunford, and Dr. Zeferino Arroyo.  Doc. 173-2 at 5 (Taylor Dep. 134:8–12).  At the meeting, the doctors expressed various concerns about plaintiff, including one about patient care, and requested that he no longer work at SCH.  *Id.* (Taylor Dep. 133:23–135:21).  CEO Taylor decided to remove plaintiff as CMO, but leave his employment intact.  *Id.* (Taylor Dep. 135:2–21).  And so, plaintiff ceased performing the duties of CMO, but he continued working at SCH.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xiii., vi.).

---

[1]      Referred to as Dr. King during discovery, Dr. King returned to use of her maiden name—Freeman—after the parties took depositions.  Doc. 189 at 3 n.5.

### *Plaintiff's Sexual Harassment Complaints*

A few months later, on August 31, 2019, plaintiff submitted a written complaint to Dr. Freund and Nancy Killion, Centura's Director of Quality, about Dr. Kessler.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xv.).  Plaintiff submitted the complaint by email at 1:54 AM on a Saturday morning.  Doc. 174-16 at 1 (Def. Ex. 33).  In the complaint, plaintiff alleged, among other things, that:  Dr. Kessler's conversion rate from a laparoscopic approach to an open procedure for gallbladder removal was "massively higher" than the appropriate conversion rate; the nursing staff "is nearly uniformly concerned with his ability to care for patients in the ICU[;]" Dr. Kessler "rarely wears gloves when doing sensitive exams[;]" and Dr. Kessler "made sexually explicit comments to numerous nurses[,]" "inappropriately touched nurses[,]" and "voiced out loud in the operating room area that he rarely spends time at home because he is either at the hospital or the strip club."  *Id.* at 2–3 (Def. Ex. 33).

Dr. Freund, in his capacity as Medical Staff President, investigated the allegations in the complaint, Doc. 174-1 at 4 (Freund Dep. 35:1–7).  But plaintiff contends that his investigation was neither fair nor reasonable, in part, because Dr. Freund let Dr. Kessler read the complaint, told him that plaintiff had filed it, and said he needed Dr. Kessler's response.  Doc. 183 at 4; Doc. 183-15 at 6–7 (Kessler Dep. 27:21–28:11).  And Dr. Freund shared plaintiff's complaint about Dr. Kessler and that he had evaluated those concerns with SCH's Medical Executive Committee (MEC) on September 17, 2019.[2]  Doc. 174-1 at 8–9 (Freund Dep. 58:24–61:10).  Based on the MEC meeting discussion, one of the doctors in attendance—Dr. Dunford, Chief of Surgery—contacted Ms. Killion with concerns about plaintiff.  Doc. 173-11 at 3–4 (Dunford

---

[2]     The parties dispute the extent Dr. Freund shared accurately or specifically about his investigation into this complaint.  Doc. 183 at 5.  The parties also dispute Dr. Freund concluding that the allegations in the complaint were false and his representing that conclusion to the MEC.  *Id.*

Dep. 31:20–35:1).  Dr. Dunford expressed that she thought plaintiff "seemed to be very

disturbed, writing a letter like that about a colleague."  *Id.* at 4 (Dunford Dep. 34:24–35:1).  Dr.

Dunford then emailed Dr. Toni Green-Cheatwood—Centura's Group VP and Physician

Executive for Centura's Greater Colorado Kansas (GCK) Group—with the same concerns.  *Id.* at

4 (Dunford Dep. 35:21–36:2).

In response to these emails, Dr. Freund, Dr. Green-Cheatwood, and Dr. Bryan Stucky—

Vice-President of Medical Staff—met with plaintiff on October 16, 2019.  Doc. 165 at 3 (Pretrial

Order ¶ 2.a.xvi.).  At the meeting, plaintiff challenged the adequacy of any investigation of his

allegations against Dr. Kessler and reiterated his complaints.  Doc. 183-6 at 49–50, 52 (Byrnes

Dep. 180:5–181:9, 183:5-24).

### *MEC Request for Psychological Evaluation*

The MEC continued to express concerns about plaintiff's allegations against Dr. Kessler,

according to a letter Dr. Freund delivered to plaintiff on December 29, 2019.  Doc. 174-1 at 16

(Freund Dep. 112:1–13).  The letter referenced the MEC's concerns—apparently expressed at a

November 2019 meeting—about plaintiff's allegations and about his "insistence that [he] believe

these allegations to be true."  Doc. 174-23 (Def. Ex. 40).  In light of these discussions and

concerns, the letter requested that plaintiff undergo a psychological evaluation, stating that the

MEC "unanimously agreed that it was in the best interest of the hospital and the medical staff to

ask [plaintiff] to seek an evaluation including a psychologic assessment."[3]  *Id.*  Dr. Freund alone

signed the letter.  *Id.*

---

[3]      Plaintiff disputes the letter's statement that the MEC unanimously agreed to this evaluation
request.  While the letter makes this assertion, plaintiff cites deposition testimony from Dr. Stucky stating
that the letter itself was drafted after the November meeting and thus the MEC couldn't have voted on the
letter itself.  Doc. 183-19 at 35 (Stucky Dep. 83:1–19).  And Dr. Stucky couldn't remember if there was a
vote about this request, or whether the vote was unanimous.  *Id.*

On January 19, 2020, plaintiff responded to this request with a letter of his own, emailed to Dr. Stucky, who had replaced Dr. Freund as President of the Medical Staff.[4]  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xvii.).  Plaintiff's response letter asserted that "Dr. Freund's letter is tantamount to retaliation against a whistleblower[,]" reiterated his initial complaints about Dr. Kessler, and demanded the MEC retract Dr. Freund's letter.  Doc. 174-24 at 2–6 (Def. Ex. 41). On January 21, 2020, Dr. Stucky emailed plaintiff a letter notifying him that the MEC would retract the letter requesting his psychological evaluation.  Doc. 174-25 at 1–2 (Def. Ex. 42).

### *Kansas Board Healing Arts Complaint and Subpoena*

Less than a week later, SCH received a subpoena from the Kansas Board of Healing Arts (KBHA).  Doc. 165 at 4 (Pretrial Order ¶ 2.a.xviii.).  The subpoena demanded SCH produce records, reports, proceedings, findings, and documents about plaintiff pursuant to an anonymous complaint filed against him.  Doc. 174-27 (Def. Ex. 44).  Plaintiff later provided Centura's in-house General Counsel, Peter Sabey, with a copy of the anonymous complaint.  Doc. 165 at 4 (Pretrial Order ¶ 2.a.xix.).  The KBHA complaint against plaintiff summarized ten different allegations.  Doc. 174-31 at 6 (Def. Ex. 48).  These included:

- "multiple alarming adverse outcomes, including multiple patient deaths[;]"

- "pressuring hospital CEO Scott Taylor to disband the hospital peer review committee[;]"

- "an unusually high number of nicked bowels during surgeries[;]"

- "abandon[ing] 8 I.C.U. cases[;]"

---

[4]      The Pretrial Order provides that plaintiff sent this letter to Dr. Stucky on January 19, 2019.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xvii.).  Given the chronology of events, the court assumes the year identified in this stipulation is erroneous and assumes the proper date is January 19, 2020.  The date on the letter itself—and the email that transported it—confirms this assumption.  *See* Doc. 174-24 at 1–2 (Def. Ex. 41).

- "transferring out patients that he has dangerously mismanaged[;]" and

- "well known incidents of sexual relations in hospital treatment rooms with

  nurses."

*Id.* The KBHA complaint also described a vote of no confidence from plaintiff's fellow

physicians: "[T]he medical staff has advised the CEO that he is unsafe and needs an assessment

due to his erratic behaviors and dangerous violations of the standard of care." *Id.*

On January 30, 2020, plaintiff phoned Dr. Green-Cheatwood to discuss the anonymous

KBHA complaint. Doc. 183-24 at 3 (Byrnes Decl. ¶ 11). He told Dr. Green-Cheatwood "that

the report was made in retaliation for the complaint [plaintiff] had filed against Dr. Kessler in

August." *Id.* And, he asserted, the report's allegations were false. *Id.* He then cited specific

data showing his mortality rate, recited his work experience as a surgeon, and reviewed his

litigation record (just two unsuccessful lawsuits against him in 12.5 years in practice). *Id.*; Doc.

174-29 at 1 (Def. Ex. 46). He also informed Dr. Green-Cheatwood about "many witnesses who

had the best knowledge to speak to and refute the allegations in the KBHA complaint[.]" Doc.

183-24 at 3 (Byrnes Decl. ¶ 12).

### *Investigating KBHA Complaint*

That same day, Dr. Green-Cheatwood informed in-house counsel Mr. Sabey about her

phone call with plaintiff. Doc. 174-29 at 1 (Def. Ex. 46). In response, Mr. Sabey initiated an

internal investigation, with plans to interview SCH "employees and medical staff members" and

gather "documents and information related to [KBHA's] inquiry." Doc. 174-30 at 1 (Def. Ex.

47).

Mr. Sabey, Dr. Green-Cheatwood, and Morgan Thomas (GCK Group Quality Director)

traveled on February 6, 2020, to Garden City to conduct investigative interviews and gather

documents. *Id.*; Doc. 165 at 4 (Pretrial Order ¶ 2.a.xx.). While there, Mr. Sabey and Dr. Green-Cheatwood talked to CEO Taylor, Ms. Killion, Dr. Michael Babigumira, Dr. Arroyo, Dr. Freeman (King), Dr. Dunford, Dr. Stucky, Dr. Freund, Dr. Kessler, and Dr. James Zauche. Doc. 165 at 4 (Pretrial Order ¶ 2.a.xx.). Mr. Sabey and Dr. Green-Cheatwood also inquired about any further developments and gathered documents about plaintiff's allegations against Dr. Kessler. Doc. 183-11 at 48–49 (Freund Dep. 168:24–169:16); Doc. 183-13 at 29–30 (Green-Cheatwood Dep. 92:21–93:21). Mr. Sabey and Dr. Green-Cheatwood didn't interview plaintiff as part of their investigation. Doc. 165 at 4 (Pretrial Order ¶ 2.a.xx.). Nor did they interview any nurses. *Id.*

### *Firing Plaintiff*

Having completed their investigation, Mr. Sabey and Dr. Green-Cheatwood reported their interpretation of its results to Tom Gessel, GCK Group President, and Scott Lichtenberger, President of Centura Health Physician Group by phone on February 10, 2020. Doc. 173-9 at 22 (Green-Cheatwood Dep. 157:24–160:23); Doc. 173-5 at 21 (Sabey Dep. 145:13–146:1; 146:20–148:17). During that phone call, Dr. Green-Cheatwood recommended that they fire plaintiff. Doc. 173-9 at 22 (Green-Cheatwood Dep. 158:13–24). After the call, Mr. Gessel and Dr. Lichtenberger jointly decided to terminate plaintiff's employment. Doc. 173-3 at 3 (Lichtenberger Dep. 24:8–24). According to Dr. Lichtenberger, he decided based on the information provided to him by Dr. Green-Cheatwood and Mr. Sabey. *Id.* at 4 (Lichtenberger Dep. 25:8–27:16; 28:14–18). And so, on February 12, 2020, Dr. Green-Cheatwood and Dr. Zauche met with plaintiff, told him that he was fired, and provided him a termination letter signed by Dr. Lichtenberger. Doc. 165 at 4 (Pretrial Order ¶ 2.a.xxi.). The termination letter specified that plaintiff's employment was terminated "without cause." Doc. 174-45 at 1 (Def. Ex. 51). Plaintiff's then-in-force employment agreement permitted either party to "terminate

[the] Agreement for any reason or no reason" on 90 days written notice.  Doc. 174-7 at 5 (Def.
Ex. 24).

### *Peer Review & Report of Cases to KBHA*

Several months after plaintiff's termination, SCH submitted a Report of Adverse
Findings on one of the plaintiff's cases to KBHA.  Doc. 173-18 at 3 (Evans Dep. 19:11–20:4).
This report process began, on February 18, 2020, when Dr. Green-Cheatwood sent Mr. Gessel
and Dr. Lichtenberger, among others, a proposed plan for establishing quality and peer review at
SCH.  Doc. 174-54 at 1–2 (Def. Ex. 60); Doc. 173-15 at 9–10 (Thomas Dep. 111:21–114:1).
The proposed plan involved immediately sending out SCH cases to other facilities boasting high
functioning peer review committees so that those committees could review and identify any
immediate care concerns.  Doc. 173-15 at 9–10 (Thomas Dep. 112:19–113:3).  So, in May 2020,
Dr. Stucky—on behalf of SCH MEC— began identifying which cases to submit for this outside
review.  Doc. 173-7 at 5 (Stucky Dep. 27:10–28:24).  Dr. Stucky also relied—specifically in
surgical cases—on recommendations from Dr. Green-Cheatwood.  *Id.*  With the cases identified,
peer review committees at other Centura facilities—including one from St. Anthony's Hospital
directed by Dr. Rebecca Vogel—reviewed them.  Doc. 173-15 at 32 (Thomas Dep. 241:20–
242:16); Doc. 173-17 at 2 (Vogel Dep. 46:3–24).  When a case received a score from the peer
review committee that met a mandatory reporting threshold, SCH submitted a Report of Adverse
Findings to KBHA.  Doc. 173-15 at 32 (Thomas Dep. 241:20–242:16).  As mentioned above,
SCH submitted one of plaintiff's cases around September 28, 2020.  Doc. 173-18 at 3 (Evans
Dep. 19:11–20:4); Doc. 184-11 (Pl. Ex. E34).  Later, on January 12, 2021, it submitted three
more reports about plaintiff's cases.  *Id.* at 3–4 (Evans Dep. 20:18–21:3).

### *KBHA Conclusions*

In the end, KBHA dismissed all four Adverse Findings Reports (and the anonymous complaint against plaintiff) in this fashion:  First, KBHA gave plaintiff an opportunity to respond to the allegations asserted in the anonymous complaint against him.  Doc. 183-24 at 2 (Byrnes Decl. ¶ 10).  And on September 22, 2021, KBHA sent plaintiff a letter stating they had determined not to take any action at this time and closed the case.  *Id.*  After receiving the first SCH Adverse Findings Report, KBHA notified plaintiff and again gave him an opportunity to respond.  *Id.* at 4 (Byrnes Decl. ¶ 17).  KBHA also decided not to take action on that report and closed the case.  *Id.*  Finally, KBHA notified plaintiff and gave him an opportunity to respond to the final three cases SCH had submitted.  *Id.* (Byrnes Decl. ¶ 20).  And plaintiff received a final letter from KBHA on August 3, 2022.  It asserted that "the reviewing Committee determined that the treatment [he] provided adhered to the applicable standard of care" and KBHA closed the matter.  *Id.*

That's all for now.  This Order will provide a few additional facts that correspond to the specific arguments raised in the parties' written submissions.

## II.    Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022)

(quotation cleaned up).

Finally, since 1986, federal courts haven't viewed summary judgment as a "disfavored

procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure

"designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.*

(quoting Fed. R. Civ. P. 1).

### III.   *McDonnell Douglas* **Burden-Shifting Framework**

According to the Pretrial Order, plaintiff asserts seven claims: Title VII Retaliation

(Count 1); Kan. Stat. Ann. § 65-4928 (Count 2); ADA (Count 3); Fraud (Count 4); Fraud by

Silence (Count 5); Promissory Estoppel/Detrimental Reliance (Count 7); and Common Law

Retaliation under the Kansas Wage Payment Act (Count 10). Doc. 165 at 17–18 (Pretrial Order

¶ 4.a.i.–vii.). Three of these claims arise under federal law, and this Order will focus on those

first: (1) Title VII retaliation, (2) ADA discrimination, and (3) ADA retaliation. The familiar

*McDonnell Douglas* burden-shifting framework for Title VII claims applies to all three federal

law claims. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003)

(explaining framework applies to Title VII and applying framework to ADA retaliation claim);

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (applying framework to ADA

disability discrimination claim). And so, the court identifies that framework before beginning its

analysis of plaintiff's federal claims.

Under the familiar burden-shifting framework, plaintiff first must present a prima facie

case of discrimination or retaliation. *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).

But the "burden on the employee to establish a prima facie case is light[.]" *Guy v. McDonough*,

No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021). Then, the burden of

production shifts to the employer "to offer a legitimate nondiscriminatory [and nonretaliatory]

reason for its employment decision." *Morgan*, 108 F.3d at 1323.  As with the employee's burden in the first step, the employer's burden at this second stage is "exceedingly light."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007).  If the employer offers a legitimate reason, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact . . . whether the employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief."  *Morgan*, 108 F.3d at 1323 (quotation cleaned up).

The court applies this *McDonnell Douglas* burden-shifting framework to plaintiff's federal law claims, starting with his two Title VII retaliation claims.

## IV.    Title VII Claims (Count I)

Plaintiff asserts two retaliation claims based on Title VII.  First, plaintiff asserts that defendants fired him as retaliation for his complaints about Dr. Kessler's alleged sexual harassment,[5] thus violating Title VII.  Doc. 165 at 17 (Pretrial Order ¶ 4.a.i.).  Second, plaintiff contends, defendants engaged in a biased and unfair review process of his cases, leading to reporting four of his cases to KBHA, in retaliation for those same complaints about sexual harassment and for his filing of EEOC charges.  Doc. 165 at 10 (Pretrial Order ¶ 3.a.).  Together, these claims comprise Count I.  The court starts with plaintiff's termination-based retaliation claim.

### A.    Title VII Termination-Based Retaliation Claim

---

[5]    Plaintiff also asserts that defendants fired him in retaliation for filing EEOC charges.  Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.iii.).  The court addresses the timing of the EEOC charge filing later in this Order.  *See* § V.B.  There, the court determines that plaintiff's firing occurred *before* plaintiff filed any EEOC charges.  *Id.*  And so, the court doesn't address the filing of EEOC charges as part of plaintiff's protected activity under its Title VII retaliation claim premised on his firing.  An employer can't fire an employee in retaliation for behavior after he was fired.  *See Durkin v. City of Chicago*, 341 F.3d 606, 614–15 (7th Cir. 2003) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity.").

1.      **Prima Facie Case**

Title VII makes certain forms of retaliation unlawful by providing that an employer may not "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  A plaintiff asserting a Title VII retaliation claim without direct evidence of retaliation must establish a prima facie case under *McDonnell Douglas*.  *Bekkem*, 915 F.3d at 1267.  For Title VII retaliation, this prima facie case has three elements.  A plaintiff must show "(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *Id.* (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)).  The burden rests on plaintiff to establish a triable issue for all three prima facie elements.  *Id.*

Here, neither party disputes that plaintiff engaged in protected opposition to discrimination.[6]  And the parties also stipulate that plaintiff submitted a written complaint about Dr. Kessler's alleged sexual harassment on August 31, 2019.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xv.).  "Complaints of retaliation for having complained of sexual harassment are, like the complaints of sexual harassment themselves, protected activity under Title VII."  *Townsend v. BG-Meridian, Inc*., No. CIV-04-1162-F, 2005 WL 2978899, at *5 (W.D. Okla. Nov. 7, 2005).  That takes care of the first prong.

---

[6]      Indeed, defendants "assume for purposes of summary judgment only, and without admitting the same, that Plaintiff participated in protected activity pursuant to Title VII when he complained in August 2019 that nurses were sexually harassed by Dr. Kessler and when he filed charges of discrimination with EEOC."  Doc. 173 at 26 n.7.

The second prima facie prong is equally straightforward.  Plaintiff asserts his firing

provides the requisite materially adverse action.  Doc. 183 at 36.  And defendants don't

challenge that assertion.[7]  *See generally* Doc. 173.  Nor could they.  The parties stipulate that Dr.

Green-Cheatwood informed plaintiff of his job's termination and provided him with a

termination letter on February 12, 2020.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xxi.).  And firing

qualifies as a materially adverse action.  *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452

F.3d 1193, 1202 (10th Cir. 2006) ("[H]e was fired, which obviously qualifies as 'materially

adverse[.]'").  So, plaintiff's prima facie case of termination-based retaliation under Title VII

comes down to the third prong:  causation.

Recall that a plaintiff establishing a prima facie retaliation case must show "'a causal

connection existed between the protected activity and the materially adverse action.'"  *Bekkem*,

915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193).  And as "a prerequisite to this showing,

[plaintiff] must first come forward with evidence from which a reasonable factfinder could

conclude that those who decided to fire him had knowledge of his protected activity."  *Hinds v.*

*Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  "An employer's action against

an employee cannot be *because* of that employee's protected opposition unless the employer

knows the employee has engaged in protected opposition."  *Petersen v. Utah Dep't of Corr.*, 301

F.3d 1182, 1188 (10th Cir. 2002) (emphasis in original).  "Plaintiff must therefore point to

evidence that those who acted against him knew of his formal complaints."  *Singh v. Cordle*, 936

F.3d 1022, 1043 (10th Cir. 2019).  And "bare speculation" supporting an employer's knowledge

---

[7]     Defendants' brief doesn't contest that terminating plaintiff qualifies as an adverse action.  It does
contest plaintiff's ability to establish a materially adverse action, however, on another basis:  MEC's
request for plaintiff to submit to a psychological evaluation.  Doc. 173 at 27.  But defendants
misapprehend the basis of plaintiff's Title VII claim.  Plaintiff clarifies in his Response that he doesn't
argue that the psychological evaluation request was a materially adverse action.  *See* Doc. 183 at 36 n.11.

of plaintiff's protected opposition won't suffice.  *Lindsay v. Denver Pub. Schs.*, 88 F.4th 1323, 1328 (10th Cir. 2023).

Here, defendants argue that plaintiff fails to provide evidence of the requisite knowledge to establish a causal connection.  Doc. 173 at 29–30.  That is, plaintiff hasn't adduced evidence that the decision makers who fired him knew of his protected activity, defendants contend.  *Id.* Without adducing evidence of such knowledge, defendants argue, plaintiff's claim fails.  *Id.*  Not so fast, plaintiff responds.  While plaintiff concedes that the decision makers who terminated him didn't possess knowledge of his protected activity, he claims that doesn't end the analysis.[8]  Doc. 183 at 40–41.  Instead, plaintiff argues, the "cat's paw" doctrine[9] applies here.  *Id.*

"On a cat's paw theory of liability the influence of [a] biased subordinate provides the causal connection the plaintiff's prima facie case requires[.]"  *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 795 (10th Cir. 2014).  That's so because "even though the ultimate

---

[8]     Plaintiff also argues that the close temporal proximity between plaintiff's January 2020 written and oral complaints and his termination in February 2020 "by itself, shows causation."  Doc. 183 at 36. To be sure, "a plaintiff may show a causal connection by presenting evidence that the 'temporal proximity' between the protected conduct and the materially adverse action justifies an inference of retaliatory motive."  *Singh*, 936 F.3d at 1043 (quotation cleaned up).  Nonetheless, "a plaintiff who seeks to show causation [by temporal proximity] still must present evidence that the decisionmakers *knew* of the protected conduct."  *Id.* (emphasis in original).  So, plaintiff's temporal proximity causation argument doesn't take care of the knowledge question.  That is, the alleged temporal proximity doesn't, "by itself," demonstrate causation and plaintiff still must rely on the cat's paw doctrine.

[9]     The Tenth Circuit previously explained the etymology of the cat's paw doctrine.  This etymology contributes to a fuller understanding of the doctrine, so the court recites it here:

> The cat's paw doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire.  As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat. . . . In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006) (quotation cleaned up).

16

decisionmakers weren't biased it was still because of bias that the employee suffered the adverse action." *Id.* "[T]o survive summary judgment when asserting the cat's-paw theory of liability, a plaintiff must show that there is a genuine issue of material fact that (1) the subordinate took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended adverse employment action." *Singh*, 936 F.3d at 1038.

Here, it's undisputed that Dr. Lichtenberger and Mr. Gessel jointly decided to terminate plaintiff's employment. Doc. 173-3 at 3 (Lichtenberger Dep. 24:8–24); Doc. 183 at 14 (disputing the veracity of the information on which Dr. Lichtenberger and Mr. Gessel relied, but not disputing whether they made the firing decision). It's also undisputed that they didn't know of plaintiff's complaints about Dr. Kessler. Doc. 173-3 at 13 (Lichtenberger Dep. 62:18–24); Doc. 183 at 15. At first blush, that seems to end the issue. When a plaintiff doesn't "come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity[,]" his claim fails. *Hinds*, 523 F.3d at 1203. But, plaintiff retorts, Dr. Lichtenberger and Mr. Gessel decided to terminate him based on information provided by Dr. Green-Cheatwood and Mr. Sabey. Doc. 183 at 15; Doc. 173-3 at 4 (Lichtenberger Dep. 25:6–27:21). And so, plaintiff argues, Dr. Lichtenberger and Mr. Gessel were innocent cats with burned paws. That is, Dr. Lichtenberger and Mr. Gessel simply did the bidding of Dr. Green-Cheatwood and Mr. Sabey, who, plaintiff asserts, were motivated by retaliatory animus.

For plaintiff here to invoke the cat's paw doctrine successfully, he first must establish a genuine issue of material fact from which a jury could infer that retaliatory animus motivated a subordinate's action. Plaintiff contends that Dr. Green-Cheatwood and Mr. Sabey imputed

retaliatory bias to the decision makers, Dr. Lichtenberger and Mr. Gessel. And plaintiff asserts that a reasonable juror could infer Dr. Green-Cheatwood and Mr. Sabey's retaliatory bias based on the evidence of pretext plaintiff provides. Doc. 183 at 41.

A plaintiff appropriately may rely on pretext evidence at the causation stage, Tenth Circuit precedent holds. *See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (identifying that the Tenth Circuit has taken into account pretext evidence in a retaliation claim's prima facie stage) (citing *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) (analyzing causation element of prima facie case for Title VII retaliation claim by addressing pretext evidence)). But here plaintiff takes a spaghetti-on-the-wall approach to pretext, rattling off no fewer than 13 theories to see which one will stick. Doc. 183 at 38–39. And plaintiff's burden at the prima facie causal connection stage differs from plaintiff's burden at the pretext stage. *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) ("The burden of establishing a prima facie case in the *McDonnell Douglas* framework is not onerous. . . . [But in the] pretext analysis . . . the burden is more demanding and requires a plaintiff to assume the normal burden of any plaintiff to prove his or her case at trial." (quotation cleaned up)). So, if the court engages in a full analysis of plaintiff's pretext arguments here—under the prima facie burden—it would have to revisit that entire analysis under plaintiff's higher burden of pretext below. The court declines. And so, the court assumes—without deciding—that a reasonable juror could infer Dr. Green-Cheatwood and Mr. Sabey's retaliatory animus under one of the many pretext arguments plaintiff proffers. And the court thus moves on to the second step of the cat's paw doctrine. And no one need worry that the court has abandoned the pretext analysis. The court will return to these pretext arguments under *McDonnell Douglas*'s third step later in this Order. *See* § IV.A.3.

The second cat's paw theory prong requires a plaintiff to show a genuine issue of material fact that "the subordinate intended the action to cause an adverse employment action[.]" *Singh*, 936 F.3d at 1038. The most obvious actions relevant here are Dr. Green-Cheatwood and Mr. Sabey's acts of conducting investigative interviews and then reporting their findings to the decision makers. And plaintiff has adduced evidence sufficient for a reasonable juror to infer that Dr. Green-Cheatwood and Mr. Sabey intended those interviews and that reporting to cause plaintiff's firing. Dr. Green-Cheatwood, for her part, expressly relied on the information procured in the interviews to recommend that Dr. Lichtenberger and Mr. Gessel fire plaintiff. Doc. 173-9 at 22 (Green-Cheatwood Dep. 157:5–158:24). And Mr. Sabey testified that the whole point of investigating was to provide information about the interviews so the decision makers could rely on it. Doc. 173-5 at 23 (Sabey Dep. 158:8–159:8). Both subordinates thus drew a straight-line between the action of engaging in the interview process and firing plaintiff, satisfying prong two.

The third prong of the cat's paw theory requires plaintiff to show a genuine issue of material fact that "the subordinate's actions proximately caused the intended adverse employment action." *Singh*, 936 F.3d at 1038. Our Circuit requires the subordinate's involvement to surpass "mere influence or input in the decisionmaking process." *BCI Coca-Cola*, 450 F.3d at 487 (quotation cleaned up). Instead, "the biased subordinate's discriminatory reports, recommendation, or other actions [must have] caused the adverse employment action." *Id.* Here, the court concludes, a reasonable juror could infer from the February 10, 2020, phone conversation that Dr. Green-Cheatwood and Mr. Sabey's interview reports caused Dr. Lichtenberger and Mr. Gessel to fire plaintiff. Dr. Lichtenberger testified that he had relied on Mr. Sabey's verbal report about the interviews in making his firing decision. Doc. 173-3 at 5–6

19

(Lichtenberger Dep. 32:8–33:9). And he testified that he relied on Dr. Green-Cheatwood's representations about the investigations, as well. *Id.* at 4 (Lichtenberger Dep. 25:6–27:16). And he had to rely in this fashion. Dr. Lichtenberger was new to his position—he had worked for defendants for just one month when he fired plaintiff—and he didn't know plaintiff at all. *Id.* at 3 (Lichtenberger Dep. 23:3–24:7). He identified Mr. Sabey as his source to confirm that the interviews substantiated the allegations against plaintiff. *See id.* at 5 (Lichtenberger Dep. 32:11–16). Mr. Gessel, for his part, doesn't recall who made plaintiff's termination decision, whether he was involved in that decision, or why plaintiff was fired. Doc. 183-12 at 3–4 (Gessel Dep. 41:12–42:16). He could surmise, however, that Dr. Green-Cheatwood and Mr. Sabey supported firing plaintiff because, since they were the ones involved in the discussion, he "probably would have remembered [any] objection." *Id.* at 5 (Gessel Dep. 43:21–25). While Mr. Gessel's testimony proves less definitive, Dr. Lichtenberger's suffices to show a genuine issue of material fact from which a reasonable juror could infer that Dr. Green-Cheatwood and Mr. Sabey's report caused plaintiff's firing, satisfying the third prong of the cat's paw doctrine.

And so, assuming cat's paw liability, the court concludes that plaintiff otherwise has established a prima facie case for a Title VII retaliation claim premised on his termination.

### 2.     Legitimate, Nondiscriminatory Reason

If plaintiff "establishes a prima facie case of retaliation, the burden shifts to [the employer] to assert a legitimate, nondiscriminatory reason for the adverse action." *Proctor*, 502 F.3d at 1208. If the employer "provides a legitimate, nondiscriminatory reason for its decision, the burden shifts back to [plaintiff] to show that [the employer's] proffered reason is a pretext masking discriminatory animus." *Id.* (quotation cleaned up).

Our Circuit has explained that the defendant employer, at this second step, doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).  That is, defendants' "burden is one of production, not persuasion; it can involve no credibility assessment."  *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  "'[T]his stage of the analysis only requires the defendant to articulate a reason for the [employment decision] that is not, on its face, prohibited' and that is 'reasonably specific and clear.'"  *Frappied*, 966 F.3d at 1058 (first alteration in original) (quoting *Flasher*, 986 F.2d at 1316 & n.4).  So, according to our Circuit's authority, a party's burden to demonstrate a legitimate, nondiscriminatory reason is "exceedingly light."  *Bekkem*, 915 F.3d at 1268 (quotation cleaned up).

Here, defendants offer four legitimate, nondiscriminatory reasons for firing plaintiff. They harbored concerns about plaintiff:  (i) abandoning patients in the ICU; (ii) poorly documenting patients' status; (iii) potentially exercising poor clinical judgment; and (iv) stopping some of the peer review components in his role as CMO.  Doc. 173-3 at 4 (Lichtenberger Dep. 25:6–26:19).  Defendants' reasons for firing plaintiff aren't prohibited facially—so, defendants have satisfied their burden at this step.  The court needn't litigate the merits of firing plaintiff for these reasons, nor need it determine whether any of these four reasons were bona fide.  Instead, because defendants' burden at this stage is exceedingly light, defendants' showing qualifies as a legitimate, nondiscriminatory reason satisfactory to discharge defendants' burden at step two.  *Frappied*, 966 F.3d at 1058.  This claim's disposition thus turns

on whether plaintiff has adduced sufficient evidence to identify a triable issue of pretext under *McDonnell Douglas* step three.

### 3.    Pretext

At the third step of the *McDonnell Douglas* framework, the burden shifts back to plaintiff.  Now, plaintiff must present a genuine issue of material fact that defendants' asserted reasons for terminating his employment were pretextual.  To meet this burden, plaintiff must provide evidence that "the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable factfinder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination" or retaliation.  *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006).  To analyze whether a reasonable juror could find pretext under this standard, the court doesn't ask "whether the employer's reasons were wise, fair or correct[.]" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007).  Instead, the court asks "whether the employer honestly believed its reasons and acted in good faith upon them."  *Id.* at 1119.

The court thus evaluates "the facts as they appeared to the person making the decision," and doesn't "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment."  *Id.*  "The reason for this rule is plain:  [the court's] role is to prevent intentional discriminatory [employment] practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Young*, 468 F.3d at 1250; *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) ("'An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.'" (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998))).

Plaintiff's pretext arguments fall into four categories[10]: defendants' inconsistent and uncorroborated reasons for plaintiff's termination; the temporal proximity between protected activity and termination; defendants' failure to conduct reasonable and sufficient investigations; and defendants' failure to follow normal policies and procedures. Doc. 183 at 38–39. The court concludes that plaintiff hasn't adduced sufficient evidence to create a genuine issue that defendants' rationale for his termination is pretext for retaliation. The court explains this conclusion by addressing each pretext argument, below.

### i.    Inconsistent and Uncorroborated Reasons

*First*, plaintiff argues that defendants offer inconsistent and uncorroborated reasons for firing plaintiff. The Tenth Circuit has "held that a jury can reasonably infer pretext when an

---

[10]    Plaintiff's Response brief lists 13 different pretext arguments. Doc. 183 at 38–39. The court identified significant overlap in several of these enumerated arguments. So, the court streamlined the arguments into four overarching categories. This footnote explains the four pretext arguments that capture all of plaintiff's pretext theories.

*First*, the court grouped together arguments about defendants' inconsistent and uncorroborated reasons for plaintiff's termination including: "(a) Defendants provided changing, inconsistent, and post-hoc reasons for termination[;]" "(b) Many irregularities, inconsistencies, and fact disputes regarding the alleged reasons for termination[;]" and "(c) Witnesses did not actually corroborate the stated reasons for termination[;]" "(e) Reasons were inconsistent with performance assessments, objective data, and recent contract renewal and recredentialing[;] and "(f) CEO Taylor . . . said [plaintiff's] performance was good, he met all quality care metrics, and termination was 'unwarranted' and 'wrong.'" *Id.*

*Second*, the court grouped together arguments about temporal proximity including: "(m) Temporal proximity between protected activity and termination" and "(i) [o]ngoing concern over [plaintiff's] complaints about Kessler that continued up to termination." *Id.*

*Third*, the court grouped together arguments about failure to conduct reasonable and sufficient investigations including: "(d) Failure to conduct a reasonable investigation[;]" "(l) Investigation of [plaintiff] was conducted 'solely because of' the KBHA complaint . . . which . . . was retaliatory[;]" and "(h) Disparate treatment of other doctors . . . (failure to interview)[;]" and "(j) Failure to conduct a reasonable investigation into Byrnes' complaints about Kessler." *Id.*

*Last*, the court grouped together arguments about defendants' failure to follow normal policies and procedures: "(g) Not following policies and normal procedures in numerous respects[;]" and "(k) failure to follow policy and normal procedure in that investigation." *Id.*

employer is inconsistent in the reasons it provides for the termination." *Fassbender v. Correct Care Sols.*, *LLC*, 890 F.3d 875, 887 (10th Cir. May 2018) (quotation cleaned up). "Such inconsistencies include abandoning explanations that the employer previously asserted[,]" *id.*, or affirmatively disclaiming a proffered rationale. *Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005). But "merely providing additional non-discriminatory reasons for the termination is not enough to establish pretext, especially where the additional reasons are not contradictory." *Rolland v. Carnation Bldg. Servs., Inc.*, 739 F. App'x 920, 924 (10th Cir. 2018) (collecting cases). "Rather, inconsistency evidence is only helpful to a plaintiff if the employer has changed its explanation under circumstances that suggest dishonesty or bad faith." *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1291 (10th Cir. 2022) (quotation cleaned up); *see also Mueggenborg v. Nortek Air Sols., LLC*, No. 20-6147, 2021 WL 4807176, at *8 (10th Cir. Oct. 15, 2021) (assuming employer provided an "inconsistent explanation" for firing plaintiff but concluding that the circumstances still did "not suggest [the employer] changed its explanation under circumstances that suggest dishonesty or bad faith").

Here, plaintiff explains, various spokespersons for defendants emphasized different termination reasons, which, plaintiff argues, amounts to an inconsistency sufficient for a reasonable juror to infer pretext. Doc. 183 at 38. As explained above under *McDonnell Douglas*'s stage two, defendants identified four reasons—across their spokespersons and decision makers—to fire plaintiff: abandoning patients in the ICU; poorly documenting patients' status; potentially exercising poor clinical judgment; and stopping some of the peer review components in his role as CMO. Doc. 173-3 at 4 (Lichtenberger Dep. 25:6–26:19). And the summary judgment evidence supports plaintiff's contention that the various spokespersons emphasized one reason over another. But those varying emphases don't equal inconsistent

reasons. Indeed, the different spokespersons—even when emphasizing one primary firing reason—also cited other reasons, as well.

Decision maker Dr. Lichtenberger identified patient abandonment in the ICU as his primary concern but noted all four reasons in his deposition testimony. *Id.* For example, even as Dr. Lichtenberger prioritized the alleged abandoning of patients, he, too, referenced plaintiff's neglect in "doing some of the peer review components." *Id.* (Lichtenberger Dep. 25:6–26:16). Similarly, defendants' corporate witness echoed Dr. Lichtenberger's concern about patient abandonment but also cited "clinical competency" concerns. Doc. 183-8 at 22–23 (Eklund Dep. 62:23–63:1). And outside counsel framed the primary issue leading to plaintiff's firing as shutting down the peer review system, but he also discussed the "inappropriateness of [plaintiff's] patient care." Doc. 183-34 at 1 (Pl. Ex. D2). To be sure, defendants identified multiple reasons, and different spokespersons did so with differing emphases. But defendants never abandoned or affirmatively disclaimed any of their reasons. *See Whittington*, 429 F.3d at 994.

What's more, the four reasons cited by defendants are "not contradictory" to one another. *See Rolland*, 739 F. App'x at 924. Plaintiff could have abandoned patients in the ICU and interfered with the peer review system when serving as CMO; these actions aren't mutually exclusive. Nor has plaintiff adduced evidence of "circumstances that suggest dishonesty or bad faith." *Litzsinger*, 25 F.4th at 1291. A given spokesperson prioritizing one reason—while still citing other reasons consistent with other spokespersons—doesn't suggest dishonesty or bad faith. *Id.* In sum, despite the multitude of reasons and the varying speakers' different emphases, the summary judgment evidence reveals sufficient overlap in the reasons given to preclude an inference of pretext premised on inconsistent reasons.

Next, plaintiff contends defendants' termination reasons were uncorroborated. Doc. 183 at 38. He argues that witnesses and previous assessments of plaintiff's work don't align with defendants' termination reasons. *Id.* And he argues that CEO Taylor's perspective that plaintiff's firing was unwarranted and wrong likewise demonstrates uncorroborated reasons. Finally, he argues that he had no role in stopping the peer review system, so this reason, too, was uncorroborated. But a reasonable juror couldn't infer from the summary judgment evidence here that defendants' termination reasons were uncorroborated. Here's why: Five different doctors had brought similar concerns about plaintiff's patient care to CEO Taylor in April 2019, *before* plaintiff engaged in the protected activity at issue here. Doc. 173-2 at 5 (Taylor Dep. 133:23–135:21); Doc. 173-13 at 4 (Arroyo Dep. 31:24–32:5) (explaining that in April 2019 five doctors communicated to CEO Taylor the same concerns about plaintiff that Dr. Arroyo reiterated to Mr. Sabey in the investigative interview). And at that time, the five doctors requested that SCH fire plaintiff. Doc. 173-2 at 5 (Taylor Dep. 133:23–135:21). But instead of firing plaintiff in April 2019, CEO Taylor removed him as CMO. *Id.* (Taylor Dep. 135:2–8); Doc. 165 at 3 (Pretrial Order ¶ 2.a.xiii.). More importantly, whether those five doctors were correct in their assessments about plaintiff's patient care issues isn't something for the court to decide here. The court doesn't need to hash out whether defendants' deciding to fire plaintiff was "wise, fair or correct[.]" *Riggs*, 497 F.3d at 1118. Instead, the court evaluates merely "whether the employer honestly believed its reasons and acted in good faith upon them." *Id.* at 1119. And the April 2019 meeting suggests, at the very least, that patient care concerns weren't uncorroborated. Even if those concerns never made it into a formal assessment or CEO Taylor didn't agree that they warranted termination, there were doctors who corroborated the patient care concerns *before* any protected activity.

26

Nor is it of any moment that plaintiff contends the peer review termination reason is false.  Again, the court evaluates "the facts *as they appeared* to the person making the decision," and evaluates "whether the employer honestly believed its reasons and acted in good faith upon them."  *Riggs*, 497 F.3d at 1119 (emphasis added).  The summary judgment evidence suggests that the decision makers—Dr. Lichtenberger and Mr. Gessel—and those influencing the decision makers—Dr. Green-Cheatwood and Mr. Sabey—understood that plaintiff bore responsibility for the hospital's inadequate peer review system.  *See* Doc. 173-5 at 16 (Sabey Dep. 115:21–116:8); Doc. 173-9 at 9–10 (Green-Cheatwood Dep. 83:19—85:3).  Mr. Sabey came to that understanding from the interviews.  Doc. 173-5 at 16 (Sabey Dep. 115:21–116:8).  Dr. Green-Cheatwood arrived at that conclusion from her own CMO experience.  Doc. 173-9 at 9–10 (Green-Cheatwood Dep. 83:19—85:3).  And Dr. Lichtenberger relied on the information he received from Dr. Green-Cheatwood and Mr. Sabey.  Doc. 173-3 at 4, 5–6 (Lichtenberger Dep. 25:6–27:16, 32:8–33:9).  The court needn't decide whether plaintiff was at fault for the peer review system stalling out; just whether the decision makers, when firing plaintiff, *thought* he was at fault.  And plaintiff hasn't presented a triable issue about the decision makers' understanding.  Instead, plaintiff disputes his role in the peer review interference with deposition testimony from CEO Taylor and Ms. Killion.  Doc. 183 at 31.  But CEO Taylor wasn't part of the decision making process.  Doc. 173-2 at 5 (Taylor Dep. 133:8–12).  So, his understanding about how the peer review system became defunct sheds no light on how the facts appeared to the people making the decision to terminate.  And plaintiff cites the deposition testimony of Ms. Killion.  Doc. 183 at 31.  But she testified that she doesn't recall discussing the peer review process in the interview with Dr. Green-Cheatwood and Mr. Sabey.  Doc. 183-16 at 40 (Killion Dep. 120:10–121:3).  Her understanding, therefore, also didn't reach the ears of the decision

makers.  In sum, none of the evidence plaintiff cites creates a triable issue about the *decision makers'* understanding of the peer review debacle.

So, the court concludes, plaintiff hasn't created a triable issue that the absence of corroborating evidence—in the form of witnesses, performance assessments, CEO Taylor's judgment, or a false peer review reason—demonstrates pretext.  *See Sarrai v. Azar*, Civ. No. 16-1299 KK/SCY, 2018 WL 6833408, at *13 (D.N.M. Dec. 28, 2018) ("[T]hat [defendants] failed to confirm the complaints' accuracy does not give rise to a reasonable inference that their stated reliance on these complaints is pretextual.").  The court moves on to plaintiff's next pretext argument:  temporal proximity.

### ii.        Temporal Proximity

*Second*, plaintiff argues, the temporal proximity of his re-upped sexual harassment complaints (in January 2020) to his firing (in February 2020) creates a triable issue of pretext.  Doc. 183 at 39.  This temporal proximity pretext argument is particularly compelling, plaintiff asserts, because the concerns about plaintiff's protected activity were ongoing, continuing up to just weeks before termination.  *Id.*  But here's the problem:  the concerns that surfaced in the interviews—and that decision makers relied on to fire plaintiff—emerged *before* plaintiff's protected activity in August 2019.  That five-doctor meeting with CEO Taylor in April 2019 manifested many of the same concerns, thus mitigating against a plausible finding of pretext on temporal proximity grounds.  What's more, "close temporal proximity can support a finding of pretext only in combination with other evidence of pretext."  *Lobato v. N. M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013)  And, as discussed more fully below, no other evidence of pretext here contributes to the requisite combination.

28

iii.        **Unreasonable Investigation**

*Third*, plaintiff contends that defendants' failure to conduct reasonable investigations demonstrates pretext.  Doc. 183 at 38.  In assessing an investigation in the context of a pretext analysis, the Tenth Circuit doesn't focus on whether that investigation is "optimal (i.e., text-book best practices)" but instead on whether it "was fair."  *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017).  That is, a "failure to conduct . . . a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext."  *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (quotation cleaned up).  *Smothers* is instructive here.  In *Smothers*, the employer fired an employee by relying on information from just one side of an employment dispute.  *Id.*  And the employer actively refused to let plaintiff talk about the quarrel.  *Id.*  The Tenth Circuit held that this coupling of one-sided reliance and active refusal sufficed for a reasonable jury to infer pretext.  *Id.* at 543.  The Tenth Circuit later framed *Smothers*' employer as having "deliberately prevented the plaintiff from responding to the allegations against him."  *Gupta v. Okla. City Pub. Schs.*, No. 21-6138, 2022 WL 1742048, at *6 (10th Cir. May 31, 2022).  On the other hand, where an employer acknowledged that plaintiff disputed the accusations against him—but declined to rely on plaintiff's representation about the conflict—the Tenth Circuit found no such inference of pretext.  *Id.*  That is, "an employer may . . . 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'"  *Dewitt*, 845 F.3d at 1314 (quoting *BCI Coca-Cola*, 450 F.3d at 488).

Here, plaintiff argues, defendants conducted an unreasonable investigation after receiving the KBHA subpoena primarily by criticizing who defendants chose to interview—and who they chose not to interview.  Plaintiff contends that defendants didn't interview "other obvious

witnesses" like nurses or a co-surgeon, didn't interview plaintiff himself,[11] didn't consider

"readily available provider data," and accepted "biased witnesses' allegations without verifying

them." Doc. 183 at 38.  But an "optimal," "best practices" investigation isn't required.  *Dewitt*,

845 F.3d at 1315.  And defendants' decision to interview doctors, instead of nurses, makes sense

given that the doctors—in light of their expertise and experience—likely were better placed to

identify issues with plaintiff's performance as a doctor.  To be sure, considering provider data

undoubtedly falls into the best practices category.  But such data rarely tells the whole story.

And—once again—best practices aren't required.

So, at bottom, a single phone call is the most important event for the court to evaluate

pretext here.  It is undisputed that Dr. Green-Cheatwood conversed with plaintiff about the

KBHA complaint—the subject of the allegedly unreasonable investigation—on January 30,

2020.  Doc. 183-24 at 3 (Byrnes Decl. ¶ 11).  And it is undisputed that plaintiff, during this

---

[11]    Plaintiff also cites this "failure to interview" in a separate pretext argument about disparate
treatment of other doctors.  Doc. 183 at 38.  But the evidence plaintiff adduces as disparate treatment for
the termination decision all centers on the unreasonableness of the investigation.  This evidence includes:
a failure to interview other informed witnesses; a failure to interview a co-surgeon in one of plaintiff's
cases reviewed by Dr. Green-Cheatwood; a failure to interview plaintiff; and a failure to provide plaintiff
with an opportunity to respond.  Because these instances of alleged disparate treatment thus center on the
reasonableness of defendants' investigation, the court doesn't address a disparate treatment pretext
argument separately here.  It is subsumed in plaintiff's pretext argument based on unreasonable
investigation.

        And even if it did address disparate treatment separately, the court could dispense with the
argument quickly.  "A plaintiff may show pretext by providing evidence that he was treated differently
from other similarly-situated, nonprotected employees who violated work rules of comparable
seriousness." *Smothers*, 740 F.3d at 540 (quotation cleaned up).  Plaintiff adduces no evidence
suggesting anyone had complained to the KBHA about the allegedly similarly-situated doctors, or that
KBHA had issued a subpoena against these other allegedly similarly-situated doctors.  And that report
and subpoena drove the investigation here.  So, plaintiff fails to adduce disparate treatment evidence to
establish pretext.

        The only other disparate treatment evidence plaintiff adduces involves a Report of Adverse
Findings submitted to KBHA months after plaintiff was fired.  But here the court addresses just evidence
about defendants' termination decision.  So, the court doesn't take up that disparate treatment argument
here.

conversation, told Dr. Green-Cheatwood that the allegations were false.  *Id.*  And that's not all.

Plaintiff also pleaded his case.  He cited specific data showing his mortality rate, recited his work

experience as a surgeon, and even reviewed his litigation record (just two unsuccessful lawsuits

against him in 12.5 years in practice).  *Id.*; Doc. 174-29 at 1 (Def. Ex. 46).  Finally, he identified

medical staff members who would support him.  Doc. 183-24 at 3 (Byrnes Decl. ¶ 12); Doc. 174-

29 at 1 (Def. Ex. 46).

This conversation ends the analysis about the KBHA complaint investigation.  During the

phone call, plaintiff provided "'his version of events.'"  *Dewitt*, 845 F.3d at 1314 (quoting *BCI*

*Coca-Cola*, 450 F.3d at 488).  And that's a far cry from "deliberately prevent[ing] the plaintiff

from responding to the allegations against him."  *Gupta*, 2022 WL 1742048, at *6.  To be sure,

defendants didn't interview plaintiff formally during their investigation.  And perhaps such a

formal interview would constitute a best practice.  But, one more time, an "optimal"

investigation isn't the standard.  *Dewitt*, 845 F.3d at 1315.  And neglecting to provide plaintiff a

second, more formal opportunity to defend himself isn't required.[12]  *See Daimaru v. Wayfair,*

*LLC*, 631 F. Supp. 3d 1069, 1085 (D. Utah 2022) ("[Defendant's] failure to ask for more

information is not the same as a deliberate attempt to prevent her from arguing her case.").

Finally, just because defendants chose not to rely on plaintiff's representations, but instead relied

on those of other witnesses, it doesn't follow that a reasonable juror properly could infer pretext.

---

[12]     The court recognizes that plaintiff had this conversation with Dr. Green-Cheatwood alone.  But it
is undisputed that Dr. Green-Cheatwood sent an email to Mr. Sabey summarizing the phone call.  Doc.
174-29 (Def. Ex. 46).  And plaintiff argues that Dr. Green-Cheatwood and Mr. Sabey influenced the
decision makers to the point of imputing their own biases, *see* § IV.A.1. above.  That argument cuts both
ways.  If Dr. Green-Cheatwood and Mr. Sabey's perspectives so influenced the termination decision, then
this phone call suffices as an opportunity for plaintiff to tell defendants his version of the events.

*See Gupta*, 2022 WL 1742048, at *6. And so, the January 30, 2020, conversation negates any inference of pretext stemming from an allegedly unfair investigation into the KBHA complaint.

A similar analysis overwhelms any inference of pretext premised on the investigation into plaintiff's complaints about Dr. Kessler. Again, plaintiff takes issue with the choice of witnesses, noting that defendants only interviewed one nurse and didn't interview the ICU nurses' boss until just before plaintiff's firing. Doc. 183 at 4. But the nurse who defendants interviewed was *the one nurse* plaintiff alleged Dr. Kessler had harassed—a logical choice. Doc. 183-14 at 19 (Hauer Dep. 40:7–17); Doc. 174-17 at 2 (Def. Ex. 34) (explaining that plaintiff's complaint included "a single incident" involving the nurse interviewed). And SCH's Human Resources Director interviewed that nurse within one week of plaintiff's written complaint. Doc. 174-18 at 1 (Def. Ex. 35). The nurse explained in the interview that the allegedly inappropriate touching was simply when "the doctor had brushed up against [her]" and that she "was not uncomfortable." *Id.* She also commented that she "was surprised" the person reporting the incident said anything and surmised that the person reporting it "must have taken it wrong" because the brushing up "did not bother [her]." *Id.* To be sure, the nurse told plaintiff the touching was "weird and inappropriate." Doc. 183-32 at 1 (St. Clair Decl. ¶ 7). But she never claims to have made any such representation to the Human Resources Director—instead the nurse says she doesn't recall their conversation.[13] *Id.* at 1–2 (St. Clair Decl. ¶ 9). In light of such

---

[13]     The summary judgment record appears to contain evidence manifesting a dispute over what precisely this same nurse told Dr. Freund when he interviewed her on behalf of the MEC. Dr. Freund claims she never said the touching was "weird and inappropriate," but she says she did. *See* Doc. 183-11 at 17–18 (Freund Dep. 65:23–66:12); Doc. 183-32 at 2 (St. Clair Decl. ¶ 10). But the court has determined that the MEC wasn't plaintiff's employer. *See* § V.A.; Doc. 165 at 3 (Pretrial Order ¶ 2.x.). So, the court focuses here on what defendants—plaintiff's employer—did in their investigation of the Kessler complaint.

statements to HR, defendants' decision not to pursue other interviews seems—perhaps not "optimal"—but at least explicable.  *Dewitt*, 845 F.3d at 1315.

What's more, plaintiff again had occasion to provide "'his version of events'" during his October 16, 2019, meeting with Dr. Freund, Dr. Green-Cheatwood, and Dr. Stucky.  *Id.* at 1314 (quoting *BCI Coca-Cola*, 450 F.3d at 488); Doc. 165 at 3 (Pretrial Order ¶ 2.a.xvi.).  At the meeting, plaintiff not only reiterated his concerns about Dr. Kessler but also expressed his views about the thoroughness of the investigation.  Doc. 174-61 at 2 (Def. Ex. 67); Doc. 183-6 at 50–52 (Byrnes Dep. 181:21–183:10).  Once again, defendants' request that plaintiff attend this meeting and explain his version of events surrounding the Kessler complaint "'defeat[s] the inference' of pretext stemming from an allegedly unfair investigation[.]"  *Dewitt*, 845 F.3d at 1314 (quoting *BCI Coca-Cola*, 450 F.3d at 488).  And so, plaintiff is left with one final pretext argument: deviation from normal policies and procedures.

### iv.        Deviation from Normal Policies and Procedures

*Fourth*, plaintiff asserts that defendants' failure to follow their normal policies and procedures allows an inference of pretext.  Doc. 183 at 38.  As evidence, plaintiff invokes CEO Taylor's not participating in the firing decision and defendants' practice of resolving patient care issues with a doctor by discussing it with him, not firing him.[14]

---

[14]     Plaintiff adduces other evidence as well, but the court needn't address it here.  *First*, plaintiff invokes Dr. Green-Cheatwood's review of plaintiff's cases.  Doc. 183 at 12–13, 39.  But plaintiff himself identifies that Dr. Green-Cheatwood didn't review the relevant case until *after* plaintiff's firing and concedes that Dr. Green-Cheatwood's "opinions regarding that procedure could not have formed a basis for [plaintiff's] termination." *Id.* at 12–13.  If any alleged issues with Dr. Green-Cheatwood's review didn't influence plaintiff's firing, the court needn't address that pretext argument here.  *Second,* plaintiff cites shortcomings of the KBHA complaint's investigation—neglecting to interview plaintiff, neglecting to interview other witnesses, such as nurses, and neglecting to review quality data—as evidence of procedural deviation.  *Id.* at 38.  And he also cites the Kessler complaint investigation's shortcomings— neglecting to interview more than one nurse.  But the court has addressed these arguments already in § IV.A.3.iii., above, and so it needn't take them up again here.

A showing of pretext premised on a deviation from procedure requires evidence that the defendant acted (i) "contrary to a written company policy[;]" (ii) contrary to "an unwritten policy[;]" or (iii) "contrary to company practice when making the adverse employment decision." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quotation cleaned up). "However, 'deviations from normal company procedures' provide support for an assertion of pretext only when they can be considered 'disturbing procedural irregularities.'" *May v. Cockman*, No. CV 13-1021 GBW/KK, 2016 WL 10591979, at *8 (D.N.M. Jan. 28, 2016) (quoting *Doebele*, 342 F.3d at 1138 n.11). "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1230. In this similarly-situated analysis, a court should "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Here, plaintiff never adduces evidence of any written policies that defendants violated when reaching a decision to terminate him.[15] So, he must rely either on unwritten policies or company practice to establish pretext by deviation. To establish pretext based on CEO Taylor not participating in the termination decision, plaintiff adduces just one scrap of evidence: CEO Taylor's subjective belief. CEO Taylor testified that he "believe[d]" it would be atypical to

---

[15]    Plaintiff adduces evidence of written SCH and Centura policies about the peer review process and a physician's opportunity to respond to cases under review. Doc. 184-3 (Pl. Ex. D6); Doc. 184-24 (Pl. Ex. E167). But plaintiff clarifies in his briefing that the quality review to which these policies apply "did not occur until after [plaintiff's] termination[.]" Doc. 183 at 21. So, the court doesn't take into account these written policies in assessing whether defendants' termination reasons were pretextual.

exclude the CEO and that it "seemed unusual" that the CEO wouldn't know the reason for a termination decision.  Doc. 183-20 at 42, 45 (Taylor Dep. 117:17–20; 120:7–24).  But CEO Taylor's belief, without more, doesn't reach the level of a "disturbing procedural irregularit[y]." *May*, 2016 WL 10591979, at *8.  And, although plaintiff's argument may have some logical appeal at first blush, it fades when one considers the CEO's position in the relevant hierarchy here.  Centura employed both decision makers[16] whereas SCH employed Taylor.  Doc. 183-20 at 2 (Taylor Dep. 12:11–25).  And CEO Taylor explains that he "reported directly to the Centura leadership team" and functioned as Centura's "agent" whose "authority came directly from their delegated authority[.]"  *Id.*  So, while one logically might assume a CEO would make hiring and firing decisions, the analysis changes when the CEO is the agent of an overarching corporation like Centura.  As such, CEO Taylor not participating in the firing decision doesn't help plaintiff here.  In sum, plaintiff hasn't adduced evidence sufficient for a reasonable juror to infer that defendants' termination reasons were pretextual based on CEO Taylor's un-involvement in the firing decision.

Nor does defendants' decision to fire plaintiff for his alleged patient care issues—instead of discussing those issues with him and coaching him through them—allow an inference of pretext.  To argue pretext here, plaintiff cites CEO Taylor's testimony about one or two older radiologists who the hospital thought it might need to remove from reading mammograms because they misread them.  Doc. 183-20 at 49–51 (Taylor Dep. 128:17–130:2).  To CEO Taylor's knowledge—he left SCH during this time—those radiologists continued to work at the hospital but with more extensive oversight and increased peer review requirements.  *Id.*

---

[16]    Mr. Gessel held the position of Group President of Centura's Greater Colorado Kansas (GCK) and Dr. Lichtenberger held the position of Centura Health Physician Group President of Physician Alignment.  Doc. 173 at 10, 15.

Essentially, this evidence invokes the similarly-situated employee argument:  Because those radiologists weren't fired but instead received increased monitoring, defendants should have taken a similar approach to plaintiff's patient care issues.  And so, he argues, a reasonable juror can infer defendants' proffered termination reasons were pretextual because defendants treated plaintiff differently than a similarly-situated employee.  But plaintiff's pretext argument fails because those radiologists weren't similarly situated employees, at least not under the controlling legal definition of the term.

A similarly-situated employee is one who "violated work rules of comparable seriousness."  *Aramburu*, 112 F.3d at 1404.  But here, defendants' concerns about the allegedly similarly-situated radiologists were limited to one discrete issue:  the accurate reading of mammograms.  And, while such an issue is less-than-ideal, defendants could address it easily by putting checks in place to confirm correct diagnoses.  The work rules plaintiff allegedly violated were myriad, not singular, and not so easily addressed with simple double-checks and oversight.  The KBHA complaint against plaintiff summarized ten different allegations.  These included:  "multiple alarming adverse outcomes, including multiple patient deaths[;]" "pressuring hospital CEO Scott Taylor to disband the hospital peer review committee[;]" "an unusually high number of nicked bowels during surgeries[;]" "abandon[ing] 8 I.C.U. cases[;]" "transferring out patients that he has dangerously mismanaged[;]" and "well known incidents of sexual relations in hospital treatment rooms with nurses."  Doc. 174-31 at 6 (Def. Ex. 48).  The KBHA complaint also described his fellow physicians' concerns:  "[T]he medical staff has advised the CEO that he is unsafe and needs an assessment due to his erratic behaviors and dangerous violations of the standard of care."  *Id.*  Such numerous and serious allegations preclude the argument that

plaintiff and the radiologists were similarly-situated employees who "violated work rules of comparable seriousness." *Aramburu*, 112 F.3d at 1404.

Nor does plaintiff adduce evidence about the "relevant employment circumstances" of those radiologists, allowing the court to categorize them as similarly-situated employees. *Id.* In his pretext section, plaintiff doesn't adduce any evidence of the radiologists' work history or of company policies, which is necessary to compare plaintiff and the radiologists as similarly-situated. *Id.*; *see* Doc. 183 at 38. Instead, plaintiff merely cites CEO Taylor's account of the radiologists' treatment. *See* Doc. 183 at 38 (citing to PSAF 142 at Doc. 183 at 34). And CEO Taylor couldn't remember whether defendants removed either radiologist from patient care, though he thought they continued practice. Doc. 183-20 at 50 (Taylor Dep. 129:5–11). Nor was CEO Taylor in defendants' employ long enough to know with any certainty the ultimate outcome of the radiologists' saga. *Id.* (Taylor Dep. 129:9–18). Absent more substantial evidence, no reasonable juror could infer pretext based on defendants' deviation from company policy as demonstrated by their differential treatment of plaintiff and the radiologists.

### v.      Pretext Conclusion

In sum, plaintiff has failed to demonstrate a genuine issue about whether the proffered reasons for his termination were pretextual. The arguments based on inconsistent and uncorroborated reasons; temporal proximity; unreasonable investigation; and failure to follow normal policies and procedures are insufficient, taken separately and together, for a reasonable jury to conclude that defendants' termination reasons were pretext for a retaliatory discharge. Defendants thus are entitled to summary judgment on the claim of Title VII termination-based retaliation. The court addresses plaintiff's other Title VII claim, next.

## B.    Title VII Review Process Retaliation Claim

Plaintiff also contends under Title VII that defendants targeted him and treated him

differently in the 2020 quality review process.  Doc. 183 at 36.  Recall that plaintiff, to state a

prima facie case for retaliation, must show that (1) he engaged in protected opposition, (2) to a

reasonable worker,  the challenged employment action is materially adverse, and (3) the

protected activity and the materially adverse action were connected causally.  *Bekkem*, 915 F.3d

at 1267.  If plaintiff presents a prima facie case of retaliation, then defendant must respond with a

legitimate, nonretaliatory reason for the challenged action.  *Parker Excavating, Inc. v. Lafarge*

*W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017).  If defendant satisfies this burden, plaintiff must

show that defendant's reason was merely a pretext for retaliation.  *Id.*

Once again, plaintiff's first protected action—filing complaints against Dr. Kessler for

alleged sexual harassment—is stipulated and undisputed.  Doc. 165 at 3 (Pretrial Order

¶ 2.a.xv.).  And plaintiff's second action—filing an EEOC charge—likewise qualifies as

protected activity.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)

("By filing an EEOC claim, Plaintiff engaged in protected activity.")  So, plaintiff easily meets

the first prong of a prima facie case.  And as with plaintiff's other Title VII claim, the second

prong of the prima facie analysis here is also straightforward.  Defendants don't dispute that

reporting to a state regulatory board constitutes a materially adverse action.  *See* Doc. 173 at 26–

31.  Their position makes sense.  As another court has explained:

> It is difficult to see how threatening to report Plaintiff to the state licensing board,
> who presumably has the ability to revoke Plaintiff's license and thus impede his
> ability to work in his profession, could not be an adverse employment action.  A
> reasonable employee could be dissuaded from engaging in protected speech if they
> knew their employer would take steps to limit their ability to work in their
> profession[.]

*Bogden-Cozmuta v. Granby Urgent Care, LLC*, No. 20-CV-00879-VLB, 2022 WL 4585442, at

*7 (D. Conn. Sept. 29, 2022).  The proverbial rubber once again meets the road, therefore, on the

causation prong.

> To establish the requisite causal connection between his protected conduct and the
materially adverse action, plaintiff must adduce evidence capable of supporting a reasonable
finding that a desire to retaliate against him for his complaints about Dr. Kessler or EEOC charge
filing motivated defendants to adopt retaliatory processes when they decided to report his cases
to KBHA.  Plaintiff's two causation theories sound like this:  (1) Dr. Stucky and Dr. Green-
Cheatwood identified, with a retaliatory motive, specific cases of plaintiff's for peer review; and
(2) Drs. Stucky and Green-Cheatwood manipulated the peer review committee to deny plaintiff
the opportunity—which it had provided to other doctors—to respond to the reviewed cases
before reporting those cases to KBHA.  Doc. 183 at 41.  Here's the problem with these
theories.[17]

> Plaintiff has come forward with no evidence to demonstrate that the reviewing committee
knew of his protected activities.  And neither of his theories establishes the requisite knowledge.
Recall that a plaintiff asserting a claim of retaliation "must first come forward with evidence
from which a reasonable factfinder could conclude that those who decided to take adverse action
against him had knowledge of his protected activity."  *Singh*, 936 F.3d at 1043 (quotation
cleaned up).  So, unless plaintiff adduces evidence to demonstrate that the decision makers
themselves had knowledge of plaintiff's protected activities, this theory of causation fails.  *See*

---

[17]    Notice that neither causation theory involves the EEOC charge filing as protected activity.
Plaintiff fails to offer *any* theory where the peer review committee—who, the court determines, are the
decision makers here—have knowledge of his EEOC filing.  *See generally* Doc. 183.  And so, plaintiff's
claim—as premised on the EEOC filing as protected activity—fails.  And the court doesn't address it in
the analysis here.  The court explains this conclusion more fully when, below, it addresses plaintiff's
ADA retaliation claim premised on the EEOC charge filing.  *See* § V.B.

*Henderson v. Stormont-Vail Healthcare, Inc.*, 607 F. Supp. 3d 1173, 1189 (D. Kan. 2022)

("Without evidence that these committee members had knowledge of plaintiff's complaint,

plaintiff necessarily cannot establish the requisite causation between her complaint and the

[standard of care violation] finding.").

      To address his knowledge problem, plaintiff first urges the court to view Dr. Stucky and

Dr. Green-Cheatwood—not the committee—as the decision makers because they chose the cases

and passed the information on to the committee. Doc. 183 at 41. The court isn't persuaded. It

declines to equate choosing which cases to place before a committee at an outside facility with

deciding how appropriate or egregious those cases were. In his alternative theory, plaintiff

accepts the committee as the decision maker but contends that the doctors manipulated the

committee such that the committee didn't allow plaintiff to offer input. *Id.* This theory fails as

well. As discussed before, to rely on a cat's paw theory of liability—such as this alleged

manipulation requires—the subordinate's involvement must surpass "mere influence or input in

the decisionmaking process." *BCI Coca-Cola*, 450 F.3d at 487 (quotation cleaned up). Instead,

"the biased subordinate's discriminatory reports, recommendation, or other actions [must have]

caused the adverse employment action." *Id.* Plaintiff hasn't adduced any evidence to show the

doctors exercised anything beyond influence or input in the decisionmaking process here. To be

sure, deciding which cases a committee reviews constitutes influence. But it doesn't *cause* the

committee to find those cases were handled so poorly or inappropriately that they must report

them to KBHA. What's more, the members of the peer review committee were from another

hospital. Doc. 183-22 at 8 (Vogel Dep. 46:3–24). They worked and conducted peer review at a

sister facility—not SCH—and this arrangement arose from an intentional attempt to ensure an

"unbiased, robust peer review[.]" *Id.* Such geographical removal casts doubt on the Dr. Green-

Cheatwood and Dr. Sabey's ability to manipulate the committee. And so, plaintiff's failure to adduce evidence of the committee's protected activity knowledge persists.

In his last-ditch effort, plaintiff attempts to cure this knowledge problem one final way: by adducing evidence that Dr. Green-Cheatwood singled out one of plaintiff's cases to Rebecca Vogel. Doc. 183 at 20. Dr Vogel served as chair of the peer review committee and the email she received from Dr. Green-Cheatwood revealed plaintiff's identity, which should have remained undisclosed. Doc. 184-33 at 2–3 (Pl. Ex. E234). But that Dr. Vogel knew plaintiff's identity isn't evidence that Dr. Vogel knew about plaintiff's protected activities. This is especially so here because Dr. Vogel led peer review conducted by at an outside, sister facility—not SCH— and so plaintiff's identity alone was less likely to divulge his protected activities. Doc. 183-22 at 8 (Vogel Dep. 46:3–24).

But let's just say it did disclose those protected activities. Still, one person's sole knowledge—when a group is deciding something—isn't sufficient to establish the requisite causation. *See Flores v. DeJoy*, No. 19-CV-00784-LF-JHR, 2021 WL 2186240, at *10 (D.N.M. May 28, 2021) ("The biggest problem for [plaintiff] in showing a causal connection . . . is that only one person involved in the process . . . was aware that [plaintiff] had filed an EEO complaint."). Instead, a plaintiff must demonstrate not just a single person's knowledge, but also that the group mentioned or considered the protected activity when reaching its decision. *See id.* ("Given that [plaintiff] has no evidence that his EEO activity was even mentioned, much less considered, when the committee made its decision, and that only one member of the committee even knew about his EEO activity, no reasonable jury could find a causal connection[.]")*; see also Henderson*, 607 F. Supp. 3d at 1191 ("While Dr. Sachs was one of th[e] members [of the

decision making committee], there is no evidence that he influenced the decision in any way or that he shared his knowledge of plaintiff's complaint.").

Plaintiff thus fails to come forward with evidence sufficient for a reasonable juror to infer a causal connection between his protected activities and the processes that led to SCH reporting his cases to KBHA. And without the requisite causal connection, plaintiff's Title VII retaliation claim based on the peer review process can't stand. The court grants defendants summary judgment on Count 1. And the court moves on to address plaintiff's other set of federal claims, below.

## V.    ADA Claims (Count 3)

Plaintiff brings two claims under Count 3, both premised on the Americans with Disabilities Act. Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.iii.). One claim asserts that defendants wrongly perceived or regarded plaintiff as disabled because he filed a protected complaint. *Id.* The second claim asserts that defendants violated the ADA by retaliating against plaintiff after he filed EEOC charges of discrimination. *Id.* The court addresses each claim, in turn.

Recall that the *McDonnell Douglas* burden-shifting framework applies with equal force to plaintiff's ADA claims. *See Morgan*, 108 F.3d at 1323 (applying framework to ADA disability discrimination claim); *Doebele*, 342 F.3d at 1135 (applying framework to ADA retaliation claim). And so, the court begins with this now familiar question: Has plaintiff established a prima facie case for each ADA claim?

### A.    "Regarded As" ADA Disability Claim[18]

Plaintiff claims that defendants violated the ADA by wrongly perceiving plaintiff to have a mental disability because he filed a protected complaint. Doc. 165 at 17–18 (Pretrial Order

---

[18]    The Pretrial Order asserts two claims under the ADA. Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.iii.). The ADA Amendments Act of 2008 ("ADAAA") amended the ADA and "went into effect on

¶ 4.a.iii.).  And plaintiff contends, as a result of that wrong perception, defendants fired him.

Doc. 183 at 46.  The ADA prohibits covered employers from discriminating against a "qualified

individual on the basis of disability" in hiring, advancement, training, termination, and "other

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "To establish a prima

facie case of employment discrimination under the ADA, [plaintiff] must present evidence that

(1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential

functions of his job with or without accommodations; and (3) he was terminated under

circumstances which give rise to an inference that the termination was based on his disability."

*Smothers*, 740 F.3d at 544 (quotation cleaned up).  Under the first prong of the prima facie case,

"being regarded as" having a disability qualifies as being disabled.  42 USC § 12102(1)(C).

   "Under the ADAAA, for a plaintiff alleging disability discrimination to show that the

employer regarded him as having an impairment, the plaintiff must show that (1) he has an actual

or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the

employer was aware of and therefore perceived the impairment at the time of the alleged

discriminatory action."  *Adair*, 823 F.3d at 1306.  That is, to establish the first prong a prima

facie case of ADA discrimination based on plaintiff's perceived mental disability, plaintiff must

adduce evidence that—applying the three elements outlined above—defendants regarded

---

January 1, 2009." *Dewitt*, 845 F.3d at 1303 n.1. Here, the "events that form the basis for [plaintiff's] disability-related claims occurred after this date; therefore, the ADAAA is technically applicable here." *Id.* So, the court "refer[s] to [plaintiff's] disability-related claims . . . as claims alleging violations of the ADAAA." *Id.* Also, as our Circuit has noted, the 2008 amendments "primarily" revised "the ADA's definition of 'disability.'" *Id.* And the ADAAA modified the scope of a "regarded as" claim by defining "being regarded as having such an impairment" as not requiring that "'the impairment limits or is perceived to limit a major life activity.'" *Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016) (quoting 42 USC § 12102(3)(A)). Because this modified scope affects plaintiff's claims here, the court's analysis relies principally on cases decided after the ADAAA's effective date.

plaintiff as having an impairment.  Having satisfied that first prong,[19] plaintiff then must adduce

evidence that the circumstances of his termination give rise to the inference that it was based on

his perceived disability.  *Smothers*, 740 F.3d at 544.  The court thus addresses, first, whether

plaintiff has adduced evidence to show that defendants regarded him as having an impairment.

Then, the court takes up whether the circumstances of his termination allow a reasonable juror to

infer that defendants premised that termination on his perceived disability.

Here, plaintiff doesn't come forward with evidence that he had an actual or perceived

impairment, thus failing to establish the first prong of a prima facie case for "regarded as" ADA

discrimination.  In his attempt to meet his burden that he had a perceived impairment, plaintiff

adduces evidence that the Medical Executive Committee (MEC) requested he undergo a

psychological evaluation.  Doc. 174-23 (Def. Ex. 40) (letter from MEC to plaintiff

recommending psychological evaluation).  And while this evidence, on its face, might seem

sufficient to permit a finding that plaintiff had a perceived impairment, a sister circuit has

determined—even after the 2008 ADA Amendments Act broadening the "regarded as" claim—

that a request for psychological evaluation isn't enough to suggest that the employer regarded

plaintiff as disabled.  *Krueger v. Home Depot USA, Inc.*, 674 F. App'x 490, 494 (6th Cir. 2017)

("Asking [the employee] to undergo a psychological evaluation is not enough to suggest that

Home Depot regarded [the employee] as mentally disabled.").  And other circuits held the same

before the ADAAA took effect.  *See Stewart v. County of Brown*, 86 F.3d 107, 111 (7th Cir.

1996) (affirming that an employer's ordering "a number of psychological evaluations for

---

[19]      The parties don't dispute the second prong of a prima facie ADA disability discrimination case:
that plaintiff "is qualified to perform the essential functions of his job with or without
accommodations[.]"  *Smothers*, 740 F.3d at 544.  *See* 183 at 46 n.15 ("Defendants did not contest that
[second] element, which is not surprising given that [plaintiff] did not actually have any impairment.  In
any event, there is an abundance of evidence that [plaintiff] was qualified.").  And so, the court's analysis
doesn't address this second prong.

[plaintiff], and . . . stat[ing] to third persons that he considered [plaintiff] to be emotionally or psychologically imbalanced" didn't show a perception of mental impairment); *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998) (holding that employer's request for a mental evaluation after plaintiff had demonstrated "unusual workplace behavior" didn't demonstrate that employer perceived plaintiff as impaired).

But even if plaintiff had adduced evidence capable of establishing that the MEC regarded plaintiff as impaired, his prima facie case would fail on the third element of the "regarded as" test. That is, plaintiff hasn't adduced evidence of circumstances which permit a reasonable juror to infer that defendants fired plaintiff based on his perceived disability. To be sure, defendants were aware of a perceived impairment at the time of termination, having first heard concerns about plaintiff's mental state in September 2019 from members of the Medical Executive Committee. *See* Doc. 174-21 (Def. Ex. 38) (explaining the MEC's concerns about plaintiff's mental state in a September 2019 email to Dr. Green-Cheatwood, Physician Executive for Centura's GKC group); Doc. 173-11 at 3–4 (Dunford Dep 32:21–35:1) (testifying that Dr. Dunford reached out to Nancy Killion, Centura's Director of Quality, in September 2019— shortly after learning about plaintiff's letter of complaint—because of concerns about his impairment). And plaintiff argues that these "internal communications show [defendants] believed [plaintiff] had such an impairment because of his protected complaints about Kessler[.]" Doc. 183 at 46. But that perception isn't all an ADA claim requires.

Circumstances must allow a reasonable juror to infer that plaintiff's *employer* fired plaintiff based on the perceived disability. But all the evidence plaintiff adduces to demonstrate his perceived mental state centers on the Medical Executive Committee (MEC), who *wasn't* plaintiff's employer. Doc. 173-4 at 6 (Gessel Dep. 48:7–16) ("Whether it's employment or new

contracts or termination of existing contracts, those weren't the purview of the hospital board."); *see also* Doc. 165 at 3 (Pretrial Order ¶ 2.a.x.) ("For purposes of [plaintiff's] Title VII and ADA claims, the Hospital and Centura concede that they jointly employed [plaintiff].").  It is undisputed that the MEC had no power to make employment decisions about employed physicians.  Doc. 173 at 2–3; Doc. 183 at 3.  And so, plaintiff needed to adduce evidence of circumstances surrounding his firing that allow an inference that *SCH* or *Centura*—not the MEC—perceived he had an impairment.  But he didn't adduce any.  Indeed, defendants—his employers—didn't take any action or indicate in any way that they might terminate plaintiff when the MEC concerns surfaced in September 2019.  Instead, defendants acted four months later—and only after the KBHA complaint and subpoena—arrived early in 2020.  And plaintiff hasn't adduced any evidence to suggest that those affiliated with defendants who knew about the MEC concerns—Dr. Green-Cheatwood, Nancy Killion, and Mr. Sabey—ever expressed those concerns to Dr. Lichtenberger and Mr. Gessel, the persons who decided to terminate plaintiff.

And so, even when the court assumes defendants perceived plaintiff as having an impairment—a generous assumption given the case law about psychological evaluations— plaintiff still hasn't adduced sufficient evidence that the circumstances of his termination give rise to an inference that defendants based it on his perceived disability.  Plaintiff's ADA "regarded as" disability discrimination claim thus fails at the prima facie stage and the court grants summary judgment to defendants on this claim.  Now, to plaintiff's second ADA claim.

### B.    ADA Retaliation Claim

In the Pretrial Order, plaintiff premises his second ADA claim on defendants' "retaliating against [plaintiff] when they took adverse action against him after he filed EEOC charges of discrimination alleging Defendants violated the ADA."  Doc. 165 at 17–18 (Pretrial Order

¶ 4.a.iii.).  But then, in his Response to Defendants' Motion for Summary Judgment, plaintiff changes his tack.  He reframes his ADA retaliation claim and premises it on his "January 2020 opposition to being wrongly regarded as disabled and asked to undergo medical examination." Doc. 183 at 46.  And, as a result, plaintiff argues in his Response that defendants' "actions to fire him and subject him to their pretextual quality investigation . . . create an inference that ADA retaliation caused those actions."  *Id.*  That is, instead of premising his ADA retaliation claim on his filing an EEOC charge—which first happened in May 2020—plaintiff scoots his premise for retaliatory conduct back in time.  In his Response, plaintiff attempts to alter the premise of his ADA claim to his January 2020 letter opposing the psychological evaluation request.  And that changed premise would allow plaintiff's ADA retaliation claim to encompass *both* his firing *and* the case peer review that followed.  But that's a problem.  Here's why.

Fed. R. Civ. P. 16(d) provides that the pretrial order "controls the course of the action" unless modified by the court.  What's more, "'[c]laims, issues, defenses, or theories of damages not included in the pretrial order are waived.'"  *Zenith Petrol. Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal–Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).  Courts must construe pretrial orders liberally "'to cover any of the legal or factual theories that might be embraced by their language.'"  *Id.* (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)).  Nonetheless, pretrial orders require the parties to disclose the "real issues" preserved for trial to "avoid surprise."  *Id.* (quotation cleaned up).

Here, the court entered the Pretrial Order on January 23, 2024, before defendants filed their summary judgment motion.  Doc. 165.  The court has reviewed the Pretrial Order and concludes that it placed defendants on notice of just one basis for plaintiff's ADA retaliation claim:  his filing of EEOC charges.  *Id.* at 17–18 (Pretrial Order ¶ 4.a.iii.).  And that claim wasn't

broadly worded to permit the court to construe it liberally to include plaintiff's January 2020 opposition letter. What's more, plaintiff's Third Amended Complaint unequivocally indicates that the EEOC filing forms the grounds for his ADA retaliation claim. Doc. 87 at 16 (3d Am. Compl. ¶¶ 126–27) ("Dr. Byrnes engaged in activity protected by the ADA by filing EEOC Charges against the Defendants. . . . Defendants retaliated against Dr. Byrnes because he engaged activity protected by the ADA, in violation of the ADA."). The court can't read the Pretrial Order or Third Amended Complaint to place defendants on notice of any other theory of recovery for ADA retaliation. And so, the court evaluates plaintiff's ADA retaliation claim as based solely on his filing of EEOC charges—and not his January 2020 opposition. As a result, this ADA claim doesn't encompass plaintiff's firing, as explained, below.

The ADA prohibits employers from retaliating against employees who engage in an activity protected by that act. *See* 42 U.S.C. § 12203(a)–(b). To make a prima facie case of ADA retaliation, plaintiff must show that "(1) he engaged in a protected activity; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action." *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1187 (10th Cir. 2016). (quotation cleaned up).

Here, the court already has identified plaintiff's sole protected activity—his EEOC charge filing. *See Anderson*, 181 F.3d at 1178 ("By filing an EEOC claim, Plaintiff engaged in protected activity."). And that protected activity determines the timeframe of relevant adverse employment actions. That is, plaintiff solely may allege adverse employment actions "subsequent to or contemporaneous with the protected activity[.]" *Foster*, 830 F.3d at 1187. Here, plaintiff filed his first EEOC claim on May 1, 2020. Doc. 87 at 9 (3d Am. Compl. ¶ 67).

So, the court only needs to evaluate those adverse employment actions occurring on or after May 1, 2020.

Defendants fired plaintiff on February 12, 2020. Doc. 165 at 4 (Pretrial Order ¶ 2.a.xxi.). So that adverse action is out. Defendants also engaged in a review process of cases that plaintiff contends demonstrates a retaliatory motive because of his disparate treatment in the process compared to other doctors. And that process led to defendants reporting some of plaintiff's cases to KBHA. That one happened in the proper timeframe. The court already has determined that such reporting qualifies as an adverse employment action. *See* § IV.B. So, on this review process basis, plaintiff has satisfied the first two prongs of a prima facie ADA retaliation claim. All that remains is prong three: the causal connection between his EEOC filing and defendants' reporting to KBHA.

But, as with the Title VII claim premised on the review process discussed above, *see* § IV.B., here, too, plaintiff has a causation problem. Recall that a plaintiff asserting a claim of retaliation "must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to take adverse action against him had knowledge of his protected activity." *Singh*, 936 F.3d at 1043 (10th Cir. 2019) (quotation cleaned up). But here, doctors in a different, sister facility conducted the review process. Doc. 183-22 at 8 (Vogel Dep. 46:3–24). And, although Dr. Stucky and Dr. Green-Cheatwood determined which cases to send to that review committee, the court already has concluded that this didn't turn them into decision-makers. *See* § IV.B., above. So, the relevant decision makers are, yet again, the peer review committee. This means that plaintiff—to discharge the requirement of a causal connection—must adduce evidence that those review committee decision makers had knowledge of his EEOC charge filing. And plaintiff hasn't adduced such evidence—at all—zero. *See*

49

§ IV.B.n.18; *see also generally* Doc. 183.  Here too, then, plaintiff fails to establish a prima facie

case of ADA retaliation on the final prong—causation.  And without a prima facie case,

plaintiff's claim can't stand.  The court thus grants defendants summary judgment against

plaintiff's ADA claims (Count 3).  Having thus granted summary judgment on all of plaintiff's

federal claims, the court takes up plaintiff's state claims, below.

## VI.  State Law Claims

In addition to his federal claims, plaintiff asserts state and common law claims for

Retaliation (Count 2), Fraud (Count 4), Fraud by Silence (Count 5), Promissory

Estoppel/Detrimental Reliance (Count 7) and Common Law Retaliation for protected activity—

under the Kansas Wage Payment Act (Count 10).  Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.ii., iv.–

vii.).

Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental

jurisdiction over state law claims if it has "dismissed all claims over which it has original

jurisdiction[.]"  Section 1367 "reflects the understanding that, when deciding whether to exercise

supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every

stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'"  *City

of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v.

Cohill*, 484 U.S. 343, 350 (1988)).  In "the usual case in which all federal-law claims are

eliminated before trial, the balance of factors to be considered under the [supplemental]

jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward

declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ.*,

484 U.S. at 350 n.7.  Also, "[n]otions of comity and federalism demand that a state court try its

own lawsuits, absent compelling reasons to the contrary."  *Thatcher Enters. v. Cache Cnty.

Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

Our Circuit has expressed its preference that, when a district court dismisses all federal claims, it typically should decline to exercise supplemental jurisdiction over state law claims. *See Smith v. City of Enid ex rel. City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). But still, the decision is committed to the district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

The court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's state law claims. The court finds no compelling reasons to depart from our Circuit's general directives. Fairness and comity lead the court to conclude that a Kansas state court should resolve plaintiff's Kansas state law claims.

## VII.   Other Pending Motions

The court also takes this opportunity to rule other pending motions associated with the summary judgment briefing: three sealing motions and one disregard or surreply motion. The court starts with the sealing motions.

### A.   Sealing Motions (Doc. 176; Doc. 188; Doc. 194)

Defendants have filed two Motions for Leave to File Under Seal (Doc. 176; Doc. 194) and plaintiff has filed one Motion for Leave to File Exhibits Under Seal (Doc. 188). All three sealing motions are unopposed.[20] The parties ask the court to seal in their entirety—or give leave to file redacted versions of—specified exhibits filed with their supporting summary judgment memorandums.

---

[20]   Defendants' first sealing motion (Doc. 176) left ambiguous plaintiff's position about their specific sealing and redacting requests. *See* Doc. 176 at 4. But plaintiff's counsel later communicated informally to chambers, clarifying that plaintiff didn't oppose defendants' motion.

The Supreme Court recognizes a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S 589, 597 (1978) (citations omitted).  Nevertheless, a party may rebut the presumption of access to judicial records by demonstrating that "countervailing interests heavily outweigh the public interests in access." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (quotation cleaned up).  The party seeking to deny access must shoulder the burden to establish a sufficiently significant interest outweighing the presumption of access.  *Id*. (quotation cleaned up); *see also United States v. Bacon*, 950 F.3d 1286, 1293 (10th Cir. 2020) ("The party seeking to keep records sealed bears the burden of justifying that secrecy," and it must "articulate a sufficiently significant interest that will justify continuing to override the presumption of public access." (quotation cleaned up)).

This legal standard requires federal courts to assess competing interests:  the general right of public access weighed against an interest in protecting certain information from disclosure.  When engaging in this endeavor, district courts have substantial discretion.  *See, e.g.*, *Nixon*, 435 U.S. at 599 ("[T]he decision [about] access [to judicial records] is one best left to the sound discretion of the trial court[.]"); *see also Mann*, 477 F.3d at 1149 ("Whether judicial records and other case-related information should be sealed or otherwise withheld from the public is a matter left to the sound discretion of the district court." (citation omitted)).  Applying this standard, the court finds that the parties' need to preserve confidentiality here outweighs the public's right to access because the material at issue falls into two categories meriting protection:  (i) patient identity and medical information; and (ii) confidential and proprietary business information.  And our Circuit has clarified that "[m]edical records and confidential business records are

examples of the types of private information this court has allowed to be sealed." *Luo v. Wang*, 71 F.4th 1289, 1304 (10th Cir. 2023).

Having reviewed the exhibits at issue in these three sealing motions, the court concludes that each falls appropriately within one of these two categories. And the court notes that the parties diligently have sought limited redactions to preserve public access whenever possible. So, the court grants defendants' Motions for Leave to File Under Seal (Doc. 176; Doc. 194) and plaintiff's Motion for Leave to File Exhibits Under Seal (Doc. 188).

### B.    Motion to Disregard or for Leave to File Surreply (Doc. 195)

The final pending motion that spins out of the summary judgment briefing is plaintiff's Motion to Disregard Defendants' New Evidence or, in the Alternative, for Leave to File a Surreply (Doc. 195). Plaintiff asks the court to disregard new materials attached to defendants' Reply brief (Doc. 189).

Our Circuit answered "whether the district court may consider evidence and issues raised by the party moving for summary judgment in a reply brief without allowing the opposing party to respond" in *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998). It determined that a district court has "two permissible courses of action" in this situation: the court may "permit[] a surreply or, in granting summary judgment for the movant, it [may] refrain[] from relying on any new material contained in the reply brief." *Id.*; *see also Doebele*, 342 F.3d at 1139 n.13 (10th Cir. 2003) (concluding "the court abused its discretion to the extent it relied on new evidentiary materials presented for the first time in [defendant's summary judgment] reply brief" because the district court denied plaintiff's motion to file a surreply); *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005) (explaining that a district court choosing not to rely on new evidence raised in a summary judgment reply brief "does not abuse its discretion by precluding a surreply" (quotation cleaned up)). Here, the court grants movants

summary judgment. And it does so without relying on any of the new evidence filed with defendants' Reply brief. So, the court follows the second permissible course of action identified by our Circuit. It grants the portion of plaintiff's motion requesting that it disregard defendants' new materials filed on reply and denies the portion of plaintiff's motion requesting leave to file a surreply.

## VIII.   Conclusion

For the reasons stated in this Memorandum and Order, the court grants defendants' Motion for Summary Judgment (Doc. 172) against plaintiff's retaliation claims under Title VII and plaintiff's "regarded as" discrimination and retaliation claims under the ADA. The court dismisses plaintiff's state law claims without prejudice. The court also grants the parties' Motions for Leave to File Under Seal (Doc. 176; Doc. 188; Doc. 194). And it grants in part and denies in part plaintiff's Motion to Disregard Defendants' New Evidence or, in the Alternative, for Leave to File a Surreply (Doc. 195). The court directs the Clerk to enter Judgment consistent with this Memorandum and Order and close this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 172) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** the parties' Motions for Leave to File Under Seal (Doc. 176; Doc. 188; Doc. 194) are granted.

The court directs the Clerk to remove the provisional designation and leave permanently under seal the following Doc. 174 exhibits: Doc. 174-27, Doc. 174-30, Doc. 174-33, Doc. 174-36, Doc. 174-43, Doc. 174-44, Doc. 174-57, Doc. 174-58, and Doc. 174-62. And the court directs the Clerk to unseal any provisionally sealed exhibits in Doc. 174 not enumerated here.

The court also directs the Clerk to remove the provisional designation and leave permanently under seal the following Doc. 184 exhibits: Doc. 184-5, Doc. 184-11, Doc. 184-21,

Doc. 184-30, Doc. 184-31, and Doc. 184-33.  And the court directs the Clerk to unseal any provisionally sealed exhibits in Doc. 184 not enumerated here.

The court also directs the Clerk to remove the provisional designation and leave permanently under seal the following Doc. 190 exhibit:  Doc. 190-1.  And the court directs the Clerk to unseal the other provisionally sealed exhibit in Doc. 190 not enumerated here.

The court further directs defendants to file the redacted version—previously submitted to chambers by email—of the following exhibits:  Doc. 174-27, Doc. 174-30, Doc. 174-33, Doc. 174-36, Doc. 174-43, Doc. 174-44, Doc. 174-58, Doc. 174-62, and Doc. 190-1.

Finally, the court directs plaintiff to file the redacted version—previously submitted to chambers by email—of the following exhibits:  Doc. 184-5, Doc. 184-11, Doc. 184-21, Doc. 184-30, and Doc. 184-33.

**IF IS FURTHER ORDERED BY THE COURT THAT** plaintiff's Motion for Leave to Disregard Defendants' New Evidence or, in the Alternative, for Leave to File a Surreply (Doc. 195) is granted in part and denied in part.  The court grants plaintiff's request to disregard defendants' new evidence and denies plaintiff's request for leave to file a surreply.

**IT IS SO ORDERED.**

**Dated this 5th day of September, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

# B. Judgment in a Civil Case

# United States District Court

--------------------------- DISTRICT OF KANSAS----------------------------

MATTHEW BYRNES,

        **Plaintiff,**

v.                               **Case No. 21-2086-DDC**

ST. CATHERINE HOSPITAL,
CENTURA HEALTH CORPORATION,

        **Defendants.**

## JUDGMENT IN A CIVIL CASE

☐     Jury Verdict.   This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒     Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.

**Plaintiff recovers nothing, the action is dismissed on the merits, and the defendants shall recover costs from plaintiff consistent with the Memorandum and Order (Doc. 200) filed on September 5, 2024.**

      _____09/05/2024_____                 SKYLER B. O'HARA
             Date                          CLERK OF THE DISTRICT COURT

                                     by: __s/ Megan Garrett_____
                                         Deputy Clerk