## CASE NO. 24-3149

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

## MATTHEW BYRNES
*Plaintiff/Appellant*

vs.

## ST. CATHERINE HOSPITAL and CENTURA HEALTH CORPORATION
*Defendants/Appellees*

---

On Appeal from the United States District Court for the District of Kansas
The Honorable Daniel D. Crabtree, United States District Court Judge
D.C. No. 21-2086-DDC-ADM

---

## APPELLEES' RESPONSE BRIEF

---

KUTAK ROCK LLP
Richard A. Olmstead    KS#19946
8415 E. 21st St. N., Ste. 200
Wichita, Kansas 67206
(316) 248.6480 (Telephone)
Richard.Olmstead@KutakRock.com

*Attorneys for Defendants, St. Catherine Hospital and Centura Health Corporation*

## ORAL ARGUMENT REQUESTED

4930-8778-7279.6

## CORPORATE DISCLOSURE STATEMENT

Centura Health Corporation is now known as CommonSpirit Mountain Region ("CSMR"), a private Colorado nonprofit corporation with its principal place of business in Centennial, CO 80112. CSMR's sole corporate parent is Catholic Health Initiatives Colorado ("CHIC"), a private Colorado nonprofit corporation. CHIC's sole corporate parent is CommonSpirit Health, a private Colorado nonprofit corporation. St. Catherine Hospital ("SCH") is a Kansas nonprofit corporation with its principal place of business in Garden City, Kansas. SCH's sole corporate member is CHIC. There are no publicly held corporations that own 10% or more of St. Catherine, CSMR, CHIC, or CommonSpirit Health stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.........................................................i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES................................................................. vi

PRIOR OR RELATED APPEALS...........................................................1

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE ...............................................................1

STATEMENT OF FACTS .....................................................................4

    The Parties........................................................................................4

    Concerns About Dr. Byrnes Arose Before His Protected
    Activity ..............................................................................................4

    Dr. Byrnes Complains About Dr. Kessler .................................6

    SCH and the MEC Investigate Dr. Byrnes's Complaints.......7

    MEC Requests a Psychological Examination .........................9

    Anonymous KBHA Complaint ...................................................10

    Centura's Investigation and Findings ......................................12

        1.    Administrative Interference with Peer Review .......................13

        2.    Patient Abandonment .................................................................14

        3.    Patient Safety/Clinical Concerns................................................15

        4.    Mr. Taylor's Failure to Hold Dr. Byrnes
            Accountable.................................................................................16

4930-8778-7279.6

5. *Independent Chart Review* ......................................................16

Centura Leadership Terminates Dr. Byrnes's Employment ...............17

No Peer Review Occurred When Dr. Byrnes Was CMO .....................19

Centura Develops and Implements a System-Wide Quality Review ..................................................................................19

SUMMARY OF THE ARGUMENTS .....................................................22

ARGUMENTS AND AUTHORITIES ......................................................23

I. The District Court properly granted summary judgment on Plaintiff's retaliation claim relating to his termination. ........................23

A. Standard of Review .........................................................................23

B. Plaintiff cannot prove retaliatory animus to support a cat's paw theory of liability and, thus, cannot establish a causal connection between his protected activity and termination ......................................................................................25

1. *Plaintiff Ignores His Burden of Proving Retaliatory Animus* ....................................................................................27

2. *Applicable Standards for Proving Retaliatory Animus* ...........28

3. *Plaintiff's Poorly Defined Cat's Paw Theories of Liability* .....................................................................................31

4. *There is No Evidence of Dr. Green Cheatwood's or Mr. Sabey's Retaliatory Animus* ...............................................32

a. *Dr. Byrnes was afforded a fair opportunity to tell his side of the story.* ...................................................33

b.  *There is no evidence that Dr. Green-Cheatwood or Mr. Sabey withheld pertinent information from the decision-makers.* ................................35

c.  *Dr. Byrnes did not provide the identities of any specific witness for Defendants to interview.* .................36

d.  *There is no evidence that Defendants failed to consider pertinent objective quality data* .......................38

e.  *Mr. Sabey and Dr. Green-Cheatwood did not deviate from any established policy or procedure* ...........40

5.  *Plaintiff's Alternative Multi-Layered Cat's Paw Theory Fails for Lack of Evidence and Legal Support* ..............41

C.  Plaintiff's remaining pretext arguments fail. ...............................44

1.  *Applicable Pretext Standards* ....................................44

2.  *Defendants have not changed or abandoned their reasons for termination.* ............................................45

3.  *There is no inconsistency in the evidence* ................................48

4.  *Defendants' termination reasons are supported by the evidence.* ...................................................51

5.  *Under the facts of this case, temporal proximity does not establish pretext.* ................................................53

II.  The District Court properly granted summary judgment on Plaintiff's retaliation claim relating to Defendants' reports to the KBHA. ...........................................................54

A.  Standard of Review .......................................................54

B.  Decision makers lacked knowledge of Dr. Byrnes's protected activity. ..........................................................54

**C.** Plaintiff cannot proceed under a cat's paw liability theory ..............................................................56

**D.** **Plaintiff cannot establish pretext in the Quality Review process** ................................................59

    *1.* *The Quality Review process did not violate any policies or procedures.* ..................................59

    *2.* *Defendants did not report any SOC 2 cases* ............................61

**III.** **The District Court did not abuse its discretion when it declined to exercise supplemental jurisdiction.** ...................................62

CONCLUSION ........................................................................63

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ..........................64

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ...................................................................65

CERTIFICATE OF SERVICE ..................................................65

# TABLE OF AUTHORITIES

## CASES

*Ainsworth v. Indep Sch. Dist No. 3 of Tulsa Cnty.*, 232 F. App'x
    765 (10th Cir. 2007) ................................................................40

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193 (10th
    Cir. 2006) .............................................................................25

*Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283 (10th Cir.
    2018) ...................................................................................42

*Birge v. Apfel*, No. 97–2158, 1998 WL 165118 (10th Cir. Apr. 2,
    1998) (unpublished) ..............................................................50

*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869 (10th Cir. 2004) ......................24, 25

*Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073 (10th
    Cir. 2006) .............................................................................24

*Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686 (10th
    Cir. 2008) .............................................................................32

*Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189 (10th Cir. 2011) ........................44

*D'Souza-Klamath v. Cloud Cty. Hlth. Ctr., Inc.*, No. 07-4031-KGS,
    2009 WL 902377 (D. Kan. Mar. 31, 2009) (unpublished) ......................55

*Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299 (10th Cir. 2017)................................32

*Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278 (10th Cir.
    2018) ...................................................................................24

*EEOC v. BCI Coca-Cola Bottling Co.*, 405 F.3d 476 (10th Cir.
    2006), *cert. granted* 549 U.S. 1105 (2007), *cert. dismissed*
    549 U.S. 1334 (2007) ....................................................28, 42, 58

*GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183 (10th Cir. 2022). ........... 25, 35-36

vi

*Gupta v. Okla. Pub. Schs.*, No. 21-6138, 2022 WL 1742048 (10th Cir. May 31, 2022) (unpublished) ........................................................ 33-34

*Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092 (10th Cir. 2019) ............................24

*Henderson v. Stormont-Vail Healthcare, Inc.*, 607 F.Supp.3d 1173 (D. Kan. 2022) ............................................................................55

*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187 (10th Cir. 2008) ...................25

*Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193 (10th Cir. 2021) ............................................................................34

*Iweha v. State of Kansas*, 121 F.4th 1208 (10th Cir. 2024) ............31-32, 41-42, 58

*Jaramillo v. Colorado Jud. Dep't*, 427 F.3d 1303 (10th Cir. 2005), *as modified on denial of reh'g* (Dec. 20, 2005)........................................51, 53

*Johnson v. Weld Cty., Colo.*, 594 F.3d 1202 (10th Cir. 2010) ..............................45

*Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334 (11th Cir. 2012) ............................................................................30

*Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280 (10th Cir. 2022) ........................................................................45, 53

*Llamas v. QC Financial Servs., Inc.*, 621 Fed. Appx. 906 (10th Cir. 2015) ............................................................................29

*Lobato v. N.M. Env't Dep't*, 733 F.3d 1283 (10th Cir. 2013) ..............................53

*Lounds v. Lincare, Inc.*, 812 F.3d 1208 (10th Cir. 2015)........................................44

*Macon v. United Parcel Serv., Inc.*, 743 F.3d 708 (10th Cir. 2014)......................44

*Mann v. XPO Logistics Freight, Inc.*, 819 Fed. Appx. 585 (10th Cir. 2020) ........................................................................29, 30

*Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072 (10th Cir. 2023)......................23

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)...............................29, 50

*McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125 (10th Cir. 1998) ..................43

*Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545 (10th Cir. 1999) ...........................30

*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007)...........................29, 30

*Morris v. City of Colorado Springs*, 666 F.3d 654 (10th Cir. 2012) ....................23

*Perfetti v. First Nat'l Bank*, 950 F.2d 449 (7th Cir.1991) ....................................51

*Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182 (10th Cir. 2002) ..................26, 55

*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052 (10th Cir. 2009)..................46

*Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324 (10th Cir. 2017) ....................................24

*Rolland v. Carnation Bldg. Servs., Inc.*, 739 F. App'x 920 (10th Cir. 2018) ................................................................................................52

*SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013)...............................................24

*Smith v. Oklahoma ex rel. Tulsa Cnty. Dist. Att'y*, 245 F. App'x 807 (10th Cir. 2007) ............................................................................ 51-52

*Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530 (10th Cir. 2014)..............33, 35

*Tavery v. United States*, 32 F.3d 1423 (10th Cir. 1994) .......................................25

*Thomas v. Berry Plastics Corp.*, 803 F.3d 510 (10th Cir. 2015) ....................26, 56

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011) ................................................................................................53

*United States v. Bowen*, 527 F.3d 1065 (10th Cir. 2008)......................................25

*Villamar v. Lincare, Inc.*, 624 Fed. App'x 658 (10th Cir. 2105) ..........................28

viii

*Young v. Dillion Companies, Inc.*, 468 F.3d 1243 (10th Cir. 2006) ....................30

# STATUTES

28 U.S.C. § 1367...............................................................................................62

42 U.S.C. § 1320a-7b (referenced as "Anti-Kickback Statute").......................5

42 U.S.C. § 1395nn (referenced as "Stark Law").................................................5

29 U.S.C. § 701 *et seq.* (referenced as "Rehabilitation Act") ...........................30

# OTHER

Brunt, L. & Stoikes, N., 10 (2023), Managing the Difficult Gallbladder, *UpToDate*............................................................................................. 7-8

Fed. R. Civ. P. 56................................................................................................37, 39

FED. R. EVID. 802..................................................................................................37

KAN. ADMIN. REGS. § 28-34-6a............................................................................6

KAN. ADMIN. REGS. § 28-52-4.............................................................................61

4930-8778-7279.6

## PRIOR OR RELATED APPEALS

This case has not been the subject of any prior or related appeals.

## STATEMENT OF THE ISSUES

**I.    Did the District Court properly grant summary judgment on Plaintiff's Title VII retaliation claim relating to his termination?**

**II.   Did the District Court properly grant summary judgment on Plaintiff's Title VII retaliation claim relating to Defendants' reports to the KBHA?**

**III.  Did the District Court abuse its discretion when it declined to exercise supplemental jurisdiction over Plaintiff's state law claims?**

## STATEMENT OF THE CASE

For the safety of their patients, hospitals must be able to terminate the employment of dangerous doctors, even those who successfully conceal clinical deficiencies for many years from those empowered to make employment decisions. That is precisely what happened in this case.

While investigating subpoenas received from the Kansas Board of Healing Arts ("KBHA") stemming from an anonymous complaint filed against Plaintiff, Dr. Matthew Byrnes ("Dr. Byrnes" or "Plaintiff"), Centura Health Corporation ("Centura") discovered highly concerning information

1

about Dr. Byrnes which led it to terminate his employment. (App. Vol. 2, 285-86).[1]

The reasons supporting termination were many and included corroboration of many of the allegations in the anonymous KBHA complaint, including, Dr. Byrnes abandoning patients, substandard clinical care, and concerns that Dr. Byrnes, in his role as Chief Medical Officer ("CMO"), interfered with the proper functioning of peer review. *Id*.

Because there had been no physician peer review at SCH for years while Dr. Byrnes was CMO, Centura subsequently developed and conducted a hospital wide comprehensive quality review. (App. Vol. 2, 440-41; App. Vol. 4, 884-86). Cases for numerous physicians were sent to an independent physician peer review committee and seven cases meeting mandatory reporting obligations under Kansas law were submitted to the KBHA, including four of Dr. Byrnes's cases. (App. Vol. 2, 344-45, 458, 462, 479-83, 487-91; App. Vol. 8, 1947-1961).

---

[1] Citations to Appellant's Appendix, filed December 26, 2024, are by volume and page number (e.g., App. Vol. __, at __). Appellant's Opening Brief will be cited as (Aplt. Brief, __).

Dr. Byrnes sued, alleging, among other claims, that Defendants unlawfully retaliated against him. (App. Vol. 1, 142-63). Defendants moved for summary judgment and demonstrated that none of the decision-makers with respect to termination or KBHA reporting knew that Dr. Byrnes had previously engaged in protected activity. (App. Vol. 7, 1802, 1825-27). Plaintiff thus concocted a multi-layered cat's paw theory of liability that lacked any evidentiary support. (App. Vol. 4, 948). Plaintiff unsuccessfully attempted to prove the animus of allegedly biased subordinates through a "spaghetti-on-the-wall approach to pretext, rattling off no fewer than 13 theories to see which one will stick." (App. Vol. 7, 1803). None stuck. (*Id*. at 1807-1827).

The lower court properly granted summary judgment in Defendants' favor on all claims arising under federal law and declined jurisdiction on remaining state law claims. (*Id*. at 1839). This appeal followed. (*Id*. at 1842).

4930-8778-7279.6

## STATEMENT OF FACTS

### The Parties

Centura was[2] a joint operating company that managed and operated SCH. (App. Vol. 1, 193, 274, 276, 283, 290; App. Vol. 2, 298-300, 302, 306, 324) (collectively, Centura and SCH may be referred to herein as "Defendants"). Dr. Byrnes worked at SCH from 2013 through February 2020 and during that time served in various capacities simultaneously including general surgeon, intensivist, and CMO. (App. Vol. 1, 194). Dr. Byrnes was employed pursuant to an employment agreement that delegated all employment decisions to Centura. (*Id*.; App. Vol. 2, 354-56, 641-76).

### Concerns About Dr. Byrnes Arose Before His Protected Activity

In April 2019, five physicians scheduled a meeting with SCH's Chief Executive Officer, Scott Taylor, to express numerous concerns about Dr. Byrnes and his patient care. (App. Vol. 1, 277; App. Vol. 2, 316-17, 319-21, 398, 412, 416, 422-23, 515; App. Vol. 3, 838, 845-46, 857, 860-61; App. Vol. 8,

---

[2] During the pendency of this litigation, Centura's sponsors disaffiliated from one another. Centura Health Corporation was rebranded as CommonSpirit Health. *See* Corporate Disclosure Statement, *supra* at i.

1852). The physicians were Dr. Arroyo, a surgeon, Dr. Dunford, Chief of Surgery, Dr. King, a hospitalist, Dr. Kessler, a surgeon, and Dr. Freund, President of Medical Staff. *Id*. These physicians reported concerns about Dr. Byrnes that included numerous abnormal surgical complications, excessive blood losses during surgery, Dr. Byrnes being out of town while on call in the ICU and other examples of patient abandonment, shipping off patients with bad outcomes to other hospitals to avoid scrutiny, and other behavioral, clinical, and quality concerns. *Id*.

Mr. Taylor did nothing to address the physicians' concerns. (App. Vol. 1, 277; App. Vol. 2, 316-17). He reported to Dr. Freund that he addressed the physicians' concerns by removing Dr. Byrnes from his CMO role. (App. Vol. 1, 277). This was simply untrue. Centura, not Mr. Taylor, removed Dr. Byrnes from his CMO role and did so *solely* because of concerns that Dr. Byrnes's total compensation exceeded fair market value and thus created Stark Law and Anti-Kickback Statute compliance risks. (App. Vol. 1, 194; App. Vol. 2, 307-08, 357, 372-73; App. Vol. 3, 677-709, generally).

Dr. Byrnes contends, and Centura agrees, that if Centura "had concerns about the quality of his medical care," Defendants would not have "entered into a new contract with Byrnes." (Aplt. Brief, 5). The record, however, is devoid of evidence that Mr. Taylor elevated these physicians' concerns to his superiors at Centura even though Centura was, at the time, negotiating a new employment contract with Dr. Byrnes. (App. Vol. 1, 194; App. Vol. 2, 373; App. Vol. 3, 677-702).

### Dr. Byrnes Complains About Dr. Kessler

In late August 2019, Dr. Byrnes lodged a complaint about Dr. Kessler[3] through Centura's Integrity Hotline. (App. Vol. 1, 194; App. Vol. 2, 308, 356, 361, 523-34, 527; App. Vol. 3, 677-702, 705-06, 794). The next day, he submitted a more detailed written complaint about Dr. Kessler to Dr. Freund and Nancy Killion, SCH Director of Quality. (App. Vol. 1, 194; App.

---

[3] Physician privileges and "Medical Staff" membership at SCH were the exclusive domain of an independently elected Medical Executive Committee ("MEC"), the powers and duties of which did not include employment decisions. (App. Vol. 1, 193; App. Vol. 2, 530-66; App. Vol. 3, 302, 339, 499-500); *see also* KAN. ADMIN. REGS. § 28-34-6a. Defendants did not employ Dr. Kessler; he was an independent general surgeon who had been granted privileges at SCH by the MEC. (App. Vol. 2, 396-97, 523).

Vol. 3, 795-98). In his complaints, Dr. Byrnes accused Dr. Kessler of sexually harassing nurses and engaging in dangerous or unsafe medical practices. *Id*.

### SCH and MEC Investigate Dr. Byrnes's Complaints

Thom Hauer, SCH's Human Resources Director, interviewed the nurses whom Dr. Byrnes alleged had been sexually harassed and found Dr. Byrnes's report to be inaccurate. (*See* App. Vol. 2, 525-26; App. Vol. 3, 799-804; App. Vol. 6, 1616-17; App. Vol. 7, 1817-18).

Because Dr. Byrnes's complaints targeted a non-employed member of the Medical Staff, Dr. Freund, on behalf of the MEC, also investigated. (App. Vol. 2, 501-04, 506-09, 516, 518; App. Vol. 3, 805-06). Dr. Freund concluded that most of Dr. Byrnes's complaints could not be corroborated. (App. Vol. 2, 507, 509, 516, 518-19; App. Vol. 3, 805-06; App. Vol. 6, 1617). By way of example, Dr. Freund reviewed Dr. Kessler's cholecystectomy charts which revealed a conversion rate from laparoscopic to open was roughly 5%, a number that is within industry norms both by objective standards and Dr. Byrnes's own subjective standards reflected in his

written complaint. (App. Vol. 2, 358, 506, 517; App. Vol. 3, 796); *see also* Brunt, L. & Stoikes, N., 10 (2023), Managing the Difficult Gallbladder, *UpToDate*[4]; *(cf.* App. Vol. 8, 1881 (identifying 2% as national benchmark)).

On September 17, 2019, Dr. Freund shared the results of his investigation with the MEC. (App. Vol. 2, 346, 404, 505, 507; App. Vol. 3, 807-08). On October 16, 2019, Dr. Freund, Dr. Bryan Stucky, Vice President of Medical Staff, and Dr. Toni Green-Cheatwood, Group Vice President and Physician Executive for Centura's Greater Colorado Kansas ("GCK") group,[5] met with Dr. Byrnes to share the results of the investigation and for Dr. Freund to try to collegially resolve Dr. Byrnes's concerns about Dr. Kessler. (App. Vol. 2, 375, 512).

Following that meeting, Dr. Byrnes texted Dr. Green-Cheatwood claiming there were unidentified nurses wanting to speak with her on the "topics of sexual harassment and clinical work." (App. Vol. 7, 1771, 1773).

---

[4] Retrieved December 12, 2023 from https://uptodate.com (discussing studies showing conversion rates from laparoscopic to open ranging from 3.4% to 13.7%). (App. Vol. 2, 508 (Dr. Freund consulted *UpToDate*)).

[5] Dr. Green-Cheatwood attended because Dr. King had not yet assumed her role as Director of Medical Affairs ("DMA"), which was created to fill the vacant CMO role at SCH. (App. Vol. 2, 375).

4930-8778-7279.6

Dr. Green-Cheatwood explained to Dr. Byrnes it would be inappropriate for her to meet with the nurses without their supervisor, Ms. Haug, being present. Dr. Green-Cheatwood had no authority over nurses at SCH. *Id*. Notwithstanding, before she left Garden City, Dr. Green-Cheatwood and Mr. Taylor met with Ms. Haug and shared Dr. Byrnes's report of nurses wanting to lodge complaints about Dr. Kessler. Ms. Haug committed to talking to the entire nursing staff about how to report such complaints. *Id*. The record contains no evidence of any such complaints ever being made.

## MEC Requests a Psychological Examination

Prompted by multiple members of the MEC becoming concerned about Dr. Byrnes's behaviors, decision-making reflected in the nature in which he raised false complaints about Dr. Kessler, and his physical and mental health, the MEC requested Dr. Byrnes to submit to a psychological evaluation. (App. Vol. 2, 344, 347, 405-06, 408, 414-15, 510-13; App. Vol. 3, 811). On January 19, 2020, Plaintiff delivered a letter to Dr. Stucky, who had succeeded Dr. Freund as Medical Staff President, responding to the MEC's request and demanding a "full retraction of the letter without hesitation or

4930-8778-7279.6

qualification." (App. Vol. 2, 339, 348, 362; App. Vol. 3, 812-17). On January 21, 2020, the MEC voted to retract its request until SCH established a peer review and appropriate quality review process, which did not exist at SCH at that time. (App. Vol. 2, 348; App. Vol. 3, 818-19; *see also infra* pp. 12-14, 19 (discussing non-existence of peer review at SCH)).

### **Anonymous KBHA Complaint**

On January 27, 2020, SCH received multiple subpoenas from the KBHA, one of which commanded production, among other documents, of five years of peer review records relating to Dr. Byrnes's cases and documents concerning allegations or investigation of patient abandonment, higher than average post-operative complications, or concerns about performance. (App. Vol. 2, 312; App. Vol. 3, 820-21; App. Vol. 8, 1844).

On January 30, 2020, Dr. Byrnes called Dr. Green-Cheatwood to report that an anonymous KBHA complaint had been filed against him and that he wanted to talk to her because he was concerned about someone 300 miles away reviewing the allegations and not knowing him the way that Dr. Green-Cheatwood knew him. Dr. Green-Cheatwood recapped her call

with Dr. Byrnes in two emails, one to Dr. Shauna Gulley, system Chief Medical Officer and Chief Innovation Officer for Centura, Tom Gessel, GCK Group President, and Peter Sabey, in-house counsel for Centura, and the other just to Mr. Sabey. (App. Vol. 2, 381-82; App. Vol. 3, 822-25).

Dr. Byrnes told Dr. Green-Cheatwood that he suspected the KBHA complaint was made by Dr. Kessler in retaliation for the complaint he made about Dr. Kessler. (App. Vol 2, 824-25; *see also* App. Vol. 6, 1559). Dr. Byrnes told her about the specific allegations in the KBHA complaint and that his attorney was "set to disprove" them all. *Id*.[6] He further emphasized data that he believed rebutted the allegations in the complaint. *Id*. Mr. Sabey subsequently notified Mr. Taylor that he was initiating an investigation into the concerns raised with the KBHA. (App. Vol. 2, 312, 380-81; App. Vol. 8, 1845-46).

The anonymous KBHA complaint contained numerous allegations including, but not limited to: (1) Dr. Byrnes was injuring and killing

---

[6] On February 3, 2020, Dr. Byrnes's counsel provided Mr. Sabey with a copy of the anonymous complaint reiterating Dr. Byrnes's position regarding the allegations that each was "totally false and baseless and … not made in good faith." (App. Vol. 2, 312; App. Vol. 3, 826-831).

patients but evaded scrutiny because he pressured Mr. Taylor to disband the peer review committee; (2) Dr. Byrnes had an unusually high number of surgical complications; (3) he abandoned patients in the ICU; (4) he transferred out patients whose care he mismanaged to avoid scrutiny; (5) he intimidated other physicians due to his close relationship with Mr. Taylor; (6) he was witnessed out of town purchasing alcohol while on call in the ICU; and (7) he was witnessed to have lost consciousness in a local eating establishment, also while on call. (App. Vol. 2, 826-31).

## Centura's Investigation and Findings

Mr. Sabey, Dr. Green-Cheatwood, and Morgan Thomas, GCK Group Quality Director for Centura, traveled to Garden City to investigate the allegations in the anonymous complaint and to gather documents and information responsive to the KBHA subpoenas. (App. Vol. 2, 312-13, 375, 435-36). Witnesses interviewed corroborated many of the allegations made in the anonymous complaint. (App. Vol. 2, 316, 319-20, 389-90, 398-400, 412, 416, 420-21, 514; App. Vol. 3, 837-63; App. Vol. 8, 1847-50, 1852-54).

### 1.    Administrative Interference with Peer Review

Ms. Thomas's role during that site visit included, among other things, to "go on a quest for any documentation of peer review" that had previously occurred at SCH. (App. Vol. 2, 313-14, 383, 435-37). She found none. (*Id*. at 433, 437, 452-53, 457). The lack of *any* physician peer review occurring at SCH was confirmed by nearly every witness interviewed. (App. Vol. 2, 315, 320, 340-41; App. Vol. 3, 837-63; App. Vol. 4, 882-83; App. Vol. 8, 1847-50, 1852-54).[7]

The SCH Medical Staff Organization Manual identified the "Peer Review Committee" as one of the "Medical Staff Standing Committees," which were required to "meet … and … maintain a permanent record of its findings … ." (App. Vol. 3, 639). The CMO was a required member of the committee. *Id*. "Duties of the PRC" included overseeing the implementation of the peer review process and reviewing cases referred to it. *Id*. (*See also* App. Vol. 2, 377).

---

[7] In his deposition, Dr. Byrnes, who was *CMO for roughly six years*, shockingly confirmed the accuracy of the witnesses' recollection when he testified that he has no knowledge of any physician peer review occurring at SCH within the last two years of his employment. (App. Vol. 2, 363).

Peer review cannot function without the CMO's involvement – the CMO (or equivalent) is the liaison between the Quality Department, where the data lives, and the independent Medical Staff, whose responsibility it is to conduct peer review. (App. Vol. 2, 371, 378, 432-34, 449-50, 454-55, 537).

Multiple witnesses interviewed reported that the reason there was no peer review at SCH was because Dr. Byrnes, as CMO, disbanded the peer review committee. (*Id*. at 319-20; App. Vol. 3, 859 ("Matt Byrnes came in and said disbanded"); App. Vol. 8, 1847 ("Byrnes said we didn't need peer review because he was CMO and was going to handle"), 1853 ("there has been no peer review … for 5 to 6 years … [because] the committee was abolished by Dr. Byrnes")). Dr. Green-Cheatwood assumed Dr. Byrnes, like all other Centura CMOs, was responsible for ensuring properly functioning peer review and that the Quality Department would have reported through him. (App. Vol. 2, 377-78, 383-84).

### 2. *Patient Abandonment*

Dr. King reported seeing Dr. Byrnes at a brewery in Hays purchasing growlers of beer while on call at the ICU in Garden City (nearly 150 miles

away). (App. Vol. 2, 319, 412; App. Vol. 3, 838; App. Vol. 7, 1764). Dr. King also reported her first-hand experience with Dr. Byrnes not properly handing off multiple patients before leaving town, resulting in numerous patients not being "rounded on" by a physician for up to two days. (App. Vol. 2, 412). Other doctors also expressed concerns about Dr. Byrnes "not handing out patients correctly, not being present when he should be" and his "very, very negative impact on the culture" at SCH. (App. Vol. 2, 321; App. Vol. 3, 846 ("he's not there. I tell myself 'this is fraud.'"), 857 ("no proper sign out", "multiple issues with sign outs"); App. Vol. 8, 1851 ("Pt back in December … admitted 1-2 AM … couldn't reach the intensivist")).

### 3.    *Patient Safety/Clinical Concerns*

Dr. Arroyo, who trained surgical residents for the University of Kansas School of Medicine for thirty years, expressed concerns about the number and type of complications with Dr. Byrnes's surgeries which were "seldom seen." (App. Vol. 2, 320, 420-22; App. Vol. 3, 845-46). He shared details concerning specific cases, including a thyroidectomy where Dr. Byrnes severed the patient's "laryngeal nerve" which left the patient

unable "to breathe and … speak." *Id.* Dr. Kessler also provided numerous examples of Dr. Byrnes's clinical incompetencies. (App. Vol. 8, 1852-54).

### 4.    *Mr. Taylor's Failure to Hold Dr. Byrnes Accountable*

Mr. Sabey and Dr. Green-Cheatwood learned through their February 6, 2020 interviews about the April 2019 meeting between Mr. Taylor and the group of physicians addressed above and Mr. Taylor's protection of Dr. Byrnes by taking no action in response to the many serious concerns raised. (*supra* pp. 4-6). Mr. Sabey concluded from the interviews that "if you took something to Scott Taylor [about Dr. Byrnes], he would not appreciate it and he would … protect [Dr.] Byrnes." (App. Vol. 2, 319-20; see also App. Vol. 3, 832-63; App. Vol. 8, 1847-54).

### 5.    *Independent Chart Review*

Dr. Green-Cheatwood, a surgeon before moving to administration, conducted a preliminary chart review of cases identified in KBHA subpoenas and in witness interviews. (App. Vol. 2, 386-89). For example, she reviewed the charts from a tracheostomy case identified by one of the witnesses and found it to be "a horrible complication for the patient,"

which she "remember[s] thinking I don't know how this – this surgical occurrence happens." (*Id*. at 386).

Another case identified in a KBHA subpoena involving a Dr. Byrnes patient who died was sent to a Centura physician in Colorado, Dr. Bordelon, whose job duties included reviewing surgical cases for the State of Colorado. Dr. Bordelon found "**[t]he surgical management of this patient [was] very troubling**" and expressed support for a temporary suspension of Dr. Byrnes "as [an] initial temporary step …, but with the caveat that a deep dive review of recent cases be undertaken concurrently." (*Id*. at 388; App. Vol. 8, 1855-56 (emphasis in original)).

### Centura Leadership Terminates Dr. Byrnes's Employment

On February 10, 2020, Mr. Sabey and Dr. Green-Cheatwood reported the information gathered during their investigation to Mr. Gessel and Dr. Lichtenberger, Centura Health Physician Group President of Physician Alignment. (App. Vol. 1, App. Vol. 2, 284-85; App. Vol. 2, 325, 391). Dr. Lichtenberger and Mr. Gessel jointly elected to terminate Dr. Byrnes's employment contract. Though the reasons supporting termination were

many, Dr. Lichtenberger's primary reasons for electing to terminate were patient abandonment and concerns about Dr. Byrnes's quality of care. (App. Vol. 1, 284-88, 290, 293l App. Vol. 2, 428).[8]

Dr. Lichtenberger had no knowledge that Dr. Byrnes had engaged in protected activity prior to termination. (App. Vol. 2, 294). There is likewise no evidence in the record that Mr. Gessel had knowledge of Dr. Byrnes's protected activity.

Defendants terminated Plaintiff's employment pursuant to the "without cause" provisions of Plaintiff's employment agreement. (App. Vol. 2, 428; App. Vol. 3, 665-66, 864-65). No reason was given to Dr. Byrnes for his termination. (*Id*.; *see also* App. Vol. 2, 363-64).[9]

---

[8] Mr. Gessel does not specifically recall being involved in the decision to terminate but believes his involvement was likely because "when it came to significant actions … with a physician, [he] would have been engaged in that conversation." (App. Vol. 2, 301).

[9] Had Mr. Taylor not previously announced his upcoming retirement, Centura would have also terminated his employment. (App. Vol. 2, 326-27).

### No Peer Review Occurred When Dr. Byrnes Was CMO

In late summer or early fall 2019, Ms. Killion, who had overseen quality at SCH for over 35 years, announced her pending retirement on February 7, 2020. (App. Vol. 2, 334-35). In advance of her departure, Ms. Thomas requested an SBAR (Situation, Background, Assessment, Recommendation) at the hospital "with volume of cases, outcomes of peer review, meeting frequency, etc **asap**." (App. Vol. 2, 376; App. Vol. 4, 876-79). She learned there had been no peer review committee operating at SCH for at least the preceding 1½ years. *Id*.

### Centura Develops and Implements a System-Wide Quality Review

Ms. Thomas and Dr. Green-Cheatwood thus developed a quality review plan that included a retrospective 2-year review of all physicians' cases that met certain quality indicators. (App. Vol. 2, 440-41; App. Vol. 4, 884-86) (the "Quality Review"). To address gaps identified in KBHA subpoenas, the plan was later amended to include a five-year review of Dr. Byrnes's cases that met those same quality indicators – cases that would have been reviewed and responsive to KBHA subpoenas had there been

properly functioning peer review when Dr. Byrnes was CMO. (App. Vol. 2, 379, 381, 386, 449, 459-61; App. Vol. 4, 887-892).

Once approved and operational in late spring 2020, the Quality Review functioned, in part, as follows:

1.      O're Berry, RN, BSN, MSN, the Quality Improvement Coordinator at St. Anthony's Hospital in Denver, performed an abstract study of medical charts that met identified quality triggers, *i.e.*, complications, returns to surgery, mortalities, etc. (App. Vol. 2, 442, 462, 469-71; App. Vol. 4, 891-893).

2.      Ms. Berry prepared spreadsheets within which she identified cases of concern or cases warranting further physician review and shared those with Dr. Stucky. (App. Vol. 2, 442, 462, 470, 473).

3.      Beginning in May 2020, Ms. Berry met regularly with Dr. Stucky who determined whether any cases should be submitted to a physician peer review committee. (App. Vol. 2, 342, 462-63, 465, 471-72; App. Vol. 4, 904-05).

20

4.     Cases selected by Dr. Stucky for peer review were subsequently reviewed by a peer review committee at other Centura facilities acting as proxies for the SCH MEC until peer review could be stood up at SCH. (App. Vol. 2, 342-43, 459, 462-63, 465, 477-79).

5.     Based on committee scoring, cases meeting *mandatory* reporting thresholds under Kansas law were submitted to the KBHA. (App. Vol. 2, 344-45, 458, 462, 479-83, 490-91).

As a result of this process, seven total cases for four different physicians were reported to the KBHA, four of those were Dr. Byrnes's cases. (*Id*. at 487-89). The peer review committee that evaluated those cases was from St. Anthony's Hospital in Denver, led by Dr. Vogel. (App. Vol. 2, 478, 481, 482; App. Vol. 6, 1542-1544). Neither Dr. Vogel nor any member of the peer review committee had any knowledge that Dr. Byrnes had engaged in protected activity. *Id*.

The Quality Review, of which peer review was a part, culminated in a comprehensive report, a presentation to SCH's Board of Trustees, and the development and implementation of a multi-factorial action plan that

addressed numerous system failures and deficiencies. (App. Vol. 2, 443-51; App. Vol. 4, 894-903; App. Vol. 8, 1857-1938).

### SUMMARY OF THE ARGUMENTS

The district court properly granted summary judgment for Defendants. There is no evidence, viewed in a light most favorable to Dr. Byrnes, from which a reasonable juror could infer: (1) a causal connection between Dr. Byrnes's protected activity and his termination or the reports of his cases to the KBHA; (2) that Dr. Green-Cheatwood, Mr. Sabey, or Dr. Stucky possessed sufficient retaliatory animus to support a cat's paw theory of liability; or (3) that Defendants' proffered reasons for their employment actions were a pretext for retaliation.

The district court did not, as Plaintiff argues, misapply applicable standards by construing evidence in a light most favorable to Defendants. (Aplt. Brief, 31). Rather, the district court properly refused to speculate and rejected Plaintiff's purported facts that lack evidentiary or logical support.

"An employment discrimination plaintiff cannot survive summary judgment where the evidence he produces permits nothing more than a

speculative basis for believing discrimination [or retaliation] was a [determinative or] motivating factor." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1083 (10th Cir. 2023). In this appeal, Plaintiff recycles the same pretext arguments that the district court rejected, all of which lack evidentiary or legal support. Like the district court, this Court should reject Plaintiff's theories, decline the invitation to speculate, and affirm the grant of summary judgment in Defendants' favor. When it does so, the Court should also affirm the district court's discretionary decision to not exercise jurisdiction over Plaintiff's state law claims.

## ARGUMENTS AND AUTHORITIES

## I.  The District Court properly granted summary judgment on Plaintiff's Title VII retaliation claim relating to his termination.

### A.    <u>Standard of Review</u>

The Court reviews "a district court's grant of summary judgment de novo, applying the same standard as the district court." *Morris v. City of Colorado Springs*, 666 F.3d 654, 660 (10th Cir. 2012). "Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law.'" *Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278, 1283 (10th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).

"No genuine issue of material fact exists 'unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). "A factual dispute cannot be said to be 'genuine' if the nonmovant can do no more than 'simply show that there is some metaphysical doubt as to the material facts.'" *SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (quoting *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006)).

While the Court must draw all *reasonable* inferences in Dr. Byrnes's favor, "an inference is unreasonable if it requires 'a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (alteration in original)

24

(quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)). Dr. Byrnes "may not evade summary judgment by speculating about possibilities or hypotheticals that have de minimis to no support in the record." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1205 (10th Cir. 2022).

Dr. Byrnes's subjective "'statements of mere belief' ... must be disregarded." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)). The Court must likewise disregard the many statements of purported fact in Dr. Byrnes's brief that lack evidentiary support. *Hasan*, 935 F.3d at 1098 (quoting *Bones*, 366 F.3d at 875).

### B. Plaintiff cannot prove retaliatory animus to support a cat's paw theory of liability and, thus, cannot establish a causal connection between his protected activity and termination.

To establish the necessary causal connection element of his retaliation claim, Plaintiff must "come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "An employer's action … cannot be

*because* of … protected opposition unless the employer knows the employee has engaged in protected opposition." *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (emphasis in original).

"Where, as here, the plaintiff lacks evidence that the actual decisionmaker possessed an unlawful retaliatory animus, the plaintiff can establish pretext by invoking the cat's-paw theory of recovery and presenting evidence that a *biased* subordinate who lacked decisionmaking power used the formal decisionmaker as a dupe in a deliberate scheme to bring about an adverse employment action." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514–15 (10th Cir. 2015) (emphasis added). "To survive summary judgment[, Dr. Byrnes] must establish … a genuine issue of material fact as to (1) *the retaliatory animus of the subordinate*, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action." *Id*. (emphasis added).

The record is devoid of evidence from which a jury could reasonably infer that Mr. Sabey or Dr. Green-Cheatwood possessed retaliatory animus sufficient to survive summary judgment.

### 1.    *Plaintiff Ignores His Burden of Proving Retaliatory Animus.*

Plaintiff, however, ignores his burden by misstating the district court's holding concerning his cat's paw theory of liability. He incorrectly argues "the district court properly found … a causal connection based on the 'cat's paw' theory, *i.e.*, that (1) a subordinate (Green-Cheatwood, along with the in-house lawyer supporting her) took action motivated by discriminatory animus" and that "the district court found Byrnes's evidence of pretext sufficient to show causation with respect to his prima facie case … ." (Aplt. Brief, 36). The district court made no such findings.

Rather, because of Plaintiff's "spaghetti-on-the-wall approach to pretext" through which Plaintiff purported to prove Mr. Sabey's and/or Dr. Green-Cheatwood's retaliatory animus, the district court "*assume[d]—without deciding—*that a reasonable juror could infer Dr. Green-Cheatwood and Mr. Sabey's retaliatory animus under one of the many pretext arguments plaintiff proffers." (App. Vol. 7, 1803). In doing so, the district court unnecessarily advanced to an analysis of all of Plaintiff's pretext arguments, and decided those issues against Plaintiff, on the *assumption*

27

that Plaintiff could establish evidence to advance a cat's paw theory of liability. (*Id*. at 1805). He cannot.

### 2. *Applicable Standards for Proving Retaliatory Animus*

There is no bright line rule regarding what constitutes evidence of animus sufficient to overcome summary judgment on a cat's paw theory. Several cases from this Circuit, however, provide guidance. For example, in *EEOC v. BCI Coca-Cola Bottling Co.*, 405 F.3d 476, 489 (10th Cir. 2006), the Court found sufficient evidence of subordinate bias because the subordinate "directed 'many race-based remarks,'" including "racial jokes and put downs" and used a "racial epithet" to describe the charging party, and "suggest[ed] a pattern of racial bias in disciplinary matters … ." Plaintiff cannot direct the Court to any comparable evidence here.

In *Villamar v. Lincare, Inc.*, 624 Fed. App'x 658, 662 (10th Cir. 2105), the Court held evidence that an allegedly biased subordinate provided false information to the decisionmaker without more was insufficient to support an inference of animus. *See also Llamas v. QC Financial Servs., Inc.*, 621 Fed. Appx. 906, 913-914 (10th Cir. 2015) (same).

However, in another unpublished opinion, the Court inferred retaliatory animus where the termination was made in sole reliance on a subordinate's recommendation and the subordinate merely had knowledge of the plaintiff's protected activity when she recommended termination. *Mann v. XPO Logistics Freight, Inc.*, 819 Fed. Appx. 585, 604-05, 609-10 (10th Cir. 2020). In support for the holding that "these two facts satisfy the causal connection under the cat's paw theory," the *Mann* Court cited but wrongly construed *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007).

*Montes* was not a cat's paw case. The portion of the *Montes* holding relied upon in *Mann* addressed a plaintiff's *prima facie* burden under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and noted that the last element (causal connection) could be established <u>either</u> by showing that *the decision-maker* had knowledge of protected activity <u>or</u> that a subordinate *who harbored discriminatory animus* "knew and used [the decision-maker] … 'as a cat's paw to effect … her own biased designs." *Id*. (quoting *Young v. Dillion Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006). The *Montes* Court did not eliminate a plaintiff's burden to prove retaliatory animus to

proceed on a cat's paw theory. *Montes* certainly did not hold, as *Mann* suggests, that mere knowledge of protected activity by an allegedly biased subordinate is sufficient evidence of retaliatory animus.

Animus can only be established through direct evidence or indirectly through evidence of pretext. *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549-50 (10th Cir. 1999). As to what constitutes evidence of animus, the Court should find persuasive the Eleventh Circuit's holding in *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012), where the Court, addressing proof of animus under the Rehabilitation Act, held as follows:

> [A]nimus … requires a showing of prejudice, spite, or ill will. [Citations omitted]. Put differently, discriminatory animus is generally thought to be a combination of intentionally differential treatment and a disdainful motive for acting that way. [Citation omitted].

Defendants are unaware of any authority suggesting animus means anything different when evaluating a plaintiff's burden under a cat's paw theory of liability.

3.    *Plaintiff's Poorly Defined Cat's Paw Theories of Liability*

In the district court, Dr. Byrnes argued in summary fashion that "[t]he bias of Green-Cheatwood and Sabey, as well as Freund and the MEC

members they interviewed who had voiced concerns about Byrnes's complaints against Kessler, is established by the pretext evidence … ." (App. Vol. 4, 947-48). Plaintiff implicitly makes the same arguments in this appeal.

The Court's holding in *Iweha v. State of Kansas*, 121 F.4th 1208 (10th Cir. 2024) is instructive. Like Dr. Byrnes, the plaintiff in *Iweha* did not "clearly indicate whether she believe[d] [the alleged biased employee whose report led to termination] was herself biased" or whether "though [the reporting employee] lacked discriminatory intent herself, she uncritically relied on the discriminatorily biased allegations of other employees in preparing her investigative report and arriving at her termination recommendation." 121 F.4th at 1229. Like the plaintiff in *Iweha*, "[t]he ambiguity in [Dr. Byrnes's] presentation is symptomatic of the scarcity of evidence supporting either version of [his] cat's paw theory." *Id.* at 1230.

4930-8778-7279.6

4. *There is No Evidence of Dr. Green Cheatwood's or Mr. Sabey's Retaliatory Animus*

Plaintiff argues Dr. Green-Cheatwood's and Mr. Sabey's alleged retaliatory animus may be established through evidence of pretext. (App. Vol. 4, 41). However, Dr. Byrnes makes only one pretext argument that, if credible, could possibly lead to an inference of Dr. Green-Cheatwood's or Mr. Sabey's alleged bias – that they intentionally conducted an "unfair, one-sided investigation." (Aplt. Brief, 44-48).

When assessing an investigation, the Court does not focus on whether the investigation was "optimal (i.e., text-book best practices)" but instead whether it "was fair." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017). "[T]he standard for establishing pretext requires evidence of not just any procedural shortfall, but of a 'disturbing procedural irregularity,' often exemplified by an employer's 'falsifying or manipulating relevant criteria[.]'" *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008). Plaintiff makes no such showing.

a.    *Dr. Byrnes was afforded a fair opportunity to tell his side of the story.*

Plaintiff falsely argues "[t]he investigators … never even interviewed Byrnes … or afforded him the opportunity [to] tell his side of the story." (Aplt. Brief, 45). Dr. Byrnes did, in fact, give Dr. Green-Cheatwood his side of the story. (App. Vol. 3, 824-25). In that call, he explained and denied every allegation in the KHBA complaint and discussed the data that he believed (incorrectly) proved he is a good doctor. *Id*. He was given a full and fair opportunity to respond to the allegations in the KBHA complaint even if he was not formally interviewed as part of the investigation. (App. Vol. 3, 824-25, App. Vol. 8, 1845-46; App. Vol. 6, 1559; App. Vol. 1, 195).

In *Smothers v. Solvay Chemicals, Inc*., 740 F.3d 530 (10th Cir. 2014), the case on which Dr. Byrnes primarily relies, the decision makers "deliberately prevented" the employee from providing his version of events as part of the employer's investigation. 740 F.3d at 543 ("During the only meeting Mr. Smothers had with any decision maker, Mr. Holley even *refused to allow him to talk about the quarrel*." (Emphasis added)). This fact is not present here. Rather, this case is more closely aligned with *Gupta v.*

*Okla. Pub. Schs.*, No. 21-6138, 2022 WL 1742048, at *6 (10th Cir. May 31, 2022) (unpublished), where the Court found no inference of pretext "where an employer acknowledged that plaintiff disputed the accusations against him—but declined to rely on plaintiff's" denial. (App. Vol. 7, 1814).

In *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193 (10th Cir. 2021) the Court found sufficient evidence of pretext based on the inadequacy of an investigation because the employer handled the investigation of a similarly situated employee differently than its investigation of the plaintiff, not because the plaintiff was not given an opportunity to explain his behaviors during the investigation. 994 F.3d at 1199-1200. There is no evidence of Dr. Green-Cheatwood or Mr. Sabey investigating a similarly situated employee differently. (App. Vol. 7, 1815, n.11). Dr. Byrnes's reliance on *Ibrahim* is, therefore, misplaced.

There is nothing Dr. Byrnes could possibly have said to discredit Dr. King's *eyewitness testimony* observing Dr. Byrnes 140 miles away from SCH while he was on call in the ICU. (App. Vol. 2, 319, 391-92, 412; App. Vol. 3, 838; App. Vol. 7, 1764). There is likewise nothing Dr. Byrnes could have

said to refute Dr. King's first-hand account of Dr. Byrnes's patients who were left unattended by a physician for two days because Dr. Byrnes left town without signing over their care. (App. Vol. 2, 391-92, 412).[10] That Dr. Byrnes was not terminated when these behaviors occurred or were brought to Mr. Taylor's attention is not evidence of pretext concerning Defendants' investigation.

      *b.*   <u>There is no evidence that Dr. Green-Cheatwood or Mr. Sabey withheld pertinent information from the decision-makers.</u>

To align his claims with the plaintiff in *Smothers*, Dr. Byrnes next argues that Dr. Green-Cheatwood and Mr. Sabey "did not tell Lichtenberger and Gessel[11] about the call with Byrnes and did not disclose any other evidence they solicited that did not align with their 'fire Byrnes'

---

[10] The only evidence offered to rebut these allegations is Dr. Byrnes's self-serving declaration in which he expresses his subjective belief that he always arranged for physicians, none of whom are named, to cover for him in his absence from the ICU. (App. Vol. 6, 1561; *cf.* App. Vol. 7, 1764 (noting the protocol for informing the call service of alternative coverage)). Dr. Byrnes's subjective beliefs cannot create a genuine issue of material fact on the issue of Dr. Green-Cheatwood's and/or Mr. Sabey's alleged retaliatory animus. *GeoMetWatch Corp.*, 38 F.4th at 1205.

[11] To the contrary, Dr. Green Cheatwood notified Mr. Gessel and others of the call shortly after it occurred. (App. Vol. 3, 822-23).

narrative." (Aplt. Brief, 47). The Court must decline Plaintiff's invitation to speculate what information was and was not shared with the decision-makers. *GeoMetWatch*, 38 F.4th at 1200. Plaintiff bears the burden of *proving* animus – speculating and guessing about what was or was not said cannot suffice. In any event, there is no evidence from which a reasonable juror could surmise that Dr. Byrnes's denial of the allegations, which was known to the investigators and decision-makers, would have resulted in a different outcome given Dr. King's eyewitness accounts and other evidence demonstrating myriad problems with Dr. Byrnes.

> c.   *Dr. Byrnes did not provide the identities of any specific witness for Defendants to interview.*

Dr. Byrnes next criticizes Dr. Green-Cheatwood and Mr. Sabey because they did not "interview witnesses Byrnes said could disprove the allegations made in the KBHA report [or] review the objective quality data they were told existed." (Aplt. Brief, 47-48). Once again, Dr. Byrnes invites the Court to speculate.

There is no evidence in the record that Dr. Byrnes identified any specific person for Dr. Green Cheatwood or Mr. Sabey to interview as part

of their investigation. Furthermore, the argument lacks reason -- Dr. Byrnes concedes he did not learn there was an investigation until long after it was completed. (App. Vol. 6, 1559). Dr. Byrnes's self-serving declaration does not support the unreasonable inference he urges the Court to make – that he suggested to Dr. Green-Cheatwood that she speak with *specific individuals* about the allegations in anonymous complaint and that she deliberately chose not to interview those people. (Compare *id*. ("'lion's share' of [SCH] medical staff would provide statements"); App. Vol. 3, 824 ("lion's share of the medical staff to write letters in support of him"); *see also* Aplt. Brief, 13 ("Defendants also failed to ask Byrnes to identify … any of the … witness he said were best positioned to address the allegations")).

Nothing within the declarations and letters of support[12] from witnesses Dr. Byrnes claims should have been interviewed discredits Dr. King's *eyewitness accounts* of Dr. Byrnes abandoning patients or being nearly 150 miles from the hospital while on call in the ICU. (App. Vol. 6,

---

[12] The after-the-fact letters of support are inadmissible hearsay and are not competent summary judgment evidence. FED. R. EVID. 802; FED R. CIV. P. 56(c)(2); (App. Vol. 7, 1740, 1742, n.10).

1578-1617). Nothing within those letters or declarations discredits Dr. Bordelon's independent assessment of one of Dr. Byrnes's cases upon which Dr. Lichtenberger relied. *Id*.

> d.   <u>There is no evidence that Defendants failed to consider pertinent objective quality data.</u>

The only "data" Dr. Byrnes cites as not being considered by the decision-makers is a "Provider Scorecard" that Dr. Byrnes subjectively believes demonstrates he is a good doctor. (App. Vol. 6, 1557, 1679).[13] Of course, there is zero record evidence that Dr. Lichtenberger and Mr. Gessel were not provided this data and it is speculative to suggest they were not.

Notwithstanding, the record contains no explanation of the significance or meaning of the Provider Scorecard data on which Dr. Byrnes so heavily relies. Mr. Taylor speculated that it reflected data collated by Ms. Killion based on chart reviews to provide the MEC "a quick

---

[13] Dr. Green Cheatwood did, in fact, share this "data" and Dr. Byrnes's interpretation of it with Mr. Sabey. (App. Vol. 3, 824-25). From this evidence, the district court correctly observed "[i]f Dr. Green-Cheatwood and Mr. Sabey's perspectives so influenced the termination decision, then this phone call [and Dr. Green-Cheatwood's sharing of the details of the call with Mr. Sabey] suffices as an opportunity for plaintiff to tell defendants his version of the events." (App. Vol. 7, 1816, n.12).

snapshot of the general performance of physicians within their approved

specialties." (App. Vol. 6, 1444).

In any event, Dr. Byrnes was not terminated because of his mortality

rate or interpretation of any other data reflected on the Provider Scorecard.

Dr. Byrnes's argument that the investigation was flawed because Dr.

Green-Cheatwood and Mr. Sabey did not consider "objective quality data"

is yet another invitation for the Court to engage in wild speculation to find

an unreasonable inference. (*See* Aplt. Brief, 4).[14]

---

[14] Of course, following Dr. Byrnes's termination Centura did, in fact, do a deep dive into all objective data, including a comprehensive chart review of Dr. Byrnes's mortalities and complications which was stopped after review of 199 charts because "[t]he level of concern was so significant … ." (App. Vol. 8, 1878). Of the 199 cases reviewed, 17 mortalities and 9 complications were sent to peer review. *Id*. Shocking findings from the Quality Review relative to Dr. Byrnes's cases included an alarming number of patients being converted to comfort care within 24 hours of admission, changing a patient to Hospice Care while still vented and on 24-hour sedation, failure to review radiology results prior to making clinical decisions "in the majority of cases," poor surgical decision-making including a demonstrated inability to recognize and treat hemorrhagic shock, and documentation that "reads as medically illiterate … ." (*Id*. at 1878-1881). Objective quality data revealed a mortality rate above expectation in 29 of the 30 case types evaluated for the 78 of Dr. Byrnes's patients who died from January 1, 2018 through his departure. (*Id*. at 1899).

39

> e.    *Mr. Sabey and Dr. Green-Cheatwood did not deviate*
> *from any established policy or procedure.*

Where, as here, Plaintiff argues Defendants deviated from some unwritten policy[15] – *i.e.*, Defendants should have interviewed people they did not, considered data they did not – Plaintiff must prove that policy has been applied to similarly situated employees from outside of his protected class. *Ainsworth v. Indep Sch. Dist No. 3 of Tulsa Cnty.*, 232 F. App'x 765, 774 (10th Cir. 2007). Plaintiff has not done so.

Mr. Sabey and Dr. Green-Cheatwood interviewed individuals they believed most likely had knowledge pertinent to the KBHA complaint and subpoenas. (App. Vol. 7, 1772). The investigation included review of medical charts of cases identified by the KBHA and by witnesses

---

[15] Plaintiff's attempts to portray Defendants' actions as contrary to policy or procedure lack evidentiary support and invite the Court to speculate. (*See, e.g.*, Aplt. Brief, at 13 ("Defendants admit that interviewing the subject of an investigation … is the best practice and normal procedure" (citing App. Vol. 4, 1090-93, 1488-90); at 14 ("Defendants admit Green-Cheatwood and Sabey should have interviewed the nurses who worked with Byrnes" (citing App. Vol. 4, 1088-89, 1097-98; App. Vol. 5, 1253-54; App. Vol. 6, 1644)). A close review of the record cited by Plaintiff quickly reveals Dr. Byrnes portrays facts as he wishes they were, not as they are.

interviewed. *Supra* pp. 16-17. Plaintiff was provided the opportunity to give his side of the story. *Supra* pp. 10-11.

The investigation was fair. As a result, Dr. Byrnes's cat's paw theory fails because there is no evidence that Dr. Green-Cheatwood or Mr. Sabey possessed retaliatory animus. The Court "need not reach [Dr. Byrnes's other pretext arguments] because [Dr. Byrnes] stumbles at the outset, on [his] first version of [his] cat's paw theory, by failing to offer proof of [Dr. Green-Cheatwood's and/or Mr. Sabey's retaliatory] bias." *Iweha*, 121 F.4th at 1230.

> 5.    *Plaintiff's Alternative Multi-Layered Cat's Paw Theory Fails for Lack of Evidence and Legal Support*

Plaintiff highlights alleged retaliatory animus possessed by several individuals who were interviewed, seemingly implying the witnesses' alleged retaliatory animus can be imputed to Defendants. (Aplt. Brief, 11 ("'[e]veryone at SCH understood that Kessler made the KBHA report"), 7-8 (implying Dr. Freund intentionally failed to investigate complaints about Dr. Kessler)). "Under this alternate cat's paw theory, [Dr. Byrnes] must show that both [Mr. Sabey and Dr. Green Cheatwood] and [Dr.

Lichtenberger and Mr. Gessel] uncritically relied on the discriminatorily biased allegations of [Dr. Byrnes's] coworkers." *Iweha*, 121 F.4th at 1230. The Court can quickly dispense with this theory.

Dr. Kessler's alleged animus cannot be imputed to Defendants. *Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283, 1291 (10th Cir. 2018) (animus of non-employees "cannot be considered in a cat's-paw analysis"). As to the remaining witnesses, Plaintiff cannot direct the Court to any evidence establishing the necessary retaliatory animus or the necessary wholesale, uncritical reliance needed to prevail on a multi-level cat's paw theory. *BCI Coca-Cola Bottling Co.*, 450 F.3d at 487 ("plaintiff must establish more than "mere 'influence' or 'input' in the decisionmaking process"). Further, evidence of identical complaints raised by the same doctors in 2019 *before Dr. Byrnes engaged in any protected activity*, conclusively demonstrates the physicians' many complaints about Dr. Byrnes were not the product of retaliatory animus.

Further, Dr. Lichtenberger's primary reasons for terminating Byrnes's employment were supported by chart review conducted by Dr. Bordelon,

42

clinical concerns identified by Dr. Arroyo, and evidence of patient abandonment from Dr. King, among other information. Plaintiff makes no argument that Drs. Arroyo, Bordelon, or King possessed a discriminatory or retaliatory animus. There is likewise no evidence suggesting that investigators and the decision-makers did not honestly believe the information provided by the clearly unbiased physician witnesses. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("The test is good faith belief.").

Because Plaintiff cannot establish evidence sufficient to survive summary judgment under a cat's paw theory, regardless of how framed, his retaliation claim related to his termination fails, the district court's grant of summary judgment must be affirmed, and the Court need not entertain Plaintiff's additional pretext arguments. But even if it does, the district court's grant of summary judgment in Defendants' favor must still be affirmed.

4930-8778-7279.6

**C.  Plaintiff's remaining pretext arguments fail.**

*1.  Applicable pretext standards*

"Pretext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation….'" *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (quoting *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014)). "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'" *Id.* (quoting *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011)) (alterations in original).

"To support an inference of pretext, the plaintiff 'must produce evidence that the employer did more than get it wrong.' … The plaintiff "must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda.'" *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th

1280, 1287 (10th Cir. 2022) (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)).

>    2.    *Defendants have not changed or abandoned their reasons for termination.*

Plaintiff's argument that pretext can be demonstrated by "shifting, abandoned, stale, and false reasons" for termination lacks evidentiary support. Dr. Byrnes incorrectly argues that Defendants told him they had "no cause" to fire him. (Aplt. Brief, 38). But the evidence is clear that Defendants fired Dr. Byrnes pursuant to the "no cause" provision of his contract, not that they had no reasons to fire him. (App. Vol. 2, 363-64, 428; App. Vol. 3, 665-66, 864-65; *see also* App. Vol. 1, 42 ("[W]hen we terminate without cause[,] it doesn't mean that there's not cause … .")). Plaintiff's suggestion that Defendants led him to believe there was no reason or basis for terminating employment is, therefore, impermissible speculation.

Plaintiff next argues Defendants shifted their justification for termination in their EEOC position statement. (Aplt. Brief, 39). Once again, Plaintiff is wrong.

Plaintiff argues Defendants asserted "two reasons for firing him: patient care and halting of peer review, emphasizing that 'this case is all about professional peer review.'" *Id*. Plaintiff further argues, without any supporting evidence, that "the information provided in the EEOC statement came from Eklund,[16] who later abandoned peer review as a reason for Byrnes's termination when she testified … as Defendants' corporate representative." *Id*. at n.13.

Even if attorney argument in a letter to an EEOC investigator were admissible to prove anything,[17] Plaintiff's argument misses the mark. In that letter to the EEOC, outside counsel emphasized "numerous cases" where Dr. Byrnes provided substandard care and that Dr. Byrnes

---

[16] The only evidence Plaintiff cites to support Ms. Eklund's alleged provision of information in the EEOC correspondence is an Outlook calendar invitation to a Zoom conference with outside counsel to provide details concerning Dr. Byrnes's termination. (App. Vol. 6, 1709). This is yet another example of Plaintiff stating as fact an unreasonable inference that is the product of speculation and, therefore, does not create a genuine fact issue. There is no evidence the conference even occurred and, if so, what information was provided to Mel Sabey and by whom.

[17] *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) ("argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment").

"inappropriately shut down" peer review, among other facts. (App. Vol. 6, 1619). Notably, the letter does not state that patient care and halting of peer review were reasons for termination or, if they were, whether they were the *only* reasons. The letter only states that after those facts came to light, Dr. Byrnes's employment was terminated.

The Parties and the Court are left to speculate whether outside counsel was, as Plaintiff argues, delineating specific and *exclusive* reasons for termination or simply providing a holistic view of the many, many problems with Dr. Byrnes discovered by Defendants coupled with the fact that termination was but one result of those discoveries.

Defendants have, nevertheless, said nothing concerning Dr. Byrnes's termination that conflicts with their EEOC position statement. Dr. Lichtenberger, the only decision-maker who could recall some specifics concerning termination, unequivocally indicated that while there were "many grounds for termination" that included, among other reasons, Dr. Byrnes's suspension of or interference with peer review, *his* reasons for choosing to terminate Dr. Byrnes were patient abandonment and clinical

concerns, both of which can be fairly characterized as "patient care" issues. (App. Vol. 1, 285-88). And because Defendants' corporate knowledge is necessarily confined by what its people know, Defendants, through Ms. Eklund, testified consistent with Dr. Lichtenberger's recollection based solely on her brief conversation with him prior to the deposition. (App. Vol. 2, 428; App. Vol. 4, 1085).

3.    *There is no inconsistency in the evidence.*

Plaintiff gives two additional examples of purported inconsistency relating to testimony and evidence regarding his abandonment of patients and his clinical incompetency. Each is addressed below.

Patient Abandonment: There are no inconsistencies in witness testimony concerning patient abandonment concerns that led to Dr. Byrnes's termination. Dr. King provided first-hand, eyewitness accounts regarding two types of patient abandonment: (1) Dr. Byrnes leaving town without signing off his patients to a new provider, leaving them with care by a physician; and (2) Dr. Byrnes going to Hays while on call in the ICU in Garden City, nearly 150 miles away, leaving ICU patients without

48

physician coverage.[18] *Supra* pp. 14-15. Several witnesses interviewed also relayed factually consistent stories of being unable to locate Dr. Byrnes while he was on call. *Id*. That these examples do not fit within Plaintiff's subjective and undefined "customary medical definition" of patient abandonment does not mean there are inconsistencies in the evidence presented.

Clinical Care: Defendants did not assert a position "at summary judgment that their concerns [about Dr. Byrnes's clinical care] were [only] based on witness interviews." (Aplt. Brief, 42 (citing App. Vol. 1, 249)). The portion of the record cited does not support Plaintiff's argument. Nonetheless, in the interest of dispelling Plaintiff's argument, concerns about Dr. Byrnes's clinical care came from multiple sources, including witness interviews, Dr. Green Cheatwood's chart review, <u>and</u> from Dr. Bordelon's chart review. *Supra* pp. 15-17.

---

[18] Even though Ms. Eklund, testifying as a corporate witness, misstated that Mr. Sabey told her that Dr. Byrnes was seen *drinking* rather than merely buying alcohol, Mr. Sabey did not report drinking of alcohol and Dr. Lichtenberger did not rely on allegations or inferences of *drinking* when deciding to terminate Dr. Byrnes. (App. Vol. 1, 285; App. Vol. 2, 325).

That Defendants' conclusions regarding Dr. Byrnes's later corroborated[19] alarming clinical incompetencies came, in part, from the subjective impressions of other physicians is no impediment to summary judgment. *See Birge v. Apfel*, No. 97–2158, 1998 WL 165118, at *3 (10th Cir. Apr. 2, 1998) (unpublished) ("[T]he mere fact that subjective criteria are involved in the reason articulated by an employer does not mean it cannot be accorded sufficient rebuttal weight to dispel the inference of discrimination raised by the *prima facie* case."); *see McDonnell Douglas*, 411 U.S. at 803 (rejecting implication that subjective criteria "'carr[ies] little weight in rebutting charges of discrimination'").

What Plaintiff characterizes as inconsistency in witness testimony is more accurately portrayed as a difference in witness recollection, more than three years after the fact, with similar, consistent, and compatible points of emphasis. Recognizing this, the district court aptly observed, that "various spokespersons emphasized one reason over another … [does not] equal inconsistent reasons." (App. Vol. 7, 1810).

---

[19] *See supra* n.15.

   4.    *Defendants' termination reasons are supported by the evidence.*

Even if there were changes in position or inconsistencies concerning

Defendants' proffered reasons for termination, Plaintiff's pretext argument

still fails. "Courts have looked to two factors to evaluate a change in the

employer's explanation for an employment decision: (1) the timing of the

change in position and (2) the evidentiary basis for the new rationale."

*Jaramillo v. Colorado Jud. Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005), *as*

*modified on denial of reh'g* (Dec. 20, 2005) (citing *Perfetti v. First Nat'l Bank*,

950 F.2d 449, 456 (7th Cir.1991)).

The holding in *Smith v. Oklahoma ex rel. Tulsa Cnty. Dist. Att'y*, 245 F.

App'x 807 (10th Cir. 2007) is persuasive. The plaintiff, like Dr. Byrnes,

contended that, over time, the employer offered different reasons for

termination and that the changing reasons constituted evidence of pretext.

245 F. App'x at 817. Just like Dr. Byrnes's termination, on the day that

Smith was discharged, no reason was given. *Id*. Later, Smith's manager

cited budget cuts as a reason for termination. *Id*. When responding to an

EEOC request for information, the manager referred to budget cuts <u>and</u>

deficiencies in work performance. *Id*. During discovery, the manager provided additional examples of deficient performance to justify termination. *Id*. Finally, in summary judgment filings, even more evidence about those deficiencies was offered. *Id*.

The Court agreed with the district court that the explanations offered for the employee's discharge were "not part of a long line of '*new*' reasons but an increasingly detailed explanation for the reasons [the manager] articulated in general terms soon after Smith was terminated: budget cuts, combined with her attitude and performance problems." *Id*.

This same reasoning applies here – Defendants have never given *new* reasons for terminating Dr. Byrnes's employment. Rather, they have provided detailed explanations of the many justifications, none of which are contradictory, for terminating Plaintiff's employment. "[M]erely providing additional non-discriminatory reasons for the termination is not enough to establish pretext, especially where the additional reasons are not contradictory." *Rolland v. Carnation Bldg. Servs., Inc*., 739 F. App'x 920, 924 (10th Cir. 2018) (collecting cases).

Furthermore, "'inconsistency evidence is only helpful to a plaintiff if 'the employer has changed its explanation under circumstances that suggest dishonesty or bad faith.' '" *Litzsinger*, 25 F.4th at 1291 (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011) (quoting *Jaramillo*, 427 F.3d at 1310)). Here, even if Defendants' explanations for terminating Dr. Byrnes's employment could be deemed inconsistent – they cannot – there is no evidence suggesting dishonesty or bad faith.

In sum, Dr. Byrnes cannot establish pretext based on Defendants' stated justifications for terminating his employment. *Jaramillo*, 427 F.3d at 1311 (pretext cannot be established by "the mere fact that the [employer] has offered different explanations for its decision.")

> 5.    *Temporal proximity does not establish pretext.*

"[C]lose temporal proximity can support a finding of pretext only in combination with other evidence of pretext." *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013). As set forth above, Plaintiff cannot establish any evidence of pretext. Temporal proximity alone thus does not establish pretext.

Moreover, because many of the reasons for terminating Plaintiff's employment were previously reported by multiple physicians but not acted upon prior to Plaintiff's protected activity any plausible finding of pretext on temporal proximity grounds is negated when reports of the same issues led to Dr. Byrnes's termination.

Plaintiff has failed to come forward with any evidence of pretext. The Court must, therefore, affirm the district court's grant of summary judgment in Defendants' favor.

## II.    The District Court properly granted summary judgment on Plaintiff's retaliation claim relating to Defendants' reports to the KBHA.

### A.    Standard of Review

*See supra* pp. 23-25, Arguments and Authorities I(A), adopted and incorporated herein by reference.

### B.    Decision makers lacked knowledge of Dr. Byrnes's protected activity.

No member of the St. Anthony's Hospital peer review committee, chaired by Dr. Vogel, had knowledge of Dr. Byrnes's protected activity. *Supra* p. 21-22. Furthermore, although a preliminary reviewer would be

aware of a provider's identity when he or she prepared a case for presentation to the committee, that identity would not be revealed when the case was presented and scored in committee. *Id*. "Without evidence [that members of the peer review committee knew about Plaintiff's protected activity] …, [he] necessarily cannot establish the requisite causation between her complaint and the SOC [3] finding." *Henderson v. Stormont-Vail Healthcare, Inc.*, 607 F.Supp.3d 1173 (D. Kan. 2022).

Additionally, SCH had no discretion to *not* report Dr. Byrnes's cases to the KBHA – all cases resulting in SOC 3 or SOC 4 peer review scores were required by Kansas law to be submitted to the KBHA. *D'Souza-Klamath v. Cloud Cty. Hlth. Ctr., Inc.*, No. 07-4031-KGS, 2009 WL 902377, *7 (D. Kan. Mar. 31, 2009) (unpublished) ("Standard of Care Level 3 or 4 are reportable to the [KBHA], and Kansas law requires medical facilities to report these assignments."); (App. Vol. 2, 490-91).

Consequently, there is no causal connection between Plaintiff's alleged protected activity and the Hospital's mandatory reports filed with the KBHA. *Peterson*, 301 F.2d at 1188.

**C.**    **Plaintiff cannot proceed under a cat's paw liability theory.**

Recognizing there is no evidence to support his retaliation claim relating to SCH's report of four of his cases to the KBHA, Plaintiff attempts to manufacture a cat's paw theory in which Dr. Stucky and Dr. Green-Cheatwood are the biased subordinates whose "animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action." *Thomas*, 803 F.3d at 514–15. This argument fails for several reasons.

As established above, there is no evidence from which a jury could reasonably infer that Dr. Green-Cheatwood possessed a retaliatory animus against Dr. Byrnes. Further, the evidence does not support an inference that Dr. Green Cheatwood[20] "revised the [Quality Review] process *to target Byrnes* by requiring every one of his cases over a five-year period to be submitted for review" in retaliation for his report of alleged retaliation by Dr. Kessler. (Aplt. Brief, 52) (emphasis added). To the contrary, the evidence is uncontroverted that plan was amended solely to address gaps

---

[20] The quality review plan was jointly prepared by Morgan Thomas and Dr. Green Cheatwood. (App. Vol. 2, 440; App. Vol. 4, 884-86).

*identified in the KBHA subpoenas* and did not include *every* case but rather only those cases with quality indicators that would have triggered review had there been a properly functioning peer review system in place under Dr. Byrnes's leadership as CMO. (App. Vol. 2, 379, 381, 386, 449, 459-61; App. Vol. 4, 887-892).

As for Dr. Stucky, Plaintiff seems to argue proof of his alleged bias can be inferred because Dr. Stucky remained "concerned about Byrnes because of his complaint against Kessler." (Aplt. Brief, 51-52). Of course, Plaintiff does not identify any factual evidence to support this proposition because there is none. The fact that the SCH MEC remained concerned about Dr. Byrnes's fitness to practice medicine even after retracting its request for a psychological evaluation is not evidence of a retaliatory animus. (App. Vol. 5, 1438-39; App. Vol. 2, 349-50).

There is likewise no evidence from which a jury could reasonably infer that Dr. Stucky or Dr. Green-Cheatwood manipulated the St. Anthony's peer review committee such that their "biased [retaliatory] reports, recommendation, or other actions caused the adverse employment

action." *Iweha*, 121 F.4th at 1228 ("most common way to [demonstrate a break in the causal chain] is by establishing that the employer 'conduct[ed] an independent investigation'") (quoting *BCI Coca Cola Bottling Co.*, 450 F.3d at 488).

Case charts were independently reviewed and, if necessary, flagged for further scrutiny by O're Berry who then worked with Dr. Stucky to determine whether the flagged cases should be submitted for formal peer review. *Supra* p. 20.[21] There is no evidence in the record that Ms. Berry had knowledge of Dr. Byrnes's protected activity.

From there, cases were handed off to the St. Anthony's peer review committee. *Id*. Mitigating against any suggestion of retaliation, the cases submitted for peer review included Dr. Byrnes's cases and cases for many other physicians. *Id*. There is no evidence in the record that any of these other physicians had engaged in protected activity under Title VII.

---

[21] Dr. Green-Cheatwood, who left Centura's employ in August 2020, was only involved if called upon by Dr. Stucky when her expertise was needed. (App. Vol. 2, 342, 344, 379, 462-63). There is no evidence in the record that Dr. Green-Cheatwood selected any specific cases involving Dr. Byrnes for submission to the peer review committee.

**D.**    **<u>Plaintiff cannot establish pretext in the Quality Review process.</u>**

1.    *The Quality Review process did not violate any policies or procedures.*

The Quality Review process was not, as Plaintiff suggests, contrary to Defendants' established policies and procedures. (Aplt. Brief, 27). The first "policy" on which Plaintiff relies for this argument is no policy at all. Rather, it was a draft policy Ms. Killion prepared in January 2020 for consideration by the MEC following Centura's discovery that no peer review had been occurring at the hospital. (App. Vol. 2, 342, 345, 348; App. Vol. 7, 1765-68).[22] In any event, Plaintiff's argument is a red herring because the evidence is uncontroverted that the SCH MEC adopted and followed the Quality Review plan prepared by Ms. Thomas as its interim solution for peer review while efforts to stand up a permanent committee were

---

[22] Indicators of the draft nature of this "policy" include spelling and grammar errors ("PEER REIVEW", "peer review information is privileges", "provider will be given the opportunity to response"), absence of proper punctuation, conflicting statutory citation format ("KSSA 65-4921 and KSAS 65-4923"), citation to non-existent statutes ("the Peer Review Reform Act"), incomplete/blank footers ("Category – Document Title", "Page 1 of __"). (App. Vol. 7, 1766-68).

ongoing. That plan made no reference to the draft peer review policy referenced above.

The second policy which Plaintiff claims Defendants violated with the quality and peer review process, as it relates to physician notice, did not go live at SCH until 2021. (App. Vol. 6, 1531; App. Vol. 7, 1762-63, 1769-70).

Notwithstanding, even if applicable during the Quality Review, neither policy would have applied to Dr. Byrnes. Rather, they would have applied only to "Medical Staff granted privileges to practice" at SCH, or "Physicians . . . granted clinical privileges" at Centura hospitals. (App. Vol. 6, 1636-38, 1687-1704). Dr. Byrnes was neither at the time of the Quality Review. (App. Vol. 2, 365) (Dr. Byrnes resigned his Medical Staff privileges on February 14, 2020).

### 2. *Defendants did not report any SOC 2 cases.*

Plaintiff argues there were procedural irregularities constituting pretext because Defendants allegedly reported a SOC 2 case and failed to

report all licensees involved in the same case – the thyroidectomy in which Dr. Byrnes's patient was left unable to talk or breathe.

KAN. ADMIN. REGS. § 28-52-4 establishes Standard of Care ("SOC") scoring of peer reviewed cases. The regulation provides "[a]ny incident determined by the designated risk management committee to meet category (a)(3) or (a)(4) *shall* be … reported to the appropriate licensing agency…." (Emphasis added). SOC 3 cases are those where the "standards of care [are] not met, with injury occurring or reasonably probable … ." *Id*. The thyroidectomy case was a mandatory reportable SOC 3 case under Kansas law, not SOC 2 as Plaintiff argues. That the case was scored as a "minor" improvement opportunity under Colorado standards did not prevent a case from being reported under Kansas regulations. (App. Vol. 2, 480-81).

In that case, the standards of care were not met (minor improvement opportunity for Dr. Byrnes as scored by the peer review committee) and injuries occurred to the patient (laryngeal nerves severed). (App. Vol. 8,

61

1954-55). This case was thus a mandatory reporting SOC 3 case under Kansas law.[23]

In sum, Plaintiff has failed to produce any evidence sufficient for a reasonable juror to infer a causal connection between his protected activity and SCH's report of four of his cases to the KBHA. Any suggestion of retaliation is also mitigated by the fact that SCH reported multiple physicians to the KBHA resulting from its comprehensive Quality Review, not just Dr. Byrnes.

## III.    The District Court did not abuse its discretion when it declined to exercise supplemental jurisdiction.

The decision to exercise jurisdiction over state law claims rests in the sound discretion of the district court. 28 U.S.C. § 1367(c)(3) (authorizing remand of state-law claims where district court has dismissed all claims over which it has original jurisdiction). Because, as demonstrated herein, the district court committed no error in granting summary judgment in

_____

[23] Defendants did not report Dr. Rink to the KBHA because the peer review committee made no findings that Dr. Rink's care in the case deviated below standard. In any event, Plaintiff cannot direct the Court to any authority suggesting that every provider involved in a procedure must be reported to the KBHA when only one falls below the applicable standard of care.

Defendants' favor, no justification exists to vacate the district court's refusal to exercise jurisdiction.

## CONCLUSION

Defendants lawfully terminated Plaintiff's employment for legitimate, nonretaliatory reasons and later reported Dr. Byrnes's substandard medical care for legitimate, non-retaliatory reasons. Dr. Byrnes cannot establish the essential elements of his claim of retaliation concerning either his termination or the KBHA reports because the decision-makers in each instance lacked knowledge of Dr. Byrnes's protected activity. Dr. Byrnes has not adduced evidence sufficient to permit him to proceed to a jury on a cat's paw theory of liability. In any event, Dr. Byrnes has not produced evidence of pretext sufficient to overcome summary judgment.

The district court, therefore, did not err when it granted summary judgment in Defendants' favor. This Court should affirm.

Respectfully submitted,

KUTAK ROCK LLP

/s/ Richard A. Olmstead
Richard A. Olmstead
8415 E. 21st St. N., Suite 200
Wichita, KS 67206
(316) 248-6480 (Telephone)
Richard.Olmstead@KutakRock.com

*Counsel for Appellees*

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Because of the voluminous factual record, counsel believes the Court will be significantly aided by oral argument and, therefore, requests oral argument be granted.

By:    /s/ Richard A. Olmstead
       Richard A. Olmstead

4930-8778-7279.6

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies the word limits of FED. R. APP. P. 32(A)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 10th Cir. R. 32(B), this document contains 11,596 words as counted by Microsoft Word.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and 10th Cir. R. 32(A) and the type style requirements of FED. R. APP. P. 32(a)(6) because it was prepared in proportionally spaced typeface using the Microsoft Word applications of Microsoft 365 Apps for Enterprise in 14-point Palatino Linotype serif font.

By:    /s/ Richard A. Olmstead
Richard A. Olmstead

## CERTIFICATE OF SERVICE

I, Richard A. Olmstead, hereby certify that on this 21st day of February 2025, I served a copy of the foregoing **Appellees' Response Brief,** by filing a copy of the same using the Court's ECF filing system, which will provide electronic notification of the same to all counsel of record.

By:    /s/ Richard A. Olmstead
Richard A. Olmstead

4930-8778-7279.6