Case No. 24-3149

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

**Matthew Byrnes**
*Plaintiff/Appellant*

vs.

**St. Catherine Hospital and Centura Health Corporation**
*Defendants/Appellees*

---

Appeal from the United States District Court for the District of Kansas
The Honorable Daniel D. Crabtree, United States District Court Judge
District Court Case No. 21-2086

---

## APPELLANT'S REPLY BRIEF

FOULSTON SIEFKIN LLP
Boyd A. Byers, Kan. #16253
Eric Turner, Kan. #25065
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206
Telephone: (316) 267-6371
Email :   bbyers@foulston.com
          eturner@foulston.com
*Attorneys for Plaintiff/Appellant*
*Matthew Byrnes*

## ORAL ARGUMENT IS REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES .................................................................... ii

ARGUMENT AND AUTHORITIES ....................................................... 1

   I.  Defendants (like the District Court) misapply the summary-judgment standards, which require the Court to view the evidence in Byrnes' favor. ... 1

  II.  The evidence supports Byrnes' claims of retaliatory discharge and retaliatory reporting to the Kansas Board of Healing Arts. ..................... 5

     A. Byrnes satisfies the *prima facie* burden to show retaliatory-discharge. .... 5

     B. The evidence tells a story of pretext, which requires that a jury decide Byrnes' retaliatory-discharge claim. ....................................................... 8

        1. Defendants' changing, false reasons show Green-Cheatwood's and Sabey's animus and Defendants' pretext. ............................................. 8

        2. Defendants' unfair, one-sided investigation is evidence from which a jury could infer retaliatory animus and pretext for Byrnes' termination. ....................................................................... 16

        3. Close temporal proximity reinforces the inference of pretext. .......... 21

        4. The evidence in its totality supports an inference that Defendants' real reason for firing Byrnes was retaliation. ..................................... 22

     C. The evidence supports Byrnes' post-termination retaliatory-reporting claim and requires a jury trial. ................................................................ 23

        1. Byrnes establishes a *prima facie* case of retaliatory reporting by showing allegedly biased persons controlled which cases Defendants reported. ......................................................................... 23

        2. The record supports a presumption that Defendants reported Byrnes to KBHA in retaliation for his protected activities. ................ 28

  III. This Court should vacate the dismissal of Byrnes' supplemental state-law claims and remand for further consideration. ................................ 31

CONCLUSION .................................................................................... 31

CERTIFICATE OF COMPLIANCE ...................................................... 33

CERTIFICATE OF SERVICE .............................................................. 34

# TABLE OF AUTHORITIES

## Cases

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193 (10th Cir. 2006) ....4

*Benjamin v. Bd. of Trs. Cmty. Coll.*, 810 Fed. App'x 691 (10th Cir. 2020)..... 19, 22

*Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114 (10th Cir. 2005)............ 2, 6, 7, 12, 19

*Dixon v. Okla. ex rel. Reg'l Univ. Sys. of the Okla. Bd. of Regents*,
    125 F.4th 1321 (10th Cir. 2025) ............................................................6

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476
    (10th Cir. 2006).....................................................................................17

*Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875 (10th Cir. 2018) ..............2, 4

*Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178 (10th Cir. 2016)...............................11

*Frank v. Bloom*, 634 F.2d 1245 (10th Cir. 1980) ......................................................4

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020) 8, 9

*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002) ....... 12, 16, 19, 22

*GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183 (10th Cir. 2022)............................3

*Greer v. City of Wichita*, 943 F.3d 1320 (10th Cir. 2019).......................................3

*Gupta v. Okla. City Public Schools*, No. 21-6138, 2022 WL 1742048
    (10th Cir. May 31, 2022) .....................................................................17

*Harvest Grp., LLC v. Love's Travel Stops & Country Stores, Inc.*,
    90 F.4th 1271 (10th Cir. 2024) ..............................................................3

*Henderson v. Stormont-Vail Healthcare, Inc.*, No. 21-2194, 2022 WL 3585627
    (D. Kan. Aug. 22, 2022) ......................................................................12

*Hinsdale v. City of Liberal*, 19 Fed. App'x 749 (10th Cir. 2001) ...........................6

*Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193
    (10th Cir. 2021)....................................................................................17

*Johnson v. Cherokee Cty. Bd. of Cty. Comm'rs*, No. 17-2644, 2020 WL 1320720
(D. Kan. Mar. 20, 2020).........................................................................9

*Leone v. Owsley*, 810 F.3d 1149 (10th Cir. 2015) ..................................1, 2

*Mann v. XPO Logistics Freight, Inc.*, 819 Fed. Appx. 585 (10th Cir. 2020)...........7

*Montes v. Valid Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007) ..............................5, 6

*Orr v. City of Albuquerque*, 531 F.3d 1210 (10th Cir. 2008)..............................2, 23

*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052 (10th Cir. 2009) .....................4

*Pioneer Centres Holding Co. ESOP & Trust v. Alerus Fin., N.A.*,
858 F.3d 1324 (10th Cir. 2017) .............................................................3

*Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005)...................................... 1, 3, 5, 11

*Rolland v. Carnation Bldg. Servs., Inc.*, 739 Fed. App'x 920 (10th Cir. 2018)......11

*Smith v. Okla. Ex rel. Tulsa Cnty. Dist. Att'y*, 245 Fed. App'x 807
(10th Cir. 2007)................................................................................9, 11

*Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008) ................................... 15, 17

*United States v. Bowen*, 527 F.3d 1065 (10th Cir. 2008) ..........................................3

*United States v. Brechtel*, 997 F.2d 1108 (5th Cir. 1993) .........................................3

*W. Coast Life Ins. Co. v. Hoar*, 558 F.3d 1151 (10th Cir. 2009) ..............................5

*Waggoner v. Frito-Lay, Inc.*, No. 22-3111, 2023 WL 2967693
(10th Cir. Apr. 17, 2023) ........................................................................ 2, 8, 22

*Walters v. Monarch Life Ins. Co.*, 57 F.3d 899 (10th Cir. 1995) .............................4

*Whittington v. Nordam Grp. Inc.*, 429 F.3d 986 (10th Cir. 2005)..........................11

*Zuniga v. Boeing Co.*, 133 Fed. App'x 570 (10th Cir. 2005).................................23

**Rules**

Fed. R. Evid. 801(c)(2) ............................................................................19

Federal Rule of Appellate Procedure 32, Tenth Circuit Rule 32............................33

iii

## ARGUMENT AND AUTHORITIES

Plaintiff Matthew Byrnes has established, based on the evidentiary record, both a *prima facie* case of retaliation (including causation under any "cat's paw" theory) and that Defendants' stated reasons for termination were pretextual. Thus, this Court should reverse the district court and remand so a jury can decide the case.

## I.     Defendants (like the District Court) misapply the summary-judgment standards, which require the Court to view the evidence in Byrnes' favor.

At summary judgment, all evidence must be viewed in the light most favorable to the non-movant, together with all reasonable inferences therefrom. *Plotke v. White*, 405 F.3d 1092, 1093-94 (10th Cir. 2005). Summary judgment is improper unless movant's evidence is "so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Leone v. Owsley*, 810 F.3d 1149, 1154 (10th Cir. 2015) (quotation omitted).

Defendants (like the District Court) hardly acknowledge Byrnes' evidence, and instead tell their own counter-narrative. But that's all they offer—an alternative story that mostly ignores Byrnes' evidence of retaliation. When Defendants do address Byrnes' evidence, they merely assign disparaging—but false—labels, such as "speculation," "subjective belief," and "unsupported," in hopes the Court will simply disregard it. Their baseless challenges violate well-established summary-judgment principles.

1

**(1)** When the record tells two stories, the case must be sent to the jury. *Waggoner v. Frito-Lay, Inc.*, No. 22-3111, 2023 WL 2967693, at *4 (10th Cir. Apr. 17, 2023) ("reasonable factfinder could disbelieve" stated reasons); *Leone*, 810 F.3d at 1153, 1160 ("[s]ummary judgment … is inappropriate when the evidence is susceptible of different interpretations or inferences…"; rejecting "troubling" conclusions in which court "brushed off" plaintiff's evidence and "drew inferences in favor of [defendants] rather than plaintiff"); *Orr v. City of Albuquerque*, 531 F.3d 1210, 1218 (10th Cir. 2008) ("a reasonable jury could disbelieve" defendant). While, perhaps, a juror could believe Defendants' story that they fired Byrnes for legitimate reasons, a juror also could believe that Defendants wanted to get rid of and punish him for reporting another doctor's sexual harassment of nurses, and thus became viewed as a squeaky wheel. Drawing all reasonable inferences in Byrnes' favor, "a coherent narrative emerges" of a pretextual termination; even if that "isn't the only reasonable explanation" and Defendants "offer[] their own plausible counter-narrative," the court may not "choose between two reasonable explanations," for "[s]uch is the jury's province." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018).

**(2)** When a piece of evidence could be read two ways, it must be viewed in Byrnes' favor. *See id.* at 885-86; *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005) (plaintiff presented "[a]nother, equally credible possibility").

**(3)** When the evidence—or absence of evidence—warrants a reasonable inference, it must be made in Byrnes' favor. *See Plotke*, 405 F.3d at 1093-94; *United States v. Brechtel*, 997 F.2d 1108, 1117 (5th Cir. 1993). When is an inference reasonable? Whenever it flows from the evidence, without mere guesswork or an absence of evidentiary foundation such that it calls for naked speculation. *See Pioneer Centres Holding Co. ESOP & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (citing *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)). What does impermissible speculation look like? It is a witness' guess or mere personal belief about hypothetical actions or motives of others without any (or contrary to the) evidence. *Id.* at 1338-39; *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1205, 1220-21 (10th Cir. 2022) ("possibilities or hypotheticals that have de minimis to no support in the record" carries no weight). The evidence proffered by Byrnes is not simply his own naked speculation or personal belief.

**(4)** A witness' account of actions he personally took or observed is not speculation, but rather evidence "competent to oppose summary judgment, irrespective of its self-serving nature." *Harvest Grp., LLC v. Love's Travel Stops & Country Stores, Inc.*, 90 F.4th 1271, 1283 (10th Cir. 2024); *Greer v. City of Wichita*, 943 F.3d 1320, 1325 (10th Cir. 2019) ("We long ago buried the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment

because it is 'self-serving.'" (quotation and alterations omitted)).[1] Here, Byrnes' evidence includes testimony from numerous witnesses based on known and observed facts, not simply his own guesses or speculative beliefs.

(5) When weighing credibility, a juror may consider inconsistencies in Defendants' statements, including representations by counsel. *See Fassbender*, 890 F.3d at 887-88 (using statements to EEOC as evidence); *Walters v. Monarch Life Ins. Co.*, 57 F.3d 899, 904 (10th Cir. 1995) ("court erred in … exclu[ding]" plaintiff-counsel's statement to impeach plaintiff); *Frank v. Bloom*, 634 F.2d 1245, 1251 (10th Cir. 1980) (counsel's statements in pleadings and letter to judge were "admission[s] by a party made by his agent acting within the scope of his employment"); *EEOC v. Phillips Colls.*, 984 F. Supp. 1464, 1466, 1470 (M.D. Fla. 1997) (counsel's statement to EEOC created a disputed fact).

Defendants cannot avoid fact disputes merely by counsel's claim (without supporting testimony) of "misstatements." *See* Appellees' Response Brief ("Resp."), 59 n.18. Such speculation and legal "argument" do not become "evidence" merely because counsel recites it. *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009).

---

[1] This is unlike cases cited by Defendants, such as *Argo*, where an employee speculated, without personal knowledge or supporting evidence, that the employer never treated employees outside his protected class the way it treated him. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006).

4

(**6**) The Court may consider only evidence properly in the summary-judgment record. Yet Defendants improperly cite "evidence" from outside the record. For example, Defendants cite to materials in their reply brief that the District Court expressly disregarded (because Defendants had failed to produce them during discovery), and thus are not part of the evidentiary record. *See* App.Vol.7 at 1838-39 (disregarding evidence proffered in Defendants' reply brief (*id*. at 1734-1785) and denying motion to file surreply). Defendants also improperly cite statistics from a website that was not part of the record and for which there is no foundation. Resp., 18 & n.4. *See W. Coast Life Ins. Co. v. Hoar*, 558 F.3d 1151, 1156 (10th Cir. 2009) (striking newly offered statistics). This Court must disregard all citations to, and arguments based on, non-record "evidence."

## II.    The evidence supports Byrnes' claims of retaliatory discharge and retaliatory reporting to the KBHA.

As outlined in Appellant's Opening Brief, there is ample evidence in the record for a juror to find retaliation and pretext.

### A.   Byrnes satisfies the *prima facie* burden to show retaliatory discharge.

Byrnes satisfies his *de minimis prima facie* case for retaliatory discharge by showing: (1) protected activity (reporting sexual harassment and retaliation), (2) adverse action (termination), and (3) a causal nexus between them. *Plotke*, 405 F.3d at 1101; *Montes v. Valid Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). The causation prong requires only that (a) "the individual who took adverse action

5

against [plaintiff] knew of the employee's protected activity" or (b) "the person allegedly harboring discriminatory animus knew" and used the decisionmaker as a cat's paw. *Montes*, 497 F.3d at 1176. Animus is not an element of proof. *See Dixon v. Okla. ex rel. Reg'l Univ. Sys. of the Okla. Bd. of Regents*, 125 F.4th 1321, 1334-35 (10th Cir. 2025) (describing myriad ways plaintiffs may create a *prima facie* inference of wrongdoing without directly showing animus). Indeed, where knowledge of the protected activity is undisputed, close temporal proximity "may, by itself, establish causation" at the *prima facie* stage. *Hinsdale v. City of Liberal*, 19 Fed. App'x 749, 756 (10th Cir. 2001) (quotation omitted).

In other words, when proving retaliation by circumstantial evidence, Byrnes does not have to show Defendants' animus. *See* Resp., 38-40. To the contrary, animus is *presumed* from the *prima facie* showing and (if Defendants rebut that presumption by asserting a nonretaliatory reason) is presumed again when Byrnes shows the stated reasons are pretextual. *See Bryant*, 432 F.3d at 1125 ("Our precedent does not require a plaintiff to offer any evidence of actual discrimination" because animus is "presume[d] …."). A finding of animus is *the result* of satisfying, not an element of, Byrnes' *prima facie* burden.

Defendants challenge the third *prima facie* prong (causation) because the ostensible decisionmakers, Scott Lichtenberger and Thomas Gessel, did not know about Byrnes' protected activities. But Byrnes' *prima facie* burden is satisfied on a

6

cat's-paw theory by evidence that Toni Green-Cheatwood and Peter Sabey, who filtered and presented the facts to the decisionmakers and recommended termination, (1) caused his termination and (2) knew about his protected activity. *See id.*; *Mann v. XPO Logistics Freight, Inc.*, 819 Fed. App'x 585, 609-10 (10th Cir. 2020) ("These two facts satisfy the causal connection under the cat's paw theory"). Both of these facts are supported, Appellant's Opening Brief (Bf.), 17-18, 24-25,[2] and neither is even disputed by Defendants. Byrnes thus states a *prima facie* case of causation. And, even if this Court abandons long-held precedent and requires Byrnes to show Green-Cheatwood or Sabey had retaliatory animus as part of his *prima facie* case, the presumption of animus from the pretext evidence discussed next satisfies that burden.[3]

---

[2] Green-Cheatwood (who did not have termination authority) recommended termination, and the decisionmakers approved her recommendation in reliance on the information she and Sabey provided them. Bf., 24-25. Green-Cheatwood knew Byrnes had filed a protected harassment complaint; he later complained directly to her that Defendants, including her personally, had not adequately investigated the complaint and were trying to sweep it under the rug; and he later reported to her that he believed he was being retaliated against for making the complaint. Bf., 17-18, 19-20. Sabey was also well aware of Byrnes' initial harassment complaint and his later complaint that Defendants were dismissive of it and retaliating against him. Bf., 18.

[3] Defendants admit that animus can be established indirectly through evidence of pretext. Resp., 40.

**B.  The evidence tells a story of pretext, which requires that a jury decide Byrnes' retaliatory-discharge claim.**

Evidence in any "variety of forms" that shows "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" permits a jury to find the employer's stated reasons "unworthy of credence" and to infer the employer's true reason was unlawful. *Waggoner*, 2023 WL 2967693, at *2 (quoting *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020)).

**1.  Defendants' changing, false reasons show Green-Cheatwood's and Sabey's animus and Defendants' pretext.**

Defendants' **(a)** suspiciously changing and **(b)** exaggerated, stale, and false reasons for firing Byrnes show pretext and require a jury trial.

**(a)** Defendants repeatedly changed their reasons for terminating Byrnes. At the termination meeting, Byrnes asked why Defendants were terminating him, and Green-Cheatwood said his termination "was for no cause"[4]; afterward, James Zauche, the other representative at that meeting, said he did not know or understand why Byrnes was terminated; and CEO Scott Taylor said Byrnes' firing was "unwarranted." Bf., 25-26. Defendants did not provide any reason for firing Byrnes

---

[4] She did not merely say he was being fired under the "no cause" provision of his contract, but was pointedly asked what the reason was, and said it "was for no cause."

until they responded to his EEOC charge. Viewed in Byrnes' favor, a juror may find that Defendants initially had no reason to fire Byrnes, but, after litigation commenced, suddenly manufactured *post-hoc* reasons for their action, which "constitute[s] evidence of pretext." *See Frappied*, 966 F.3d at 1059; *Johnson v. Cherokee Cty. Bd. of Cty. Comm'rs*, No. 17-2644, 2020 WL 1320720, at *11 (D. Kan. Mar. 20, 2020) (employer "did not give [plaintiff] a reason for his termination" but later claimed poor performance).[5]

Once Defendants finally stated a reason, they later abandoned it and substituted a new reason. In response to Byrnes' EEOC charge, Defendants asserted that, (1) as to Byrnes' "medical care," they found "numerous cases … well below the standard of care," resulting in "[n]umerous" patient injuries, and (2) in his prior role as CMO, he had "shut down … peer review" to cover up his substandard care. App.Vol.6 at 1619. They then represented, "When the facts regarding [Byrnes'] patient care and his halting of the peer review process fully came to light, his employment was terminated…. As a result of the foregoing, this case is all about

---

[5] The facts here are not at all like *Smith v. Okla. Ex rel. Tulsa Cnty. Dist. Att'y*, 245 Fed. App'x 807, 817 (10th Cir. 2007), where the court found no pretext because the employer consistently relied on the same documented reasons for laying off the plaintiff (budget cuts and past performance), even though plaintiff's manager told plaintiff that he was not authorized to give her an explanation. Moreover, unlike in *Smith*, Defendants abandoned and changed the reasons they initially identified during litigation, and even these new reasons are pretextual. *See* below.

professional peer review. It turns on the inappropriateness of Dr. Byrnes' patient care and his self-protected shut down of the peer review processes …." App.Vol.6 at 1619. A juror may infer that Defendants formally asserted peer-review interference as a (and the primary) reason for firing Byrnes. Eliminating any doubt, Defendants asserted in this litigation that they fired him "because … [he] … shut down peer review…." App.Vol.1 at 27-28 (citing their EEOC statement). From these admissible statements, *see* §I(5), a juror may find Defendants' stated reasons for firing Byrnes (1) were primarily the "shut down of the peer review process," plus "numerous cases well below the standard of care," and (2) did not include the unmentioned alleged administrative failure to sign out (so-called "patient abandonment").

But early depositions confirmed Byrnes did nothing to interfere with peer review and lacked authority or ability to do so, and Defendants could not have reasonably believed otherwise. Bf., 27. With their primary justification debunked, Defendants abandoned that reason (including mid-deposition, when Lichtenberger—the only witness with personal knowledge why he and Gessel signed off to terminate Byrnes—first identified, then later disavowed, peer-review as a reason, Bf., 27) and swapped it with a new primary justification they thought they could more easily defend, namely patient "abandonment." App.Vol.5 at 1372-73, 1379-80.

Defendants' initial insistence that Byrnes' firing was "all about peer review," abandonment of that reason after it was debunked, and substitution of a new reason that "primarily" led to Byrnes' firing is exactly the type of suspicious change that supports a finding of pretext. *Compare Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005) (defendant "disclaimed … or abandoned in the face of contrary testimony from its own management" all but one of its original reasons, and "jury was not bound to believe" remaining reason); *Fassbender*, 890 F.3d at 887-88 (changed reasons—taking note home vs. failing to report note); *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016) (holding manager "to the reason he first gave for terminating" plaintiff, even though employer claimed manager's original testimony was "subsequently clarified" and therefore "insignificant"); *and Plotke*, 405 F.3d at 1103 (reversing court for accepting newly proffered reasons when employer claimed the first-stated reason "was only one of several incidents" the decisionmakers considered) *with Smith*, 245 Fed. App'x at 817 (elaborating on original reason) *and Rolland v. Carnation Bldg. Servs., Inc.*, 739 Fed. App'x 920, 924 (10th Cir. 2018) (elaboration "entirely consistent," and "not inconsistent," with original reason).

Even with Defendants' new patient-abandonment justification, their position suspiciously changed. Their corporate representative gave binding testimony claiming that Byrnes was seen drinking while on call, Bf., 21-22—even though

Defendants admit that never happened. Counsel now argues (without supporting testimony) this was a misstatement, Resp., 59 n.18, but a juror, viewing the evidence in Byrnes' favor, *see* §§I(3), (5), may infer Defendants intentionally "inflat[ed] and exaggerat[ed] long-standing critiques" as a pretext to justify Byrnes' termination. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218-19 (10th Cir. 2002).

**(b)** The record raises questions about the veracity of Defendants' stated reasons and the reasonableness of Green-Cheatwood's and Sabey's belief in those reasons. *See Henderson v. Stormont-Vail Healthcare, Inc.*, No. 21-2194, 2022 WL 3585627, *4 (D. Kan. Aug. 22, 2022) (investigators cannot "honestly believe" findings based on supposed statements that witnesses deny making). "[O]nce a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason," the Court "presume[s] the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." *Bryant*, 432 F.3d at 1125.

Defendants' first stated reason—interference with peer review—proved to be demonstrably false, as the Hospital's CEO and Quality Director admit Byrnes did not interfere with peer review.[6] Bf., 27. And, indeed, Defendants abandoned this

---

[6] Defendants' attempts to distance themselves from their representations to the EEOC are unpersuasive.

First, Defendants assert there is no evidence the information provided to the EEOC came from Cynda Eklund, their corporate representative in this case. Resp.,

reason via their corporate representative's deposition and in their motion for summary judgment. App.Vol.1 at 233, ¶53.

Defendants' next reason given to the EEOC—"numerous cases well below the standard of care"—likewise is false. By the time this case got to discovery, Defendants were compelled to concede this was an outright fabrication; their corporate representative admitted their concern was just a "general sense" based on Green-Cheatwood's informal review of five files. App.Vol.4 at 1088-89. But Green-Cheatwood could not say she ever reviewed any patient files before the termination decision. App.Vol.5 at 1246-47. So, by the time Lichtenberger testified, he directly contradicted the corporate representative's testimony and said his concern was based

———————————————

56 & n.16. However, Eklund, along with Sabey, were the only ones invited to meet without outside counsel to provide information for the position statement. App.Vol.6 at 1618-20, 1709; App.Vol.5 at 1399-1400; App.Vol.4 at 1083-85. In any event, this is irrelevant. §I(e), above.

Second, Defendants argue the EEOC position statement is unclear, leaving the Court "to speculate" whether it was intended to list the "specific and exclusive" reasons for termination. Resp., 57. While this explanation of what led to Byrnes' firing seems clear enough, to the extent it really is ambiguous, it must be viewed in Byrnes favor. §I, above.

Third, any confusion about the meaning of the position statement was clarified when Defendants told the Court, citing this document as support, that they terminated Byrnes "because … [he] … shut down peer review." App.Vol.1 at 27-28.

Fourth, Defendants' half-hearted suggestion that the EEOC position statement was simply the argument of counsel and thus immaterial is both factually incorrect (*see* "first" point, above) and legally wrong. §I(5), above.

on "***potentially*** poor clinical judgment" in ***one case*** reviewed by a doctor other than Green-Cheatwood, App. Vol 5 at 1372-73—a shifting story that is a far cry from "numerous cases well below the standard of care."

In their Response, Defendants continue to argue, contradicting their witnesses' testimony, that their supposed "clinical concerns" were more general in nature, coming from "multiple sources," including witness interviews, Green-Cheatwood's informal chart review, and Bordelon's informal chart review of one 2019 case.[7] Resp., 59. While such contradictions themselves are reason to deny summary judgment, there are other material fact disputes as well. None of the interviewed witnesses verified any clinical competency or patient care concerns, and the only person who said anything negative (other than Kurt Kessler, whose input was supposedly disregarded App.Vol.5 at 1396-97) was Zeferino Arroyo, who merely reported "talk" he overheard, but about which he had no personal knowledge or information. Bf., 32. Further, Defendants acknowledged that they failed to follow their normal practices and procedures for investigating concerns about a case, which included discussing it with the doctor, App.Vol.4 at 1090-93; App.Vol.6 at 1526-27,

---

[7] Bordelon reviewed the only case specifically referenced in the KBHA subpoena. Defendants' peer reviewers subsequently refuted Bordelon's findings and identified only a "minor improvement opportunity." App.Vol.2 at 388-89. KBHA found no basis to take any action on that case. App.Vol.6 at 1659. In fact, Bordelon advised only that further "deep dive review" was needed. App.Vol.8 at 1855.

1531-32, 1637, 1691, and that reviewing a chart without the doctor's input "doesn't tell the whole story." App.Vol.5 at 1417; App.Vol.6 at 1707, *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159 (10th Cir. 2008) (employer used methodology it knew was not reliable to justify terminations).[8]

Defendants' final stated reason for termination—patient "abandonment"—is also pretextual, false, and unreasonable. The record shows Defendants terminated Byrnes for patient abandonment based on Green-Cheatwood and Sabey's report that a witness said Byrnes was seen (in 2017 or 2018) out of town drinking while on call—but no witness actually told them that. Bf., 29.[9] And the witness who reported seeing Byrnes out of town said she did not know whether he in fact had arranged for coverage.[10] Bf., 30. Further, Green-Cheatwood claims witness Gretchen Dunford was the source of the patient abandonment concerns—but Dunford flatly denies this.

---

[8] Defendants' claim that they *subsequently* corroborated the allegations of substandard care, Resp., 49 n.14, (1) is irrelevant to establishing their reasons for terminating Byrnes at the time of that decision, and (2) underscores (in light of KBHA's later findings) that Defendants' post-termination review process and findings were also biased. *See* §III, below.

[9] Defendants try to disavow this testimony as a "misstatement," Resp., 59 n.18, but the record is clear, and legal counsel's unsupported representation in the Response is not evidence.

[10] In fact, Byrnes had arranged for other call coverage that day. App.Vol.6 at 1561. Defendants' attempt to controvert Byrnes' testimony with a sham affidavit fails because the district court excluded that evidence. *See* §I(6). In any event, that evidence is irrelevant because the Court must accept Byrnes' testimony. *See* §I(4).

Bf., 30. Even Defendants' misuse of "abandonment" in this context suggests a pretextual exaggeration, intended to artificially bolster their rationale for termination (not because it defies "customary medical definition," *cf.* Resp., 59, but because it exaggerates the severity of Byrnes' alleged administrative error of not signing out). *Garrett*, 305 F.3d at 1218-19.

The evidence in this case, including changing and false reasons for termination, is sufficient for a jury to find that Defendants' reasons were pretextual and an inference that Green-Cheatwood and Sabey acted on retaliatory animus.

### 2. Defendants' unfair, one-sided investigation is evidence from which a jury could infer retaliatory animus and pretext for Byrnes' termination.

The record shows Sabey and Green-Cheatwood conducted a one-sided investigation. They intentionally failed to take the basic step of interviewing Byrnes, or even tell him he was being investigated. They intentionally failed to follow up with Byrnes even though he had told Green-Cheatwood he could point her to objective data and numerous witnesses who could refute the allegations in the retaliatory KBHA charge filed against him. They failed to speak with witnesses with first-hand knowledge or look at records, data, or other objective evidence. They then presented a slanted, exaggerated, and false report to the decisionmakers so they would fire him. Bf., 20-23, 52-56.

This supports a finding that Defendants' investigation was pretextual and an inference that Green-Cheatwood and Sabey had retaliatory animus. *Compare Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1199-1200 (10th Cir. 2021) ("[A] factfinder can reasonably infer pretext … from shortcomings in the employer's investigation," including "failure to inquire into the reasons for an employee's behavior" during employee interview.); *Trujillo*, 524 F.3d at 1159 (failure to interview supervisor with exculpatory information); *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542-43 (10th Cir. 2014) (decisionmakers "ultimately relied on "one-sided information" from an "inadequate, one-sided investigation"); *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 491-93 (10th Cir. 2006) (investigator "failed to take even the basic step … of asking [plaintiff] for his side of the story") *with Iweha*, 121 F.4th at 1231 (fair investigation where investigator interviewed plaintiff and other witnesses and reviewed related records) and *Gupta v. Okla. City Public Schools*, No. 21-6138, 2022 WL 1742048 (10th Cir. May 31, 2022) (unlike here, plaintiff never argued the non-investigation constituted pretext and employer terminated plaintiff based on volume, not truthfulness, of complaints, so lack of investigation did not cause termination).

Defendants' characterization of the investigation as a "full and fair opportunity" for Byrnes to defend himself, Resp., 43, is unsupported by, and contrary to, the record. In fact, Defendants **stipulated** that they never interviewed

Byrnes pursuant to their investigation.[11] App.Vol.1 at 195. Even further, they deliberately hid from him the fact they were conducting an investigation. Bf., 21.

Defendants revisionist-history effort to characterize a perfunctory eight-minute call, initiated by Byrnes, as an "interview" is not only contrary to their stipulation, it is contrary to Green-Cheatwood's testimony that "He just wanted to let me know what was going on," App.Vol.3 at 822. Specifically, he gave her a heads up that: he had received notice of a KBHA complaint filed against him; the allegations in the report were false (without discussing any particulars); the report was made in retaliation for reporting Kessler's sexual harassment; and Hospital records and others who worked with him could refute the allegations. *See id.* at 824; App.Vol.6 at 1559. She did not ask him any questions, and he did not address or respond to the specific allegations. And, even when she informed Gessel of Byrnes' call, she did not share Byrnes' denials or concerns about retaliation with him. App.Vol.3 at 822.

Defendants' reliance on stale allegations Kessler re-asserted in February 2020 regarding alleged peer-review interference years ago as CMO (a role not held since

---

[11] Green-Cheatwood says they did not interview Byrnes because he was represented by counsel and was out of town. App.Vol.5, 1255-57. Sabey says they did not interview Byrnes for the circular and illogical reason that they decided to fire him before the investigation got that far. App.Vol.2 at 324. No evidence supports counsel's legal argument, *see* §I(5), that Defendants did not interview Byrnes because he already had a "full and fair opportunity" to share his side of the story.

July 2019), alleged substandard care in 2015, and alleged "patient abandonment" in 2017/18, further reinforces that this was a sham to dredge up a laundry list of old issues to justify Byrnes' termination. *Benjamin v. Bd. of Trs. Cmty. Coll.*, 810 Fed. App'x 691, 696 (10th Cir. 2020) ("considerable delay—in some cases, years—between the alleged misconduct and the termination could show pretext"); *Garrett*, 305 F.3d at 1218-19 ("inflating and exaggerating long-standing critiques").

Green-Cheatwood's and Sabey's reliance on second-hand rumors is even more egregious given that Green-Cheatwood knew—because Byrnes told her—he could identify witnesses and records to refute the allegations against him. These witnesses, who had first-hand knowledge regarding the allegations, would have made it clear there was no merit to them.[12]  App.Vol.4 at 916, 936-37; App.Vol.6 at 1578-1605. But Green-Cheatwood deliberately failed to follow up to find out who these witnesses were or talk to them, or even tell Byrnes he was under investigation. Defendants admit that not interviewing Byrnes departed from their normal practice

---

[12] Defendants' hearsay objection to some of these statements, Resp., 47 n.12, is baseless. Evidence offered at summary judgment need not be "in a form admissible a trial," so long as its "content or … substance … is admissible," *i.e.*, that a witness' statements is based on personal knowledge. *Bryant*, 432 F.3d at 1122. The witnesses could offer their statements (based on personal knowledge) at trial, so they are admissible here. And, to the extent offered to show that witnesses available to Defendants in February 2020 would have refuted the allegations against Byrnes, if only Defendants had asked them, those statements are not offered to prove the truth of the matter asserted and are not hearsay. Fed. R. Evid. 801(c)(2). Moreover, some of these statements were provided in declaration form.

and procedure, and that they should have interviewed the nurses who worked with Byrnes. Bf., 21-22. Green-Cheatwood even *admits* she avoided witnesses she assumed would support Byrnes, and one witness reported that Green-Cheatwood and Sabey had no interest in speaking to him further and cut-off his interview once it was clear he would not support their desired narrative. App.Vol.4 at 979-83; App.Vol.5 at 1253-54. Green-Cheatwood and Sabey likewise made no effort whatsoever to locate or review Hospital records that also would have disproved Kessler's retaliatory allegations against Byrnes.

A juror may infer from all this evidence that Green-Cheatwood and Sabey conducted an unfair and one-sided investigation, in response to hearsay complaints about Byrnes made by a doctor Byrnes had recently reported for sexual harassment, and they then presented a one-sided story to Lichtenberger and Gessel—which was inconsistent with what the witnesses actually told them, and in which they failed to disclose that they had not interviewed Byrnes or made any effort to look into the evidence he said existed, or that the complaints about Byrnes were being pushed by a doctor with a retaliatory agenda.

The evidence of a pretextual investigation is particularly compelling here because a jury need not speculate as to the outcome of a "full and fair" investigation. After conducting an unbiased investigation, KBHA did not sustain the allegations in the complaint and affirmatively concluded Byrnes satisfied the standard of care in

cases Defendants later reported. App.Vol.6 at 1659-63. Again, a juror may conclude that Green-Cheatwood and Sabey manufactured a one-sided trail of false and exaggerated misconduct as a pretext to fire Byrnes.

### 3.   Close temporal proximity reinforces the inference of pretext.

The close temporal proximity of Byrnes' February 12, 2020, termination with his pre-termination protected activities, which continued through January 30, 2020, reinforces the inference that Defendants gave pretextual reasons to dissemble their retaliatory intent. Bf., 56-58. Defendants do not contest this close temporal proximity, but instead argue that their reasons for firing Byrnes cannot be pretextual for a different timing reason, *i.e.*, because "many of" them were raised by Arroyo, William Freund, and others in April 2019, pre-dating Byrnes' protected activity. Resp., 64. Defendants are wrong for two reasons. First, the reporting doctors did not raise "many of" Defendants' reasons. They raised mostly interpersonal conflicts with Byrnes, and Arroyo mentioned the rumors regarding the 2015 thyroidectomy. App.Vol.6 at 1491-92. Second, viewed in Byrnes' favor, the doctors' April 2019 report ***strengthens*** Byrnes' showing of pretext. *See* §I(2). CEO Taylor told Freund that removing Byrnes from the CMO role would resolve the doctors' April 2019 concerns (which, again, were mostly interpersonal) and Freund (as head of the MEC,

responsible for peer review and Medical-Staff reappointments) agreed.[13] App.Vol.6 at 1491-92. Everyone moved on, and Defendants entered into a new employment contract with Byrnes, and several doctors involved in the April 2019 meeting approved his reappointment to the medical staff. But, after Byrnes made a protected sexual harassment complaint, which riled up Kessler and a few other doctors, Defendants suddenly felt the need to terminate Byrnes immediately, without telling him about the investigation or giving him a chance to tell his side of the story, interviewing witnesses with first-hand knowledge, or letting peer review run its normal course. A jury could infer from this sequence that the rumored patient-care issue was not really a concern, and that Defendants dredged up and exaggerated non-terminable, stale issues as a pretext to fire Byrnes. *See Benjamin*, 810 Fed. App'x at 696; *Garrett*, 305 F.3d at 1218-19.

### 4. The evidence in its totality supports an inference that Defendants' real reason for firing Byrnes was retaliation.

While evidence of changing reasons, false reasons, and an unfair investigation each, standing alone, supports a finding of pretext, the Court must view Byrnes' evidence in its totality, including other evidence that, alone, might not warrant a finding of pretext. *Waggoner,* 2023 WL 2967693, at *3 (quoting *Orr,* 531 F.3d at

---

[13] Taylor never said (and Byrnes does not claim) that he removed Byrnes as CMO **because of** the April 2019 visit, only that this change resolved the concerns.

1215)). Such additional evidence also includes close temporal proximity (addressed above); Defendants' prior, positive evaluations of Byrnes' performance. App.Vol.6 at 1487-88, 1557, 1676-79; *Zuniga v. Boeing Co.*, 133 Fed. App'x 570, 574-75 (10th Cir. 2005); and Defendants' admission that they initiated their (unfair) investigation against Byrnes "solely because of" Kessler's retaliatory complaint to the KBHA. App.Vol.1 at 249. These additional facts reinforce the permitted inference that Defendants' real reason for firing Byrnes was retaliation.

Considering all Byrnes' evidence together, a juror may find that Defendants' stated reasons were pretextual. Therefore, this Court should reverse judgment for Defendants and remand this claim for trial.

### C. The evidence supports Byrnes' post-termination retaliatory-reporting claim and requires a jury trial.

After Defendants fired Byrnes, they continued to retaliate against him by reporting his old cases to KBHA, and judgment on Byrnes' retaliatory-reporting claim should be reversed.

### 1. Byrnes establishes a *prima facie* case of retaliatory reporting by showing allegedly biased persons controlled which cases Defendants reported.

The District Court granted judgment for Defendants after erroneously concluding Byrnes could not make out the third (causation) prong of his *prima facie* case. As explained above, *see* §II(A), Byrnes need only show two facts to satisfy this prong: that allegedly biased decisionmakers (1) knew about his protected activity

and (2) caused the adverse action. Defendants maintain Byrnes cannot show the allegedly biased actors (Green-Cheatwood and Bryan Stucky) caused his cases to be reported to KBHA because independent peer-reviewers assigned SOC ratings that dictated (without any discretion by Green-Cheatwood or Stucky) which cases Defendants reported. Resp., 55. But Defendants ignore the role Green-Cheatwood and Stucky (both of whom knew of Byrnes' protected activities) played in the review process.

There are two separate "but for" causes for reporting Byrnes' cases, and either or both support this claim. On one hand, Green-Cheatwood and Stucky controlled the scope of the outside-review process and the information available to the cat's-paw reviewers, and they used that control to target Byrnes and manipulate outcomes.

- They controlled what information the peer reviewers considered and provided incomplete information, causing Byrnes' cases to be flagged when they otherwise should and would not have been. They did not provide complete medical records or any input from Byrnes or other providers. App.Vol.5 at 1247; App.Vol.6 at 1560. The record shows a fully informed, objective decisionmaker would not have found that Byrnes violated any standard of care. *See* App.Vol.6 at 1615, 1660-63. It further shows this lack of information directly impacted reviewer ratings. For example, for the 2015 thyroidectomy, the reviewers found a "minor

improvement opportunity," but only because the records they reviewed were incomplete. App.Vol.8 at 1955. When KBHA investigated this case with complete information, as supplemented by Byrnes, it found that Byrnes met the standard of care. App.Vol.6 at 1660-63. Thus, a juror may find that Green-Cheatwood and Stucky, as information gatekeepers, caused the peer reviewers to find reportable violations they otherwise would not have found.

- Green-Cheatwood impaired the neutrality of the outside reviewers by specifically calling out Byrnes' (and only his) cases to the head reviewer (Rebecca Vogel) outside the established protocol, including by sharing Bordelon's prior review of the 2019 case. App.Vol.8 at 1966-69. This improperly de-anonymized Byrnes' cases and, a juror may infer, signaled that Green-Cheatwood expected Vogel to find Byrnes did not meet the standard of care. In response, Vogel shared her personal evaluation of several Byrnes' cases with Green-Cheatwood, *id.*, from which a juror may infer that Vogel sought Green-Cheatwood's pre-approval of findings before they were finalized. A juror thus may infer that Green-Cheatwood's extraordinary contact with the head peer-reviewer tainted the reviewers' independence and caused them to look for something in Byrnes' cases they could report as a need for improvement (even if minor).

On the other hand, the outside reviewers' scores were not final or determinative of which cases were reported to KBHA. Stucky still had, and used, discretion to downgrade findings of reportable incidents so that those cases would not be reported. Bf., 35-36 n.11. Stucky, as decisionmaker, caused Byrnes' cases to be reported to KBHA when they otherwise would not have been when he did not allow Byrnes the same opportunity as other doctors to discuss his cases.

- When the reviewers assigned an initial SOC 3 or 4 rating, Stucky typically met with the doctor to understand whether other information outside the sterile medical records might justify downgrading that rating. *See*, *e.g.*, Bf., 35-36 n.11. In fact, Defendants' policies—which cover the review of any case performed by a provider who had privileges at the Hospital[14]—

---

[14] The policies applied, respectively, to the peer review of cases involving "Medical Staff granted privileges to practice at St. Catherine's Hospital," App.Vol.6 at 1636, and "all Physicians … granted clinical privileges at Centura hospitals," including the Hospital, *id.* at 1687. Nothing therein states or implies these policies no longer apply (or apply differently) to such a case after the provider leaves the Hospital. Even if, as Defendants insist, the policies could be read that way, the Court must read them in Byrnes' favor, *i.e.*, as though they applied to peer review of any case by a physician who, at the time of treatment, had Hospital privileges. *See* §I(2). In any event, Defendants' claim that they did not have to interview Byrnes because he no longer had privileges would be further evidence they manipulated the review process to keep Byrnes from defending his cases, because they induced him to resign his privileges by assuring him he was not under any peer-review investigation (even though, unbeknownst to him, Defendants' peer-review plan for his cases was already in place, App.Vol.4 at 884). App.Vol.4 at 922-23, ¶¶ 62-63.

required such an interview.[15] App.Vol.6 at 1637, 1691. But Stucky gave Byrnes no such opportunity. Based on the record (including Joanne Rink's testimony about the 2015 thyroidectomy and the KBHA findings), a jury could find that the reviewers' finding, for example, of a "minor improvement opportunity" on Byrnes' 2015 thyroidectomy case could have been resolved if Byrnes had been allowed to provide Stucky the missing information.

- Stucky treated Byrnes worse than other doctors who had not engaged in protected activities when he reported Byrnes, but not the co-surgeon involved in the 2015 thyroidectomy case. *See* App.Vol.7 at 1954 (KBHA reporting form requires, "Facilities must submit a separate form for each licensee involved"). Citing no evidence, defense counsel previously argued "Byrnes was the surgeon who caused the injuries," and they now argue Defendants had no obligation to report the other doctor because the peer review committee made no findings about that doctor's care. *Id.* at

---

[15] Defendants' claim documents they produced as the peer-review policies in effect from 2016-2020 at the Hospital were not actually in effect, Resp., 69-70, is based on sham testimony outside the record. *See* §I(6). It also ignores the uncontroverted fact that, whether these specific ***documents*** were in effect, the same ***processes*** always had governed peer review. App.Vol.6 at 1531-32; *see also id.* at 1636 (indicating Hospital policy originated in 2004). In any event, Defendants' contrary "evidence" at most creates a fact question for the jury. *See* §I(2).

1737; Resp. 72 n.23. However, there is no evidence at all that the other doctor was even submitted to peer review, and the record does not show that the minor finding based on the absence of documentation in this file was attributed to Byrnes. *See* App.Vol.8 at 1954-55 (no indication who caused the "minor improvement opportunity" attributed to a lack information available to the reviewers). A juror may infer that Stucky reported only Byrnes on this case because he was the only doctor who engaged in protected activity. *Smothers,* 740 F.3d at 540.

This satisfies Byrnes' *de minimis* burden to establish the *prima facie* causation prong, and the District Court's judgment must be reversed.

**2.  The record supports a presumption that Defendants reported Byrnes to KBHA in retaliation for his protected activities.**

While the District Court's analysis stopped at the *prima facie* stage, the record supports a finding that Defendants' stated reasons for reporting Byrnes—that they had no discretion under Kansas law—was not their real reason, meaning that this claim must be submitted to a jury.

First, the evidence supports a finding that the individuals who selected cases to refer to peer review (Green-Cheatwood and Stucky), and the final decisionmaker after cases came back from peer review (Stucky), had retaliatory animus. A juror may infer Green-Cheatwood's animus from the circumstantial evidence of pretext in §II.B, above, as well as the evidence in §II.C.1 that she intentionally targeted

Byrnes during the peer-review process. A juror may infer Stucky's animus from his frank admission that, at the time of the peer review, he "***still had concerns about the fact that Dr. Byrnes had levied … this complaint against Dr. Kessler***, App.Vol.5 at 1438-39 (emphasis added), as well as his involvement in limiting the information available to the peer reviewers and from his disparate treatment of Byrnes when deciding which cases to report, as described in §II.C.1.

Second, Defendants do not establish a legitimate business reason for reporting the 2015 thyroidectomy case to rebut Byrnes' *prima facie* showing. They say they only reported cases rated SOC 3 or 4 under Kansas law, and that each of Byrnes' reported cases was rated SOC 3 or 4. Resp., 70-71. But that is not what the record shows. There is no evidence the reviewers ever assigned this case SOC 3 or 4, only that they assigned it "minor room for improvement" under Colorado standards. Defendants' sole "evidence" is counsel's circular argument that the case must have met the SOC 3 rating definition. Resp., 71-72; §I(5), above. But Vogel testified that the reviewers engaged in "robust discussion" to determine whether even a more-severely-rated "moderate improvement needed" case would justify an SOC 3 or 4 under Kansas standards and that the committee "erred on the side of not making them reportable." App.Vol.2 at 480. This shows Defendants had significant discretion when translating a "minor improvement needed" finding to the Kansas scale. Moreover, the reviewers' findings on the 2015 thyroidectomy do not meet

Kansas' SOC 3 definition. SOC 3 applies when the "standards of care [are] not met …." Resp., 71 (quoting Kan. Admin. Reg. § 28-52-4). While the reviewers found a "minor improvement opportunity," they did not find any failure to meet the standard of care (they found only that they could not tell from the records they reviewed whether the standard was met) and did not attribute this "opportunity" to Byrnes. App.Vol.8 at 1955. Given the absence of any evidence that the reviewers rated this case SOC 3, that the standard of care was not met, or that Byrnes caused any such deviation, and the committees' practice of not assigning an SOC 3 in close cases, a juror could find that Defendants have not established that this case had to be rated SOC 3 and reported to the KBHA under Kansas law (or, alternatively, that Defendants' stated reason is pretextual).

Third, as to each case reported, a juror may find from the evidence described above—(1) reviewers' determination that Byrnes' cases should be rated SOC 3 or 4 was pretextual because Green-Cheatwood and Stucky manipulated the scope of the peer-review protocol, provided only partial information, and tainted the otherwise anonymous and impartial review process; and (2) Stucky's disparate treatment of Byrnes—further supports a finding of pretext and corresponding inference of retaliation.

For all these reasons, this Court should reverse judgment for Defendants on this retaliatory-reporting claim and remand it for trial.

**III.  This Court should vacate the dismissal of Byrnes' supplemental state-law claims and remand for further consideration.**

Defendants do not contest Byrnes' request that, upon reinstating his federal retaliation claims, this Court should vacate the District Court's dismissal of Byrnes' state-law claims, which are part of the same case or controversy as his federal claims. *See* Bf., 63-64; Resp., 72-73. Therefore, when the Court reverses judgment on Byrnes' federal claims, it should vacate the dismissal of his state-law claims (which was predicated on the disposition of the federal claims) and instruct the District Court to reconsider whether to exercise supplemental jurisdiction over them.

## CONCLUSION

This Court should reverse the district court's memorandum and order granting summary on Byrnes' Title VII retaliation claims, vacate the corresponding declination to exercise supplemental jurisdiction and dismissal with prejudice of the state law claims, and remand the Title VII and state law claims to the district court for further proceedings and trial.

Respectfully submitted,

By: /s/ *Boyd A. Byers*
      Boyd A. Byers, Kan. #16253
      Eric Turner, Kan. #25065
      FOULSTON SIEFKIN LLP
      1551 N. Waterfront Parkway, Suite 100
      Wichita, Kansas 67206
      Telephone: (316) 267-6371
      Email : bbyers@foulston.com
           eturner@foulston.com
      *Attorneys for Plaintiff/Appellant*
      *Matthew Byrnes*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Tenth Circuit Rule 32(B), this document contains 6,200 words, as counted by Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Tenth Circuit Rule 32(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in proportionally spaced typeface using the Microsoft Word application of Microsoft 365 Apps for Enterprise in a 14-point Times New Roman serif font.

*/s/ Boyd A. Byers*
Boyd A. Byers

## CERTIFICATE OF SERVICE

I certify that on April 11, 2025, the foregoing Brief was filed electronically with the Clerk of Court using the Court's ECF system. I further certify that all parties required to be served have been served through the Court's ECF system.

If ordered by the Court under Tenth Circuit Local Rule 31.5, hard copies of the foregoing Appellant's Reply Brief will be sent via FedEx for overnight delivery within the prescribed time, addressed to:

> Clerk of the Court
> Tenth Circuit Court of Appeals
> Byron White U.S. Courthouse
> 1823 Stout Street
> Denver, CO 80257

*/s/ Boyd A. Byers*
Boyd A. Byers
